**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | | |
|---|---|---|
| DIANE VOIGT, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No.: 3:23-cv-00286 |
| v. | ) ) | CLASS ACTION |
| LUMEN TECHNOLOGIES, INC., JEFF K. STOREY, INDRANEEL DEV, CHRISTOPHER D. STANSBURY, EDWARD MORCHE, MAXINE L. MOREAU, and SHAUN C. ANDREWS, | ) ) ) ) ) ) ) | COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS |
| Defendants. | ) | DEMAND FOR JURY |

**March 3, 2023**

**LEVI & KORSINSKY LLP**
Shannon L. Hopkins
Gregory M. Potrepka
Morgan M. Embleton LA Bar #35769
Nicholas Lange
David C. Jaynes
1111 Summer Street, Suite 403
Stamford, Connecticut 06905
Tel.: (203) 992-4523
Fax: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
membleton@zlk.com
nlange@zlk.com
djaynes@zlk.com

*Lead Counsel for Plaintiff and the Class*

Plaintiff Diane Voigt ("Plaintiff"), by her attorneys, except for her own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Lumen Technologies, Inc. ("Lumen" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired Lumen common stock between September 14, 2020 and February 7, 2023, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's claims are asserted against Lumen and certain of Lumen's executive officers and directors.

2.      At the outset of the Class Period, Lumen announced it would redefine its business by renaming itself from CenturyLink to Lumen and refining its marketing approach, cutting off market segments and operations that did not align with the Company's strategic objectives and adding market segments that were aligned with the Company's vision.

3.      Specifically, Lumen announced to investors that it would leverage its existing 400,000 route miles of fiber optic cable, which had previously serviced enterprise and wholesale markets, to expand its fiber services to small and medium business ("SMB") and residential or consumer markets. Lumen represented to investors that expanding its fiber services into the SMB

and residential markets, branded as Quantum Fiber, was a natural fit for the Company that represented a strong opportunity for growth.

4.      Throughout the Class Period, Defendants represented to investors and the public that Lumen was, among other things, "investing heavily in our consumer fiber business" and "aggressively taking market share in our small business segment."  Defendants also represented that "we continue expanding our Quantum Fiber footprint and increasing our penetration" and "we're not capital-constrained. So as we continue to improve our penetration and performance, we'll continue to expand our footprint, and we believe we've got a long runway for growth in -- within Lumen in Quantum Fiber."

5.      However, contrary to Defendants' statements touting the rate of investment and progress in expanding fiber services to SMB and residential markets, Lumen was experiencing serious headwinds that were impeding its ability to grow its newly-targeted fiber markets.

6.      Beginning on February 9, 2022, Defendants began to admit that Lumen's expansion into SMB and residential fiber services was occurring slower than previously represented. On this news, Lumen's stock price declined $1.99, from a close of $12.82 per share on February 9, 2022, to a close of $10.83 on February 10, 2022.

7.      On November 2, 2022, Defendants continued to partially disclose the truth when Lumen's Chief Executive Officer admitted, "let me be clear, we are not yet at the pace of build we expect or want" with respect to the Company's development of its Quantum Fiber brand. On this news, Lumen's stock price declined $1.25, from a close of $7.05 per share on November 2, 2022, to a close of $5.80 on November 3, 2022.

8.      By February 7, 2023, Defendants would admit, contrary to what was previously represented, that they had pressed "more of a stop button than a pause button" on Lumen's

investment into the Quantum Fiber network and expansion into the SMB and residential markets while the Company re-evaluated its strategic priorities. The price of Lumen's common stock had been artificially inflated by Defendants' misrepresentations about the Company's progress expanding into SMB and residential markets. Upon the news that Lumen's progress was slower than represented and that Lumen had stopped investing in the expansion of its Quantum Fiber network, the price of Lumen's common stock plummeted as the artificial inflation was removed from the price. On this news, Lumen's stock price declined $1.04, from a close of $4.99 per share on February 7, 2023, to a close of $3.95 on February 8, 2023.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

11.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. Lumen is headquartered in this District, with its principal place of business located at 100 CenturyLink Drive, Monroe, LA 71203.

## PARTIES

13.    Plaintiff Diane Voigt purchased Lumen common stock during the Class Period as set forth herein, and in her certification filed herewith.

14.    Lumen is a corporation, formerly known as CenturyLink, organized and existing under the laws of the State of Louisiana. Its common stock trades on the New York Stock Exchange ("NYSE") and the Berlin Stock Exchange and is traded under the symbols "LUMN" and "CYTH," respectively. Prior to September 18, 2020, when the Company rebranded itself as Lumen, the Company's stock traded on the NYSE under the ticker symbol CTL.

15.    Defendant Jeff K. Storey ("Storey") served as President and Chief Executive Officer ("CEO") of Lumen from the beginning of the Class Period through his departure on November 7, 2022. Lumen abruptly announced Storey's departure on September 13, 2022 and reported that Defendant Storey would remain with Lumen through December 31, 2022 to assist with the transition.

16.    Defendant Indraneel Dev ("Dev") served as the Chief Financial Officer ("CFO") and Executive Vice President of Lumen from the beginning of the Class Period through his termination from Lumen on April 4, 2022.  On March 28, 2022, just six months prior to Lumen announcing the departure of its, CEO Defendant Storey, Lumen abruptly announced that Defendant Dev would be terminated, effective April 4, 2022.

17.    Defendant Christopher D. Stansbury ("Stansbury") served as the CFO and Executive Vice President of Lumen following Defendant Dev's termination, effective April 4, 2022, through present.

18.    At all relevant times, Defendant Maxine L. Moreau ("Moreau") served as Lumen's President of Consumer Markets Division.

19.     At all relevant times, Defendant Shaun C. Andrews ("Andrews") served as Lumen's Executive Vice President and Chief Marketing Officer.

20.     At all relevant times, Defendant Edward Morche ("Morche") served as Lumen's President of North America Enterprise and Public Sector.

21.     Storey, Dev, Stansbury, Moreau, Andrews, and Morche are collectively referred to herein as the "Individual Defendants."

22.     Lumen and the Individual Defendants are collectively referred to herein as "Defendants."

**RELEVANT NON-PARTIES**

23.     Kate Johnson ("Johnson") served as President and CEO of Lumen from November 7, 2022, following the termination of Defendant Storey, through the end of the class period.

**CONTROL PERSON ALLEGATIONS**

24.     By reason of the Individual Defendants' positions with the Company as executive officers, the Individual Defendants possessed the power and authority to control the contents of Lumen's annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them, but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then

6

materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### I.      Background

25.      Lumen purports to be an international facilities-based technology and communications company focused on providing its business and residential customers with an array of integrated products and services necessary to fully participate in a rapidly evolving digital world. Lumen purports to operate one of the world's most interconnected networks that empowers its customers to rapidly adjust digital programs to meet immediate demands, create efficiencies, accelerate market access, and reduce costs – allowing customers to rapidly evolve their information, communications, and technology programs to address dynamic changes.

26.      Throughout the Class Period, the Company's service offerings included providing fiber infrastructure delivering high-bandwidth telecommunication services, primarily under the Quantum Fiber and Lumen brands. Specifically, Quantum Fiber is Lumen's brand for fiber-based services to residential and small business customers, and whereas the Company does business as Lumen when serving enterprise and wholesale markets. In addition to the Company's emerging fiber business, Lumen provides mass-marketed legacy copper-based services under the CenturyLink brand.

### II.      Defendants' Material Misrepresentations and Omissions

27.      The class period begins on September 14, 2020 when the Company, formerly known as CenturyLink, announced in a press release published on its Investor Relations webpage that it would be rebranding itself as Lumen and stated that it had launched "Quantum Fiber," which it described as "a fully digital platform for delivering fiber-based products and services to residents

and small businesses." The Company further stated that "Quantum Fiber will use the Power of Lumen's extensive fiber network and infrastructure."

28.     In connection with the Company's renaming from CenturyLink to Lumen, the Company's stock ticker symbol on the NYSE changed from CTL to LUMN, effective with the opening of the trading day on September 18, 2020.

29.     Soon after the Company announced the launch of Quantum Fiber in September 2020, Lumen began communicating to the investing public that the Company had carefully considered plans to invest in and grow its Quantum Fiber brand. During an earnings call on November 4, 2020 with investors to discuss the Company's financial and operating results for the third fiscal quarter of 2020, Defendant Storey touted Quantum Fiber's launch and overstated the Company's relevant growth plan, emphasizing that the growth plan included a leadership team focused on growing the consumer and small business markets:

> As you can see on Slide 6, while Lumen is the name of our company and our flagship brand for serving enterprise and wholesale markets, we also launched Quantum Fiber. Quantum Fiber is our brand for serving fiber-based services to small business and consumer customers. And just as with Lumen enterprise customers, we're offering our Quantum customers a simplified, highly digital customer experience with expanded tools for managing the Quantum platform with mass market efficiency.
>
> As we continue deploying Quantum Fiber services to the small business segment, **we intend to utilize our more than 170,000 on-net, fiber-fed buildings as a starting point, targeting small businesses in tens of thousands of existing buildings. We know that bandwidth is critical for these customers, and our simple, resilient, all-digital Quantum services are well positioned to meet those needs. While Lumen's primary focus is enterprise, we have a dedicated leadership team whose sole focus is to leverage our Quantum investments to grow the consumer and small business markets.**

30.     During that same call, Defendant Dev assured analysts that the Company was "**investing in the products and services that support the Lumen platform.  We also continue to invest in expanding our fiber footprint** and our digital customer and employee experience."

8

31.     Reiterating the Company's commitment to focus on Quantum Fiber, Defendant Storey further stated in response to an analyst question that "*from a going-forward perspective, we think that the products, the capabilities that we're layering on top of the great fiber and network infrastructure that we have in place today really position us to grow revenue, and we'll continue to focus on that*."

32.     During a Company conference presentation by Lumen's Chief Technology Officer on December 2, 2020, Defendant Dugan assured investors that "*we have been investing heavily in our consumer fiber business*," "*I think the combination of a great service and a great experience [with respect to Quantum Fiber] will absolutely let us win*," and that *investing between four main categories of fiber are "all relatively significant investments for us*."

33.     During a January 6, 2021 Citi Global TMT West Conference with the Company presented by Defendant Morche, President of Lumen's North American Enterprise and Public Sector Group, Defendant Morche touted Lumen's success with and continued investment in Quantum Fiber:

> Portions of our IGAM business are doing the same thing. And also want to call out our Quantum Fiber business in the consumer organization. We added 46,000 gig customers last quarter alone. *So we're seeing really good pockets of growth. And it's going to happen piece by piece as we continue to drive the business forward and invest more.* So that's kind of on the operating side.

34.     During the prepared remarks of an earnings call on February 10, 2021 with investors to discuss the Company's financial and operating results for the fourth fiscal quarter of 2020, Defendant Dev touted Quantum Fiber's growth opportunity:

> In addition to fiber-enabled locations, we are now reporting fiber subs and ARPU. *Quantum Fiber represents a growth opportunity for us along several fronts. Fiber-enabled homes are less than 15% of our footprint, and we continue to invest with our micro-targeting strategy. Given that a significant number of enabled units were added in the past couple of years, driving up penetration represents a near-term addressable market opportunity. Moreover, we have*

*deemphasized low-speed offerings over fiber, and our typical new sales ARPU now is generally higher than our base, representing another potential opportunity to improve the business.* Finally, we are breaking out SBG broadband, which until now hasn't been a large focus for us, and we expect to improve the trajectory like we have for consumer broadband.

35.     At that same earnings call, Defendant Storey reiterated Lumen's confidence in Quantum Fiber in response to an analyst's question, stating:

*And I'll just add, from a market perspective, we're super excited about our Quantum Fiber brand and the capabilities that we bring to the market. The digital experience is, in my opinion, second to none where our NPS scores reflect a very high satisfaction, the quality of the product, the bidirectional nature of the product and the symmetry of that capacity, the peering networks that we tie that into. We're extremely excited about the capabilities that we give to the customers and their acceptance of it.*

36.     During an Analyst/Investor Day presentation on April 7, 2021, Lumen's President of Consumer Markets Division, Maxine L. Moreau, during prepared remarks, assured investors of Quantum Fiber's success to date and Lumen's committed ongoing investment:

Hi. I'm Maxine Moreau, President of Mass Markets at Lumen. As Jeff mentioned, I'm here today to explain the excitement around Quantum Fiber Mass Markets platform for future growth. *This new digital platform is rapidly improving many aspects of our business and is foundational for growing fiber customers, increasing ARPU, improving customer experience and reducing churn.*

The past year accelerated an ongoing trend. More people are working from anywhere, learning from home, streaming video and using data-intensive applications like online gaming and virtual reality. We have seen a shift in how we consume video and leverage IoT technology for smarter and safer homes. Consumers and small businesses require safe, reliable, high-bandwidth broadband and with fast download and upload speeds.

*Quantum Fiber can deliver that now and into the future as these trends continue.* Quantum Fiber is uniquely positioned to fulfill that demand by delivering fiber-based broadband services to our consumer and small business customers in a unique and distinct way, one that gives customers freedom, control, confidence and security they need to power their personal and professional lives.

With cable's asymmetrical speed, upload speeds are often far slower than their download speeds, impacting the quality of file uploading, video conferencing, online gaming and other data-intensive applications. Quantum Fiber broadband can

10

deliver symmetrical speeds, creating a compelling value proposition for a large and growing part of the market, leveraging Lumen's highly secure, reliable and vast fiber network coupled with our fully digital-enabled customer experience.

We can differentiate Quantum Fiber against our competitors and the industry, and our customers are starting to tell us that. Quantum Fiber is a reinvented digital approach for customers, a simplified digital experience with a transformed customer success and support model.

We review the entire customer life cycle to eliminate pain points and friction, increase the ease of use and simplify the process from first touch to support. A Quantum Fiber customer's bill looks as simple as your monthly Apple subscription notice, 100% prepaid subscription-based pricing with flexible payment options, including Apple Pay and PayPal with more to come. Since we began launching Quantum Fiber, we have eliminated over 50% of human interactions with our new digital platform.

It's not enough to have an amazing platform, we must also deliver results. ***In 2020, we expanded our fiber footprint by 400,000 locations. We've committed to future footprint expansion using our micro-targeted urban densification focus and disciplined approach that benefits multiple Lumen business units and customer segments. With urban densification, we can take advantage of many efficiencies in fiber enablement from planning to market readiness and achieve higher sales through targeted digital and local marketing tactics***.

***In one of our top Tier 1 markets, we are already 40% fiber-enabled and plan to continue our expansion in dense urban clusters. We are also leveraging Lumen's on-net buildings to grow our small business market share and connect MDUs and MTUs that are near net to our national fiber footprint***. 100% of our sales are through online ordering, delivering an amazing customer experience, reducing order cancellation rates before install and lowering operating expenses associated with poor traditional service ordering.

***Fiber is delivering a 20% reduction in run rate-level churn over historical levels, improving revenue and margin trends***. Quantum Fiber eliminates complexity and enhances the support model for our customers. Our customers are loving the simplicity, ease of use and service that it provides. As a result, we are seeing significant improvement in the customer experience measured by Net Promoter Score. Our 2021 year-to-date aggregate NPS scores for Quantum Fiber customers is at positive 76, higher than Amazon or Apple. As you know, NPS scores above 50 are considered excellent.

We are also seeing a 50% reduction in churn before install from our enhanced communications and delivery processes. With an all-digital platform, superior fiber broadband service and the early successes we are seeing, what should you expect from Quantum Fiber in the future? ***Future investments will continue to focus on***

*driving urban densification using our micro-targeted approach. With over 23 million living units and small businesses in our footprint, we have a vast footprint to select from to grow our fiber enablement. We have the ability to operate outside our footprint anywhere Lumen's fiber is in proximity to MDU and MTU developments.*

*Next, we are aggressively taking market share in our small business segment, especially with MTUs located in dense markets where we have fiber-lit buildings. In the first quarter, we are seeing a fourfold year-over-year improvement in small business fiber broadband net adds. With approximately 2.4 million locations fiber-enabled and 28% fiber penetration rate at year-end, we have a significant future growth opportunity with the investments we have already made. We expect to complete the launch of Quantum Fiber across all markets during 2021.*

With that comes our enhanced go-to-market, including local market accountability to drive growth at the neighborhood or building level, micro-targeted sales and marketing efforts and a differentiated world-class customer experience. As we grow fiber penetration, we have a path to continue growing customer ARPU. We are bringing to market products and services such as fully managed WiFi and other advanced services that enable growth in wallet share, pull-through additional fiber sales and enhance the overall experience.

*Finally, we plan to deliver sustained growth with Quantum Fiber well into the future by growing our market share, footprint, revenue and customer ARPU.* Thank you for your time.

37.     During that same investor day presentation, Defendant Storey reiterated in prepared

remarks similar assurances to analysts:

The bottom line is we are investing in a unique platform of capabilities and solutions. *We are attracting new customers and growing our base. The industry is recognizing this, and our shift to delivering application technology is only going to accelerate. On the mass market side of our business, we're excited about Quantum Fiber and our fiber-based services to consumers and small businesses. We believe our fiber-to-the-premises technology is superior to any wireless or HFC-based offerings of our competitors now or in the future.*

The symmetrical nature of our fiber-to-the-premises solutions deliver differentiated performance for work from anywhere, remote education and similar use cases. *As you know, we continue expanding our Quantum Fiber footprint and increasing our penetration.* Our blended penetration of new and previous builds is almost 30%. *To me, the existing penetration rate validates our Quantum Fiber strategy and represents an opportunity as we continue to drive penetration higher.*

38.     Also during that same investor day presentation, Defendants Storey and Moreau

answered an analyst's questions concerning the penetration of Quantum Fiber as follows:

Analyst:

Great. My question is on Quantum Fiber. Maxine, I wonder if you could talk a little
bit about the right penetration. Do you think you can split the market 50-50 with
the cable provider or the other providers? And what are you seeing in some of your
best markets? And how long do you think it gets there?

[…]

Defendant Storey:

Sorry, thought I had already done that. Before handing it off to Maxine or Neel, let
me talk about our fiber-to-the-home strategy and what we're going to do. Maxine
touched on the fact that we want to have an urban densification in our fiber-to-the-
home. We think it's a great opportunity. ***And we continue to invest in that. And
we've proven over the last couple of years that where we invest, we can grow,
where we invest, we can drive penetration.***

***And so I'll continue to focus Maxine and her team as she is on how do we
increase the penetration in the markets where we are, but then also how do we
continue to use our micro-targeting efforts to expand our footprint. We think
there's tremendous opportunity for us.*** But we also don't view it just as a fiber
solution. If you listened to Maxine, it's the overall digital experience of Quantum
Fiber that we bring to our customers, the way they buy our services, the way they
consume our services, the way we deliver them, the way we secure them and make
them robust for our customers.

***And so we'll continue to heavily invest in that. We think that we're investing at
approximately the right pace. We'll probably pick up speed as we move forward.***
But we've been making sure that we deliver on the value proposition, we get the
return on investments and that we're able to drive the penetration. ***And what
Maxine and her team have done have proven all of that strategy to us.*** So with
that, I'll hand it over to Maxine if you want to make any more comments.

Defendant Moreau:

Thank you, Jeff, and thanks for the question, Simon. I would say we don't have a
ceiling target. We believe that our fiber product is superior to any wireless solution,
wired fiber. Our fiber-first strategy is our focus and will continue to be our focus.
And Neel has been very clear. ***We don't -- we're not capital-constrained. So as we
continue to improve our penetration and performance, we'll continue to expand***

*our footprint, and we believe we've got a long runway for growth in -- within Lumen in Quantum Fiber.*

39.     During a presentation by Lumen's Chief Marketing Officer on September 13, 2021, Defendant Andrews reassured investors that recent changes at Lumen are "congruent with our focus and aligned with our focus on really investing where we can grow and focusing on the Quantum Fiber experience in Mass Market and then the growth aspects of Enterprise."

40.     During that same presentation, Defendant Andrews detailed Lumen's plans for Quantum Fiber to "win back market share" in the small and medium business marketplace:

> So first and foremost, *having a fiber experience wrapped with security with 2-way speeds that are differentiated and superior to the cable experience is one way that we can drive growth in the mid-market*. Second is partnering with best-in-breed unified communications providers. So we have a strong relationship with Zoom and Cisco and Teams. And our ability to bring that high-speed 2-way fiber connectivity, rapid security tied with a Zoom experience, tied with the Team experience, tied with Cisco and bring the SIP Trunking, all in one experience for that mid-market customer in a way that they can consume digitally, that's differentiated.

41.     Defendant Andrews went on to confirm that Lumen will equally target the consumer mass market:

> And early on when we were looking at the Mass Markets opportunity, *we were clear. We're going to invest where we can grow, and we're going to invest where we can grow with fiber, and Maxine has done a fantastic job with that. Now we have Quantum Fiber in the marketplace, where not only do you get a fiber experience, but it's all digital and seamless and quick*.

42.     Defendant Andrews also confirmed that Lumen was "extremely focused" on growing Quantum Fiber, and that part of Lumen's prior divestitures were made to focus Lumen on areas that are "really ripe for further investment and growth":

> *That further investing in growth opportunities* is not only along the lives of edge compute and connected security and unified communications, *but it's also within Quantum Fiber and Mass Market. So there is an opportunity for us to grow there*. We do have our line -- our eyes set on where that is. *And we are extremely focused, and part of the transaction with Apollo was really to cleave off the part where we*

14

*weren't going to invest and grow and leave us with the part that's really ripe for further investment and growth*.

43.     The statements in paragraphs ¶¶27-42 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) various headwinds were impeding the Company's ability to invest in and grow its Quantum Fiber brand; (ii) Quantum Fiber was not progressing as was represented to the investing public; (iii) Lumen's management was reassessing its strategic priorities and had placed a hold on the plans to quickly scale up the Quantum Fiber brand; and (iv) as a result of Lumen's decision to delay expansion of Quantum Fiber, the Company's results and metrics were negatively impacted and the scaling up of Quantum Fiber would not occur until, at the earliest, the end of 2023. As a result of the foregoing, Lumen's public statements were materially false and misleading at all relevant times.

### III.     The Truth Emerges In A Series Of Partially Corrective Disclosures

44.     On February 9, 2022, during a conference call to discuss the Company's financial and operating results for the fourth fiscal quarter and full year ended December 31, 2021 (the "Q4 2021 Conf. Call"), Lumen's CEO, Defendant Storey, revealed the negative effects of stressed supply chains on Lumen's operations:

> Both enterprise and mass market supply chains are stressed, and we continue working very closely with our diverse and valued suppliers to mitigate risk as we execute on our growth objectives. In addition, we're managing through this inflationary environment and, with some exceptions, do not expect pricing pressures to impede our goals.

45.     During that same conference call, Defendant Storey confirmed that those supply chain obstacles negatively impacted operations regarding Quantum Fiber in response to analyst questioning:

**Simon William Flannery**
*Morgan Stanley*

So good to hear on the Quantum Fiber revenue growth and the build plans. I guess on the build plans, should we think about the -- I think you did 400,000 this year. Should we think about the 1 million this year as being fairly linear? Or is it still very much second half loaded, I guess, to get to that 1.5 million to 2 million? ***And I guess the question is why not go faster***? We've obviously seen the infrastructure bill award a lot of funding. We've seen fixed wireless gain some traction here. So if you see the opportunity here, you've got obviously a lot of homes with potential. ***So what's keeping you from accelerating that pace***? And then, Neel, just one on taxes. I saw you highlighting, I think, $100 million of cash taxes. But what should we be thinking about run rate cash taxes once the transactions are complete in terms of the ongoing -- as a sort of a full taxpayer? Does that go up a few hundred million as we get out of '22 and to '23?

**Defendant Jeffrey K. Storey**
*CEO*

***So Simon, on the build plan for Quantum Fiber, it's not going to be linear. It takes a while to ramp these capabilities, to do the engineering, to make sure that we've got the construction resources in place. So it's not going to be linear*** but it's not going to be fully back-end loaded either. We're already at a pace of, call it, 400,000, 500,000 homes and business locations. So there's going to be that as a starting point, but we'll get to the full 1 million toward the end of the year, obviously. ***So it's a little back-end loaded*** but not substantially.

What keeps us from going faster? This is hard work. It's hard work. There's a lot of things to do. We want to make sure that we do it right. We're exceptionally good at building networks and we will continue to do that with the Quantum Fiber build, ***but there's hard work. And we also have supply chain challenges.*** And I mentioned that in the prepared remarks. ***I don't want to overemphasize it but it's an issue, and we see it with equipment vendors and chips and them getting access to chips. So we'll continue to manage that, but that's also a constraining factor on how to accelerate faster.*** Now the main point is we want to accelerate to a point of 1.5 million to 2 million homes by the end of the year. So we want to be on that run rate finishing the year and going into 2023. And that's really a large effort to make sure that we do go as fast as we possibly can.

46.    On this news, Lumen's stock price declined $1.99, *or more than 15.5%*, from a close of $12.82 per share on February 9, 2022, to a close of $10.83 on February 10, 2022.

47.    On November 2, 2022, during a conference call to discuss the Company's financial and operating results for the third fiscal quarter and nine months ended September 30, 2022, Lumen's CEO, Defendant Storey, further revealed delays in the Quantum Fiber build:

> I'd like to talk more specifically about our digital transformation and the foundation we laid for our business going forward. ***Digital transformation is not a destination, but it's a journey***. I'm very pleased with the significant strides we've made in driving simplicity and automation into our business. We are now easier to do business with, have greater efficiency and are evolving the way our customers interact with and experience our capabilities.
>
> Our customer experience is better than ever and continues to improve as demonstrated by our very high NPS and customer e scores for both Quantum Fiber and the upper end of our enterprise customer base. ***Although not yet where we want to be***, our results with our mid-market customers clearly show ***we're making progress*** there as well.
>
> As I say to our team all the time, ***we have much more to do***, and I'm incredibly proud of their accomplishments so far. Top line growth is our principal focus, but ***we cannot overstate the importance of these transformation efforts in delivering the experience our customers want and driving the efficiencies we need to grow the profitability of our business***.

48.    Furthering the admission that Lumen's Quantum Fiber was "not yet where we want to be" and that the Company has "much more to do," Defendant Storey continued:

> We have a powerful and robust fiber network complemented with an increasingly deep set of adjacent capabilities like orchestration, interacting with our customers' businesses via machine-to-machine applications rather than phone calls or e-mails. ***The market for these capabilities is still in the early stages of growth*** that I believe the ***foundation to Lumen to be a market leader has been laid and the opportunity for growth is significant***.
>
> On the Mass Markets side, we have ramped our investment in the Quantum Fiber footprint and our all-digital service delivery platform. We've doubled the number of new enablements per quarter over last year. ***So let me be clear, we are not yet at the pace of build we expect or want***. We will continue to ramp our enablements and overcome the supply chain, labor and inflationary constraints we've seen.

49.    During that same conference call, Lumen's CFO, Defendant Stansbury, also admitted that "we slowed some of our [digital] transformation efforts" while undertaking a series of divestiture transactions.

50.    During the question and answer segment of the earnings call, a J.P. Morgan analyst asked "what's holding this [fiber build] back" and "[w]hat's your potential to accelerate from here?" Defendant Storey replied to the analyst:

> If you look at our fiber enablement, ***we're not doing it as fast as we want to do***. So let me lead with that. ***We're not doing it as fast as we want to be deploying new enablement***. There are a lot of things that go into that supply chain constraints, labor shortages, inflationary pressures and those types of things. And we'll continue to work through those. So I'm not terribly worried about it, but we'll work through them.

51.    On this news, Lumen's stock price declined $1.25, ***or more than 17.7%***, from a close of $7.05 per share on November 2, 2022, to a close of $5.80 on November 3, 2022.

52.    On February 7, 2023, during a conference call to discuss the Company's financial and operating results for the fiscal quarter and full year ended December 31, 2022 ("Q4 2022 Conf. Call"), Lumen's new CEO, Kathleen Johnson stated in relevant part:

> ***Second, let's talk about our Quantum pacing. As we've said previously, we hit the pause button during the fourth quarter. Now to be frank, it was more of a stop button than a pause button, which impacted our Quantum metrics for the quarter.*** That said, the evaluation we undertook was absolutely critical to position Quantum for long-term success. By focusing on all metrics and not just the location enablement goal, we've established a higher IRR, more predictable long-term outcome for this exciting project.
>
> A natural outcome of our assessment of Quantum is a more focused build target where we're able to achieve proper returns for shareholders. We believe the overall Quantum enablement opportunity is 8 million to 10 million locations. ***The engine is revving back up, and we're aggressively working to ramp our build activities in 2023.*** And to that end, we made an important change during the fourth quarter to separate our operational activities like planning, engineering and all field operations between mass markets and business.
>
> Maxine Moreau, our President of Mass Markets, now has top to bottom operational and P&L responsibilities. ***This is a significant change internally that I expect will***

*improve our Quantum deployment pacing, but it will take time to reach scale.* My expectation is that later this year, you'll see significant improvement in our execution on enablement.

53.     During that same call, Defendant CFO Stansbury further explained the delays in

Quantum Fiber expansion:

As Kate discussed, *we have made significant changes in how we are approaching the Quantum Fiber opportunity*. This was a thoughtful evaluation that will result in a significant improvement in long-term shareholder value. That said, *our location and subscriber results were impacted by the pause we had in place through our evaluation. This change in strategy will continue to impact Quantum metrics until we get to scale with our new plan, which we expect to occur late this year*. During the quarter, total enablements were approximately 97,000, bringing the total enabled locations to over 3.1 million as of December 31. During the quarter, we added 19,000 Quantum Fiber customers, and this brings our Quantum Fiber subscribers to 832,000.

54.     On this news, Lumen's stock price declined $1.04, *or more than 20.8%*, from a

close of $4.99 per share on February 7, 2023, to a close of $3.95 on February 8, 2023.

## ADDITIONAL SCIENTER ALLEGATIONS

55.     As alleged herein, Defendants acted with scienter in that they knew that the public

documents and statements issued or disseminated in the name of the Company were materially

false and misleading; knew that such statements or documents would be issued or disseminated to

the investing public; and knowingly and substantially participated or acquiesced in the issuance or

dissemination of such statements or documents as primary violations of the federal securities laws.

As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information

reflecting the true facts regarding Lumen, their control over, and/or receipt and/or modification of

Lumen's allegedly materially misleading statements and/or their associations with the Company

which made them privy to confidential proprietary information concerning Lumen, participated in

the fraudulent scheme alleged herein.

56.     Further, the abrupt departure of both Lumen's CEO and CFO in such a short time supports a strong inference of Defendants' knowledge, recklessness, and/or scienter with respect to the problems facing Lumen's Quantum Fiber brand expansion.

## LOSS CAUSATION

57.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Lumen's common stock and operated as a fraud or deceit on Class Period purchasers of Lumen common stock by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Lumen's common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Lumen common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

58.     At all relevant times, the market for Lumen's common stock was an efficient market for the following reasons, among others:

a)      Lumen common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b)      Lumen filed periodic public reports with the SEC and the NYSE; and

c)      Lumen regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

59.     As a result of the foregoing, the market for Lumen's common stock promptly digested current information regarding Lumen from all publicly available sources and reflected such information in the prices of the common stock. Under these circumstances, all purchasers of Lumen common stock during the Class Period suffered similar injury through their purchase of Lumen common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

60.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Lumen who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

61.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Lumen common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their

families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

62.    The members of the Class are so numerous that joinder of all members is impracticable, since Lumen has more than a billion shares of stock outstanding and because the Company's shares were actively traded on the NYSE. As of February 21, 2023, Lumen had more than 1.001 billion shares issued and outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

63.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a)     whether the Exchange Act was violated by Defendants;

(b)      whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e)     whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f)      whether the price of Lumen common stock was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g)      whether the members of the Class have sustained damages as a result of the decline in value of Lumen's stock when the truth was revealed, and if so, what is the appropriate measure of damages.

64.      Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

65.      Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

66.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of
### the Exchange Act and SEC Rule 10b-5
### (Against All Defendants)

67.      Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

68.      This Count is asserted by Plaintiff on behalf of herself and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

69.      During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public,

including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Lumen's common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Lumen's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

70.     Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain artificially high market prices for Lumen's common stock in violation of Section 10(b) of the Exchange Act and Rule 10-5.

71.     As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded common stock would be based on truthful, complete, and accurate information. Defendants' material misrepresentations and omissions as set forth herein violated that duty.

72.     Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff

and the Class. Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

73.     As a result of Defendants' fraudulent activity, the market price of Lumen was artificially inflated during the Class Period.

74.     In ignorance of the true financial condition of Lumen, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Lumen containing the misleading information, purchased or otherwise acquired Lumen's common stock at artificially inflated prices during the Class Period.

75.     Plaintiff and the Class's losses were proximately caused by Defendants' active and primary participation in Lumen's scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiff and other members of the Class purchased Lumen's stock in reliance on the integrity of the market price of that common stock, and Defendants manipulated the price of Lumen's common stock through their misconduct as described herein. Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of Lumen.

76.     Throughout the Class Period, Defendants were aware of material non-public information concerning Lumen fraudulent conduct (including the false and misleading statements described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

77.     As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Lumen common stock during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

78.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

79.     During the Class Period, the Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Plaintiff and other members of the Class had no access to such information, which was, and remains solely under the control of the Defendants.

80.     The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with

copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

81.     The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Lumen's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, the Individual Defendants are responsible for the accuracy of Lumen's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations contained herein.

82.     The Individual Defendants acted as controlling persons of Lumen within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Lumen to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Lumen and all of its employees. As alleged above, Lumen is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

83.     As a direct and proximate result of the wrongful conduct of Lumen and the Individual Defendants, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

(A)     Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class and Levi & Korsinsky, LLP as Class counsel;

(B)     Awarding Plaintiff and the members of the Class damages, including interest;

(C)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees; and

(D)     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 3, 2023.                              Respectfully submitted,

*/s/ Morgan M. Embleton*
**LEVI & KORSINSKY LLP**
Shannon L. Hopkins
Gregory M. Potrepka
Morgan M. Embleton LA Bar #35769
Nicholas Lange
David C. Jaynes
1111 Summer Street, Suite 403
Stamford, Connecticut 06905
Tel.: (203) 992-4523
Fax: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com

membleton@zlk.com
nlange@zlk.com
djaynes@zlk.com

*Counsel for Plaintiff*