UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| In re LUMEN TECHNOLOGIES, INC. SECURITIES LITIGATION | Civil Action No. 3:23-cv-00286-TAD-KDM |
| | CLASS ACTION |
| | Judge Terry A. Doughty<br>Magistrate Judge Kayla D. McClusky |
| | DEMAND FOR JURY TRIAL |

**AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ....................2

II. JURISDICTION AND VENUE ....................6

III. PARTIES ....................7

A. Plaintiffs ....................7

B. Defendants ....................7

C. Relevant Non-Parties ....................9

D. Confidential Witnesses ....................9

IV. FACTUAL ALLEGATIONS ....................11

A. High Speed Internet Services Background ....................11

B. Defendants Were Facing a Dying Legacy Technology Business and a Changed Telecommunications Landscape ....................12

C. CenturyLink Rebrands Itself and Launches Quantum Fiber ....................13

D. Lumen Touts Its Net Promoter Scores to Assuage Concerns ....................17

E. Lumen Touts Its Financial Planning for the Fiber Buildout ....................19

F. Defendants Systematically Generate and Utilize Biased Data and Unsupported Financial Metrics ....................20

G. Former Employees Further Confirm that Defendants Hid Quantum Fiber Issues ....................22

H. The Fraudulent Scheme Begins to Unravel and Lumen's CEO and CFO Abruptly Depart ....................23

I. Defendants' Post Class Period Statements Confirm That Defendants' Class Period Statements Were False and Misleading ....................25

V. DEFENDANTS' CLASS PERIOD MATERIAL MISREPRESENTATIONS AND OMISSIONS ....................27

A. Defendants' Material Misrepresentations and Omissions in 2020 ........................28

B. Defendants' Material Misrepresentations and Omissions in 2021 ........................33

1. Defendants Continue to Tout Lumen's Efficient Investment in and Growth of Quantum Fiber ........................33

2. Defendants Announce that Lumen Will Ramp Up Quantum Fiber Builds ........................37

C. Defendants' Material Misrepresentations and Omissions in January 2022 ........................42

D. Defendants' Material Misrepresentations and Omissions Are Partially Corrected on February 9, 2022 ........................44

E. Defendants' Material Misrepresentations and Omissions Are Partially Corrected on March 8, 2022 ........................46

F. Defendants' Additional Material Misrepresentations and Omissions in 2022 ........................47

G. Defendants' Material Misrepresentations Are Partially Corrected on November 2, 2022 ........................56

H. Defendants Continue to Make Material Misrepresentations and Omissions ........................57

I. Defendants' Material Misrepresentations and Omissions Are Partially Corrected on February 7, 2023 ........................61

VI. ADDITIONAL EVIDENCE OF SCIENTER ........................62

A. Quantum Fiber Was a Core Operation at Lumen, Supporting a Strong Inference of Scienter ........................62

B. The Sudden Departures of the Company's CEO and CFO Support a Strong Inference of Scienter ........................68

C. Defendants' Certifications Pursuant to the Sarbanes-Oxley Act of 2002 Demonstrate Scienter ........................70

VII. SCHEME LIABILITY ........................71

VIII. LOSS CAUSATION ........................71

IX. CONTROL PERSON ALLEGATIONS ........................77

X. APPLICABILITY OF PRESUMPTION OF RELIANCE ........................79

XI. INAPPLICABILITY OF SAFE HARBOR ........ 81

XII. CLASS ACTION ALLEGATIONS ........ 81

XIII. COUNTS ........ 84

COUNT I ........ 84

Violation of § 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ........ 84

COUNT II ........ 85

Violation of § 20(a) of the Exchange Act Against the Individual Defendants ........ 85

XIV. PRAYER FOR RELIEF ........ 86

XV. JURY DEMAND ........ 87

This is a federal securities class action on behalf of all persons and entities that purchased or otherwise acquired Lumen Technologies, Inc. ("Lumen" or the "Company," formerly known as CenturyLink) common stock between September 14, 2020 and February 7, 2023, inclusive (the "Class Period"), and were damaged thereby (the "Class"), against: (i) Lumen; (ii) former President and Chief Executive Officer ("CEO") Jeffrey K. Storey ("Storey"); (iii) former Chief Financial Officer ("CFO") and Executive Vice President ("EVP") Indraneel Dev ("Dev"); (iv) CFO and EVP Christopher D. Stansbury ("Stansbury"); (v) President of Mass Markets Maxine L. Moreau ("Moreau"); (vi) former Chief Marketing Officer and EVP Shaun C. Andrews ("Andrews"); (vii) Chief Technology Officer Andrew Dugan ("Dugan"); and (viii) Senior Vice President, Sales and Marketing, Consumer Markets Wes Gibson ("Gibson") (collectively "Defendants"), for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and United States Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

Lead Plaintiffs George Sanchez ("Sanchez"), Douglas and Barbara Evans, Individually, and as Trustees of the Douglas P. Evans Living Trust U/A Dated 08/24/2010 (collectively, "Evans") and Plaintiff Dale Brown, (and collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned counsel, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts and upon investigation as to all other matters conducted by and through their counsel, which included, among other things, a review of SEC filings by Lumen, transcripts of Lumen's public conference calls, press releases issued by the Company, media reports about the Company, and interviews with third parties conducted by attorneys and/or investigators retained by attorneys. Plaintiffs' investigation of the facts

underlying this action continues, and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This case concerns a straightforward effort by Defendants to intentionally engage in a fraudulent scheme to mislead the market over several years about Lumen's widely publicized expansion of its fiber optics operations. For years, Lumen's (then CenturyLink's) antiquated business of providing customers with ever more outdated telecommunications services had resulted in declining earnings and revenue and caused the Company to be one of the worst performing stocks in the S&P 500. To reverse the Company's stock price slide and save their jobs, Defendants decided to pull one of the oldest tricks in the book: They would "rebrand" and sell investors on a "bold new purpose."

2. Defendants' fraudulent scheme began on the first day of the Class Period when Defendants announced that CenturyLink would be renamed "Lumen Technologies," a company that would "lead [its customers] through the challenges and opportunities of the 4th Industrial Revolution." The cornerstone of their bold vision for the future of the Company, Defendants claimed, was their new "Quantum Fiber"—a "fully digital platform" of fiber-based high speed internet products and services to residents and small businesses.

3. Defendants touted the importance of Quantum Fiber to the rebranded Company, claiming that "we expect that future performance will be largely driven by our execution around our fiber to the home investment strategy in driving up penetration of our competitive assets[,]" that "we have a dedicated leadership team whose sole focus is to leverage our Quantum investments to grow the consumer and small business markets[,]" and "Quantum Fiber represents a growth opportunity for us along several fronts." Financial analysts and the market bought Defendants' story, estimating that—based on information provided by Defendants—

Lumen could enable between approximately 14–23 million locations with Quantum Fiber, and thus finally turn the Company's prospects around.

4. But Defendants' supposed revolutionary miracle cure was a lie. From the get-go, Lumen was never capable of building the Quantum Fiber rollout that Defendants sold to investors and the market, and they knew it from the start. In fact, according to former employees and Defendants' own post-Class Period admissions, the Quantum Fiber buildout was critically behind schedule right from the start of the Class Period due to several operational and financial failings about which Defendants knew but failed to disclose, including, (1) that the Company could not deploy nearly enough technicians to install fiber at customers' premises and not enough field engineers to lay the fiber; (2) Lumen had a "horrific backlog" of necessary materials for the Quantum Fiber buildout due to the COVID-19 pandemic; and (3) Lumen's "planning yield"— a critical internal metric it used to determine where to build fiber and measured "weekly"—showed that the Company was not using its capital efficiently to expand fiber, and it was not close to being able to meet the pace of buildouts that it touted to the market. None of this information was fully disclosed to the market during the Class Period. Rather, Defendants intentionally sought to cover up the failure of the Quantum Fiber launch through their false and misleading public statements. Indeed, as Defendant Stansbury admitted after the Class Period, Lumen's planning yield during that time was "***horrendous***." In 2021, the Company's planning yield was below 20%, meaning that Lumen was wasting "over 80% of [its] resources" on proposed builds that were not approved. In 2022, it was "as low as 10%. . . . " Defendant Stansbury later admitted that Lumen's cost estimates were based on a "gold-rush" mentality and "emotional exuberance" that—after the Class Period—had been tempered "with some more rational thought."

5. To hide their total inability to deliver on the promise of Quantum Fiber, Defendants falsely told investors and the market that Quantum Fiber had tremendously high "NPS" or "Net Promoter Scores," which was supposedly a means of measuring customer satisfaction. In their calls with analysts and investors, Defendants tied Quantum Fiber's purportedly high NPS scores to growing revenue growth and EBITDA, and claimed their scores were "***higher than Amazon or Apple. As you know, NPS scores above 50 are considered excellent***." But, according to former employees, the NPS scores Defendants presented to the market were widely known within the Company to be faulty because they were based on a Lumen-developed methodology designed to generate the most favorable numbers, not a methodology that was in line with the science of how NPS should be reported. In fact, Lumen's customer service was inundated with complaints that the Quantum Fiber rollout was a disaster, with customers unable to get service. The NPS scores were a fabrication to create a smokescreen to hide the desultory Quantum Fiber operation from the market.

6. The importance of Quantum Fiber to Lumen continued to increase throughout the Class Period, as Defendants continued to lie to the market stating, for example, that the "***Quantum Fiber build plan is ramping***"; "***confidence is high to get to the 1 million units this year***"; and that it was "***really about all hands on deck right now to see what we can do***". In addition, the Company made large divestitures in mid-2021 that supposedly enabled Lumen to invest more attention and capital on its Quantum Fiber expansion. In July and August 2021, for example, Lumen announced sales of more than $11 billion in assets, which, according to the Company, would "sharpen Lumen's enterprise focus, accelerate the Quantum Fiber deployment, and drive growth on the Lumen Platform." As Defendant Storey explained, "What we can tell you today is that while we remain strategic and disciplined in our approach, ***we expect to build***

***faster and with more scale in the markets that we prioritize for Quantum Fiber investment***." None of these statements were true.

7. Defendants' scheme to falsely inflate the growth in Lumen's Quantum Fiber business began to unravel in a series of disclosures in 2022 by the Company's admissions that stressed supply chains and labor issues in building its fiber network had prevented them from achieving the fiber buildout. Then, in a total surprise to the market, both Lumen's CEO Defendant Storey and CFO Defendant Dev abruptly left the Company within months of each other. But despite these disclosures and departures, Defendants continued to downplay the significance of the buildout slowdown, assuring investors that they were still on track to enable 1 million homes with fiber by the end of 2022, and that further acceleration of the build would occur in the second half of 2022. Defendants also represented that "[w]e will continue to ramp our enablements and overcome the supply chain, labor and inflationary constraints we've seen." Unbeknownst to investors, however, the Company was doing nothing of the sort.

8. It was only after Kate Johnson was brought in as the new CEO on November 7, 2022, did the Company finally start to come clean with the market and correct the years-long fraud by disclosing how bad the Quantum Fiber operation was. As she would finally admit on February 7, 2023, rather than ramping up Quantum Fiber, Lumen had actually pressed "a stop button" on the Company's investment in the Quantum Fiber network and expansion. Indeed, Lumen had managed to enable only 605,000 units with fiber in 2022, well under the 1 million they repeatedly promised the market they would complete. CEO Johnson also announced that day that Lumen had revised its enablement forecast to "8 million to 10 million" locations, which was down significantly from the approximately 14-23 million locations originally anticipated by

the market and the 12 million plus locations the Company revised it to after the mid-2021 divestitures.

9. When the relevant truth was disclosed, the Company's stock price plummeted, causing millions of dollars of damages to Lumen investors who bought Lumen stock at inflated prices. Plaintiffs seek to recover those damages on behalf of the putative Class through this action.

## II. JURISDICTION AND VENUE

10. The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act (15 U.S.C. § 78aa).

12. This Court has personal jurisdiction over each of the Defendants named herein because each Defendant is either essentially at home in the jurisdiction or has sufficient minimum contacts with the forum from which Plaintiffs' claims arise out of or relate so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)), as many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District. In addition, Lumen maintained its corporate headquarters at 100 CenturyLink Drive, Monroe, LA 71203, which is located in this District, at all relevant times, and Defendants conduct substantial business in this District.

14. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and the facilities of national securities exchanges.

## III. PARTIES

### A. Plaintiffs

15. Lead Plaintiff George Sanchez, as set forth in his previously filed certification (ECF No. 11-3), acquired Lumen common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures. Sanchez was appointed Lead Plaintiff on May 24, 2023. ECF No. 35.

16. Lead Plaintiffs Douglas and Barbara Evans, Individually, and as Trustees of the Douglas P. Evans Living Trust U/A Dated 08/24/2010, as set forth in their previously filed certifications (ECF No. 17-4), acquired Lumen common stock at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures. The Evans were appointed Lead Plaintiffs on May 24, 2023. ECF No. 35.

17. Plaintiff Dale Brown, as set forth in his certification filed herewith as Exhibit A, acquired Lumen common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

18. Lead Plaintiffs Sanchez and Evans are sometimes referred to herein collectively as "Lead Plaintiffs," and collectively with Plaintiff Brown as "Plaintiffs."

### B. Defendants

19. Lumen, formerly known as CenturyLink, is a Louisiana corporation, with its principal executive offices located at 100 CenturyLink Drive, Monroe, LA 71203. The Company's common stock trades on the New York Stock Exchange ("NYSE") and the Berlin

Stock Exchange and is traded under the symbols "LUMN" and "CYTH," respectively. Prior to September 18, 2020, when the Company rebranded itself as Lumen, the Company's stock traded on the NYSE under the ticker symbol "CTL."

20. Defendant Storey served as President and CEO of Lumen from the beginning of the Class Period through his departure on November 7, 2022. Lumen announced Defendant Storey's departure on September 13, 2022, and reported that Defendant Storey would remain with Lumen through December 31, 2022, to assist with the transition.

21. Defendant Dev served as CFO and EVP of Lumen from the beginning of the Class Period through his abrupt departure from Lumen on April 4, 2022, which was announced on March 28, 2022.

22. Defendant Stansbury served as CFO and EVP of Lumen following Dev's departure, effective April 4, 2022, through present.

23. Defendant Moreau served as President of Mass Markets at Lumen at all relevant times.

24. Defendant Andrews served as Chief Marketing Officer and EVP at Lumen at all relevant times.

25. Defendant Dugan served as Chief Technology Officer at Lumen at all relevant times.

26. Defendant Gibson served as Senior Vice President, Sales and Marketing, Consumer Markets at Lumen.

27. Storey, Dev, Stansbury, Moreau, Andrews, Dugan, and Gibson are sometimes collectively referred to herein as the "Individual Defendants."

28. Lumen and the Individual Defendants are collectively referred to herein as "Defendants."

**C. Relevant Non-Parties**

29. Kate Johnson ("Johnson") has served as President and CEO of Lumen since November 7, 2022, following the abrupt departure of Defendant Storey.

30. Laurinda Y. Pang ("Pang") served as President of Global Customer Success, Wholesale & International, from the beginning of the Class Period, until her departure from Lumen in December 2022.

**D. Confidential Witnesses**

31. Several former Company employees have provided information demonstrating that Defendants' Class Period statements were false and misleading, that Defendants knew or recklessly disregarded the falsity or misleading nature of their statements, and that Defendants engaged in a scheme to defraud investors. The confidential witnesses ("CWs") include individuals formerly employed at the Company during the Class Period, whose accounts corroborate one another, other sources set forth herein, and facts now admitted by Lumen. The CWs provided information to Plaintiffs' counsel and/or Plaintiffs' counsel's investigators on a confidential basis and are particularly described by job description and/or responsibility, and duration of employment, thereby providing sufficient detail to establish their reliability and personal knowledge. As discussed herein, the information provided by the CWs supports a strong inference that the Defendants acted with scienter.

32. **Confidential Witness No. 1 ("CW-1")** was a former Senior Director of Marketing who worked at the Company from 2020 to 2023. Specifically, CW-1 worked in Marketing Intelligence on the consumer side of Lumen's business, which included support of the Quantum Fiber business. CW-1's team did marketing research to support both marketing efforts

and strategic decision-making. CW-1 also oversaw a team that engaged in data analytics, which involved predictive modeling to determine which customers were likely to have a propensity to buy fiber on a per-home and per-zip code basis; examining churn; and customer segmentation to determine those "audiences" that were most interested in Quantum Fiber.

33. **Confidential Witness No. 2 ("CW-2")** was a former Director of Experience Management at Lumen from November 2011 through May 2023. CW-2 was part of the Company's Business-to-Business group.

34. **Confidential Witness No. 3 ("CW-3")** was a former Vice President of Marketing & Demand Generation at Lumen from September 2020 to approximately April/May 2022. CW-3 was hired to work on the launch of the Quantum Fiber initiative at Lumen.

35. **Confidential Witness No. 4 ("CW-4")** worked as a Vice President, Global Customer Experience at Lumen from November 2018 to March 2023. CW-4 had been with Lumen and its predecessor companies on and off since 2002. As Vice President of Global Customer Experience, CW-4 looked at and used data, data analytics, and AI to understand the experiences of Lumen's customers so as to drive ways to improve that experience. CW-4 was involved with the Company's calculation of Net Promoter Scores ("NPS").

36. **Confidential Witness No. 5 ("CW-5")** worked as a Senior Manager, Brand & Communications at Lumen from October 2020 to September 2022. CW-5's role included branding and communications work for a Quantum Fiber project, which involved working on "an entire tech stack," which included the billing system. CW-5 was brought onto the project because Lumen's goal for Quantum Fiber was to develop and introduce an entirely new brand.

## IV. FACTUAL ALLEGATIONS

### A. High Speed Internet Services Background

37. One of Lumen's primary products and services is based upon providing high speed broadband services to residential and small business customers. Broadband (short for "broad bandwidth") is a type of high-speed internet access. Bandwidth refers to the total speed at which data can be delivered to internet-connected devices, like a computer. The higher the bandwidth of an internet service, the faster the connection speed will be.

38. There are several types of broadband internet connections, including Digital Subscriber Line ("DSL") and fiber, among others. DSL internet uses copper phone lines to transmit internet and TV signals. Cable technology uses a coaxial cable, which uses copper phone lines as well, but with a different outer material that allows the signal to travel further than DSL.

39. While the copper phone lines for DSL and cable use electrical pulses for transmission, fiber-optics use light to transmit data along tiny glass strands that are bundled together into a cable, allowing information to travel close to the speed of light. In addition to providing higher speeds, fiber is more likely than copper to provide symmetrical bandwidth to customers, which means that it has equal upload and download speeds.

40. There are three types of fiber optic cable internet. The fastest and most reliable is "Fiber to the Home" ("FTTH") or "Fiber to the Premises", where the fibers come straight to a building. "Fiber to the Curb" is fiber that gets to the utility pole near one's home and uses coaxial cable to get from there to the home. "Fiber to the Node" or "Neighborhood" is fiber that gets within one mile of a home, but metal wires carry the connection the rest of the way.

### B. Defendants Were Facing a Dying Legacy Technology Business and a Changed Telecommunications Landscape

41. In the years leading up to the Class Period, there was a historical trend of growing demand for fiber optics' speed and reliability and a reduced demand for DSL. Lumen (then CenturyLink) had been working to expand its fiber network for years, which included expanding CenturyLink's Fiber-to-the-Home broadband services – an important part of the Company's growth that was intended to help offset losses from the Company's lower speed legacy DSL/copper services. As of December 31, 2019, however, it still had nearly twice as much old copper wire planted than the newer, faster and more reliable fiber optic cables. This was true throughout 2020 as well.

42. As a *Barron's* analyst noted in February 2019, "the majority of CenturyLink's revenues" are made up of "legacy services" which have been "eaten away" by "increasingly affordable wireless plans and new fiber-optic networks[.]" As a result, for several years prior to the beginning of the Class Period, the Company's revenues had been steadily declining. According to Lumen's (then known as CenturyLink) 2016 Annual Report, Lumen's 2014 operating revenues were $18.031 billion. These revenues declined to $17.9 billion in 2015 and $17.47 billion in 2016. The Company knew that revenues would continue to decline without major changes, due to the fact that its business model was in jeopardy from the decreasing need for the many legacy services it offered.

43. Simultaneously, the Company was facing the consequences of a corporate strategy that for over a decade focused on business-to-business rather than business-to-consumer operations. Securities analysts in September 2020 estimated that "Lumen's enterprise businesses" accounted for "roughly 75% of total revenue, [and] we think revenue is likely to continue declining. Lumen's business customers will continue to benefit from the ability to use

shared, rather than private, networks and technological advancements that require less bandwidth and enable more efficient routing." Additionally, the Company's enterprise business was under pressure at the time because, as at least one analyst observed, although "Lumen has 170k buildings that have fiber and a large number of potential building where fiber can be built, . . . there is limited demand as many potential customers are still out of the office . . . ."

44. As part of its efforts to "boost its fiber footprint and gain scale," CenturyLink acquired Level 3 Communications, Inc. ("Level 3") in late 2017. A March 4, 2019 article in *Barron's* touted the acquisition as setting CenturyLink "apart from its wireline peers" and "better position[ing] it for growth."

45. While the Level 3 acquisition helped buoy CenturyLink's fortunes, 2019 was a difficult year for CenturyLink's shares. Indeed, according to a September 27, 2019 article in *Barron's*, CenturyLink was "one of the worst performing stocks in the S&P 500" in 2019. That year, the Company cut its dividend by more than half, sending shares tumbling 10%. This cut was made to help the Company lower its net debt to earnings before interest, taxes, depreciation and amortization to 2.75 times to 3.25 times, while continuing to pay dividends and invest in growth initiatives.

**C. CenturyLink Rebrands Itself and Launches Quantum Fiber**

46. On September 14, 2020 – the first day of the Class Period – Defendants widely publicized a major effort to turn things around and compete more effectively against rivals who were far ahead of the Company in the fiber-optics space. Specifically, CenturyLink announced that it was rebranding itself as Lumen and proclaimed that it was ready to enable "Amazing Things" with a "bold new purpose" to help lead enterprises through the challenges and opportunities of the "4th Industrial Revolution." Lumen explained that in addition to its "heritage" operations through CenturyLink for residential and small businesses over traditional

networks, it was also announcing the new "Quantum Fiber, a fully digital platform for delivering fiber-based products and services to residents and small businesses." According to Lumen, "Quantum Fiber is a subscription-based, prepaid, online platform for delivering premier fiber-based connectivity to residents and small businesses."

47. Quantum Fiber's success was largely dependent on Lumen's fiber-to-the-home strategy. That is, for customers to be able to subscribe to Quantum Fiber, their homes or businesses would first need to be fiber-enabled — meaning connectable to, or "passed" with, Lumen's fiber. Thus, the number of homes and businesses passed is an important metric for gauging the successful rollout of Quantum Fiber, as it is the first step to connecting potential Quantum Fiber customers to Lumen's fiber network.

48. Analysts estimated that based on information provided by Lumen, including information on Lumen's geographic "footprint," Lumen could enable between approximately 14 – 23 million locations with fiber. Accordingly, the market was very interested in the progress of Lumen's fiber build, including the number of fiber-enabled locations, the number of Quantum Fiber subscribers, and Quantum Fiber's penetration (*i.e.*, the percentage of fiber-enabled homes subscribed to Quantum Fiber). Indeed, analysts asked about the progress of the Quantum Fiber buildout on nearly every conference call during the Class Period.

49. Unbeknownst to investors, the Quantum Fiber buildout was behind from the start, plagued by inadequate planning, inadequate funding, supply chain and labor issues, as well as other internal issues that made it impossible for the Company to be able to expand Quantum Fiber at the pace Lumen had touted to the investing public. Despite being well aware of all this, Defendants nonetheless falsely and misleadingly reassured the market throughout the Class Period that the Quantum Fiber buildout had been carefully planned, that the Company was

devoting adequate resources—like materials, labor, and capital—to the Quantum Fiber buildout, and was doing so efficiently to maximize its return on investment.

50. For example, Defendants repeatedly stressed that the Quantum Fiber buildout was not "capital constrained," and routinely discussed the capital efficiency of its investment strategy. Indeed, from the very beginning of the Class Period, Lumen discussed its "microtargeting" investment strategy for expanding fiber-to-the-home, which meant that it was supposedly "building in selective areas where the return on capital is supportive[.]" During the August 5, 2020 Q2 2020 Conference Call, Defendant Dev described this strategy as "pick[ing] the neighborhoods where we can get high returns because it's a function of population density or housing density and the cost to build." As Defendant Storey explained, "we always make decisions based on economics. And the microtargeting helps us identify those locations that are high economics. I don't think that there's a short supply of opportunities based on microtargeting. I think that just helps us be ***very efficient*** in generating a return for the investment that we make."

51. Defendants also repeatedly touted the importance of its fiber-to-the-home investment strategy and its commitment to it, stating, *inter alia*, "we expect that future performance will be largely driven by our execution around our fiber to the home investment strategy in driving up penetration of our competitive assets[,]" that "we have a dedicated leadership team whose sole focus is to leverage our Quantum investments to grow the consumer and small business markets[,]" and "Quantum Fiber represents a growth opportunity for us along several fronts." They also stressed to the market that the buildout was not "capital constrained."

52. The importance of Quantum Fiber continued to increase throughout the Class Period, as large divestitures enabled Lumen to invest more attention and capital on its Quantum

Fiber expansion. For example, on July 26, 2021, Lumen announced that it would sell its Latin American business to Stonepeak, an alternative investment firm, for $2.7 billion. According to Lumen and Defendant Storey, "[t]his transaction allows Lumen to focus investments in key areas of the business to drive future growth while providing flexibility for our capital allocation strategy."

53. Then, on August 3, 2021, Lumen announced that it would sell its incumbent local carrier operations ("ILEC") in 20 states to Apollo Global Management, Inc. for $7.5 billion, including debt assumption of approximately $1.4 billion ("Apollo transaction"). ILECs are phone service providers that are mandated by the Telecommunications Act of 1996 to provide and maintain copper services across the nation. According to Lumen, this transaction "will sharpen Lumen's enterprise focus, accelerate the Quantum Fiber deployment, and drive growth on the Lumen Platform."

54. Lumen would retain its ILEC assets in 16 states, as well as its national fiber routes and competitive local exchange carrier networks. Of Lumen's 2.6 million fiber-enabled units, only 200,000 were included in the divestiture. On the earnings call that same day, Defendant Storey explained that after the closing of the Apollo transaction, "approximately 70% of our remaining mass market footprint" – about 15 million units – "is well suited for Quantum Fiber investment."

55. Defendant Storey further explained on that call that Lumen would be accelerating its Quantum Fiber push: "We are developing an accelerated build plan, and we'll share those details as they're finalized. What we can tell you today is that while we remain strategic and disciplined in our approach, ***we expect to build faster and with more scale in the markets that we prioritize for Quantum Fiber investment***."

56. Defendant Dev further stated that Lumen would be moving from a micro-targeted approach to a market level approach "to really scale up our investment" for fiber construction. As part of this scale up, Defendant Moreau represented during the August 10, 2021 Cowen Communications Infrastructure Summit that Lumen would "continue to be disciplined in how [it] deploy[s] capital."

57. On November 3, 2021, during the Q3 2021 earnings call, Defendant Storey announced that Lumen planned to "ramp" its fiber-enablement pace from about 400,000 locations per year to ***over 1 million new locations by the end of 2022***, "on our way to hitting a run rate of 1.5 million to 2 million enablements per year as we exit 2022." At that point in time, Lumen had approximately 2.7 million fiber-enabled locations, 774,000 Quantum Fiber subscribers, and Quantum Fiber penetration of around 29%.

### D. Lumen Touts Its Net Promoter Scores to Assuage Concerns

58. Defendants falsely assured the market that no major obstacles were impeding the progress or cost of Lumen's fiber expansion or the Quantum Fiber rollout, but the market still had concerns about Lumen's business. For example, one analyst noted that "[a]part from geographic areas where it is the only provider option, we don't see any advantage or even reason for consumers to choose Lumen." Additionally, early in the Class Period, other analysts noted that Lumen's "~28% fiber penetration among fiber homes passed [means] there is ample room for improvement." The market's concerns persisted throughout the Class Period, along with growing concerns that Lumen's fiber build was not proceeding quickly enough, with one analyst noting that "[w]hile the company says it is not capital constrained, the build pace is clearly subdued despite the frenzy driven by Telco builds, overbuilders, low interest rates (lower hurdle rate), favorable regulatory environment (proposed infrastructure bill calls for $100B for broadband), a high-tide of PE/Infra Fund capital, and lockdown-driven improved business case."

Relatedly, another analyst noted that "debate is emerging about what the value of fiber assets that don't grow are actually worth." Compared to its peers, there was concern among analysts that Lumen was not growing its fiber investments aggressively enough.

59. To address these concerns, Defendants falsely claimed that Quantum Fiber had tremendously high "Net Promoter Scores" or "NPS", which is a means of measuring customer satisfaction by asking customers how likely they are to recommend a service to a friend or colleague. For example, Defendant Storey tied Lumen's claimed high NPS scores to revenue growth and EBITDA during the February 10, 2021 Q4 2020 Company earnings call, explaining that "we grew both adjusted EBITDA and adjusted EBITDA margin in the fourth quarter" and linking that to "improvement in our Net Promoter Scores particularly in those areas where we've invested for growth in fiber-based services for enterprise and consumers," which had the effect of "improving revenue trajectory[.]" Similarly, Defendant Storey, at the September 22, 2021 Goldman Sachs Communacopia Conference, explained that "We've been investing in growth in our consumer and small business customers through Quantum Fiber . . . . Penetration rates, ARPU [Average Revenue Per User], churn, NPS give us confidence across the board with our mass market business.[1] And with around 15 million urban/suburban units in our retained markets, we think there's a lot of opportunity for growth. We continue investing in EBITDA and revenue growth through our ongoing transformation." Additionally, at the December 7, 2021 UBS Global TMT Conference, Defendant Andrews claimed, "The other one is the success we're having with the Quantum Fiber launch. So 2 years ago, we didn't have the Quantum Fiber launch. Now Quantum Fiber is out in the market. It's resonating. We're reaching the

---

1 According to the Company's 2021 10-K, Lumen's "mass market" business provided products and services to consumer and small business customers, and included Quantum Fiber.

penetration rates we want. And it's really thrilling customers with crazy high NPS scores. So you kind of take the success that Maxine [Moreau] is seeing with Quantum Fiber and the increased focus as a result of the divestiture, and that's what gets us to the plan to kind of double down and dramatically increase build." As late as September 15, 2022 at the Goldman Sachs Communacopia + Technology Conference, Defendant Stansbury continued to tout Quantum Fiber's NPS scores.

60. The market was focused on what Defendants were saying about NPS throughout the Class Period and believed what Defendants were saying. For example, Wells Fargo, in a June 13, 2022 report, discussed Defendants' claims of high NPS scores and explained those scores helped it "remain confident in LUMN's ability to achieve its build and IRR [Internal Rate of Return] targets on the FTTH build . . . ."

**E. Lumen Touts Its Financial Planning for the Fiber Buildout**

61. Similarly, Defendants touted their financial planning, including repeated false statements throughout the Class Period that the average cost per build was $1,000 or less. For example, on the November 3, 2021 Q3 2021 Lumen earnings call, Defendant Dev falsely stated that Lumen was "[i]n terms of the $1,000, we are building at a significantly lower cost today . . . . But what we are confident in is the return profile of that business . . . . So we still – irrespective of the actual cost, we think we have a really big margin of error, if you will, in terms of generating great returns." Defendant Storey reiterated these build cost figures at the January 6, 2022 Citi AppsEconomy Conference, explaining, "we think that we have a great cost position in our ability to deliver for less than $1,000 per home passed – or at $1,000 per home passed."

62. In fact, at the March 29, 2022 New Street Research and BCG Fiber to the Future – Global Infrastructure Conference, Defendant Gibson emphasized the conservativeness of Lumen's financial planning by explaining, "So we publicly announced that we believe we can

build out these 10 million locations for $1,000 or less. And so – and we built some inflation in the numbers into that because we believe that's a good number. . . . But you're absolutely right, we're going to be prudent about where we invest to make sure that the cost is in place and the penetration targets are in place that we continue to drive a really good return on invested capital and return for shareholders . . . ."

**F. Defendants Systematically Generate and Utilize Biased Data and Unsupported Financial Metrics**

63. In reality, the NPS data that Lumen heralded was false and misleading and used to make the Quantum Fiber rollout appear to be much more successful than it actually was. Similarly, Defendants' claims that the financial planning for the buildout was prudent and "capital efficien[t]," including as to the cost and progress of the buildout, was also false and misleading.

64. According to CW-2, it was widely known within Lumen that although the Company touted how good Quantum Fiber's "experience scores" were, the public numbers were not reliable and based on "funky math" because the scores were derived from "too small a data set." Moreover, according to CW-2, there was an internal war within Lumen over the NPS numbers because of "inconsistencies" in how they had been derived. CW-2 believed that the faulty calculation of the experience scores had been derived to satisfy Defendant Storey.

65. CW-1 was the employee that CW-2 said had "went to war" over the calculation of the NPS scores. CW-1 explained that the NPS scores had been "massaged and recalibrated to come up with the most favorable numbers." CW-2 explained that the NPS numbers had come from Defendant Moreau and CW-4, who agreed that Lumen calculated NPS "a bit different" than how they normally were derived. CW-1 specifically described an all-hands marketing

meeting where Moreau gave the high NPS numbers that were "laughable" to another colleague of CW-1.

66. According to CW-1, Lumen had "developed its own methodology for reporting NPS that was not in line with the science" of how NPS should be reported, specifically focusing on the sampling issue discussed by CW-2. As CW-1 explained, the samples used for NPS reporting by Lumen were i) only comprised of interviews with customers who had called Lumen's customer service and ii) only about specific issues. Customers who called to cancel their service were not included in the NPS pool. Similarly, CW-5 confirmed that the NPS scores were "really smoke and mirrors" because they were derived from "so few customers."

67. According to CW-1, while the traditional NPS method focused on "relational NPS," which is a holistic survey of customer satisfaction, Lumen used "transactional NPS," which focuses just on particular transactions, specifically only "on-boarding transactions," which were "brand-new customers." These customers were ones who had just started their service with Lumen and therefore were still happy with the Company.

68. CW-1 also explained that a major issue with the Quantum Fiber rollout was that Lumen was simply unable to accurately report "which homes they had turned on or not." The Company used a marketing database called DataMart, which was supposed to draw data relevant to marketing from the myriad systems Lumen used. Unfortunately, according to CW-1, there was "never an accurate count" of "premises passed," *i.e.*, which customers had "Quantum Fiber turned on." According to CW-1, the numbers produced by DataMart would be different than the numbers that were claimed by field engineers from other sources. The marketing department literally did not know who they should be marketing to because the numbers across Lumen's

different data systems did not match, and "no one knew" how many premises had been passed according to CW-1.

69. CW-1 believed that these data integrity issues had been conveyed to Defendant Moreau. Regardless of the source of the data for premises passed, *see infra* ¶¶ 71-74, none of the multiple sources available within Lumen had "accurate numbers" that matched with any other source.

### G. Former Employees Further Confirm that Defendants Hid Quantum Fiber Issues

70. Multiple former employees further confirm that although Defendants repeatedly publicly touted its investments in and progress of the fiber rollout to the market, these statements were false and misleading because the reality was that Lumen hid from investors the fact that Lumen was experiencing major supply chain issues, labor shortages, and other internal issues that materially increased the risk that it could neither meet its goals nor continue to "heavily invest" in the Quantum Fiber expansion.

71. According to CW-1, the Quantum Fiber buildout was "behind schedule right out of the gate due to a number of factors." One reason was that there were not enough technicians to install fiber at a customer's premises and not enough field engineers to lay fiber. Another problem was the inability of Lumen's operations department to accurately report "which homes they had turned on or not", as discussed above. *See* ¶ 68.

72. CW-2 confirmed that the Company had a "run rate for the homes" they wanted to install fiber to, but what was missing was technology, time, money and "physics" to accomplish the Company's goals. According to CW-2, Lumen had a "horrific backlog" of necessary materials for the Quantum Fiber buildout because of the COVID pandemic.

73. CW-5 reported similar issues. At the time CW-5 joined the Quantum Fiber project, "almost nothing" had been done towards setting up a new brand, and as of September 14, 2020, the Quantum Fiber billing system was "not ready to go."

74. Additionally, according to CW-5, while Lumen's technicians operated from electronic notepads to map out where Lumen laid fiber and had fiber connections available, it did so in a way that did not match how the billing systems and CenturyLink.com website had mapped out fiber locations. As a result, the billing system might indicate that fiber was not available when it actually was.

75. In 2021, CW-5 learned on calls held by Defendant Gibson and attended by CW-5 and others that 85% of orders from existing (*i.e.*, CenturyLink fiber customers) and new customers who signed up for Quantum Fiber "fell through" and were never installed due to ongoing problems with the billing system "not talking to the technicians." By July/August 2022, the percentage of orders that fell through because Lumen was unable to fulfill them dropped from 85% to 65%.

76. CW-3 similarly stated that as of the first quarter of 2022 (approximately March/April 2022), upwards of 65% of customer orders for Quantum Fiber had not been filled. In some instances, Lumen apparently was taking so long to fulfill orders that after a while the Company simply opted not to show up at all because the personnel did not have enough time.

77. Just prior to when CW-5 left the Company, Defendant Moreau told CW-5 that Quantum Fiber is "just a wreck."

### H. The Fraudulent Scheme Begins to Unravel and Lumen's CEO and CFO Abruptly Depart

78. Defendants' fraudulent scheme began to unravel on February 9, 2022, when Defendants finally revealed for the first time the negative effects of stressed supply chains on

Quantum Fiber, stating *inter alia*, that these supply chain issues were "a constraining factor on how to accelerate faster." On this news, Lumen's stock price declined $1.99, or 16%, from a close of $12.82 per share on February 9, 2022 to a close of $10.83 on February 10, 2022.

79. Then, on March 8, 2022, Lumen's President of Global Consumer Success disclosed for the first time that Lumen was facing labor issues in building its fiber network, and reiterated that supply chain issues were still plaguing the Company. On this news, Lumen's stock price declined 3%, from a close of $10.95 per share on March 8, 2022, to a close of $10.62 on March 9, 2022.

80. Shortly after Lumen began revealing the truth, on March 28, 2022, the Company announced the abrupt departure of one of the Company's highest-ranking executives, EVP and CFO Dev, after an 18-year tenure at the Company. Described by one analyst as "not anticipated", Defendant Dev's departure was set to be effective just one week later, on April 4, 2022.

81. Despite Lumen's initial partial disclosures, Defendants continued to intentionally mislead investors about the true state of the Quantum Fiber disaster by downplaying the significance of the buildout slowdown, falsely assuring investors that they were still on track to enable 1 million homes with fiber by the end of 2022, and that further acceleration of the build would occur in the second half of 2022.

82. Then, just six months later on September 13, 2022, Lumen announced the additional departure of the Company's President and CEO, Defendant Storey, effective January 1, 2023. Defendant Storey's departure came after serving only five years in the Company's top role and hard on the heels of Defendant Dev's exit.

83. On November 2, 2022, Defendants surprised the market again by disclosing that the Company is "not yet at the pace of build we expect or want[,]" sending down Lumen's stock price by $1.25, from a close of $7.05 per share on November 2, 2022 to a close of $5.80 on November 3, 2022, for a decline of 18%.

84. Nonetheless, Defendants falsely claimed that "[w]e will continue to ramp our enablements and overcome the supply chain, labor and inflationary constraints we've seen." Unbeknownst to investors, however, the Company was doing nothing of the sort.

85. As CEO Johnson would finally admit on February 7, 2023, Lumen had actually pressed "more of a stop button than a pause button" on the Company's investment in the Quantum Fiber network and expansion into the small business and consumer markets while it re-evaluated its strategic priorities in the fourth quarter of 2022 – the last quarter that Defendant Storey presided over Lumen. Indeed, Lumen had managed to enable only 605,000 units with fiber in 2022, well under the 1 million they repeatedly claimed they would complete. CEO Johnson also announced that day that Lumen had revised its enablement forecast to "8 million to 10 million" locations, which was down significantly from prior forecasts of approximately 14-23 million locations, and the 12 million plus locations they touted following the LATAM and Apollo divestitures in mid-2021.

86. On this news, the price of Lumen's common stock dropped $1.04, or 21%, from a close of $4.99 per share on February 7, 2023, to a close of $3.95 per share on February 8, 2023.

## I. Defendants' Post Class Period Statements Confirm That Defendants' Class Period Statements Were False and Misleading

87. After the Class Period, on a March 7, 2023 Raymond James Institutional Investors Conference call, Defendant Stansbury admitted that prior cost estimates per enablement location had not been realistic and that Lumen employees were not being rational: "But I think there was

also a little bit of a gold-rush mentality as it relates to fiber to the home. And I think that emotional exuberance has been at least tempered somewhat with some more rational thought. And I think people are pulling back on their build plans, more realistic cost estimates and ARPUs coming with that as well." He also stated that "[w]hen I came to Lumen [in April 2022], the operations team only had 2 metrics, get to 12 million enabled locations at $1,000 per enablement. Well, that's troublesome as a CFO and so you want to make sure that you're building to the right markets and maybe $1,000 isn't the right number. We're now at $1,200."

88. In another post-Class Period call on June 5, 2023, Defendant Moreau confirmed that the average cost of enablement was higher than Defendants claimed during the Class Period. During the June investor day call, CEO Johnson confirmed that the cost per home "looks like it's inching a little higher" and confirmed that it was in the "range of the 1,000 to 1,500 per location."

89. Additionally, Lumen's "planning yield" – a key internal metric measured weekly that was relied on by the Company during the Class Period to determine where to build fiber, but which metric was not specifically disclosed to investors during the Class Period – showed that during the Class Period Lumen was not using its capital efficiently to expand fiber, and it was not anywhere close to being able to meet the new accelerated pace of buildouts. After the end of the Class Period at the March 6, 2023 Morgan Stanley Technology, Media & Telecom Conference, Defendant Stansbury explained what the "planning yield" metric is used for:

> So planning yield is the markets you want to build go on the top of the funnel. That then goes through things like site walks and engineering. They built a detailed engineering plan. The engineers come back with a cost that goes to finance. Finance has to make a decision on whether we're going to build or not, and that's what comes out the bottom of the funnel.

90. In other words, the Company expends money and resources to determine whether it can actually build in a certain location, and then only builds there if finance approves it. The

percentage of proposed builds that result in approvals from finance is the "planning yield." On March 7, 2023, after the Class Period, Defendant Stansbury admitted that Lumen's planning yield was below 20% – *i.e.*, finance approved a proposed build only 20% of the time in 2021. At the March 7, 2023 Raymond James Institutional Investors Conference, Defendant Stansbury's described this as "horrendous," and meant that Lumen was wasting "over 80% of [its] resources" on proposed builds that were not approved.

91. On May 2, 2023, during the Company's earnings call, CEO Johnson confirmed that Lumen's planning yield in 2022 was "as low as 10%[,]" a yield lower than what was previously reported and further illustrated problems with the roll out of Quantum Fiber. CEO Johnson also acknowledged on February 7, 2023, that the penetration rate for the 2021 vintage (*i.e.*, the percentage of units that were fiber-enabled in 2021 that subscribed to Quantum Fiber), was 17%. As Defendant Stansbury would explain a month later on a March 7, 2023 conference call, this number was "not good enough in terms of the ramp that we expected[,]" and was one of the "layers" that caused the Company to stop investing in Quantum Fiber in the previous quarter.

## V. DEFENDANTS' CLASS PERIOD MATERIAL MISREPRESENTATIONS AND OMISSIONS

92. One of the methods and means of Defendants' scheme was to make, issue, and disseminate statements that omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants' omissions of material facts caused Lumen shares to trade at artificially inflated prices during the Class Period.

93. Below are the Class Period statements, including, but not limited to, Defendants' SEC filings and investor conferences and calls, that were rendered misleading by virtue of

omitting the material facts. Defendants' misleading statements should be considered holistically as part of their fraudulent scheme. Plaintiffs reserve their rights to allege other omissions of fact and/or misleading statements as they are discovered and/or occur.

**A. Defendants' Material Misrepresentations and Omissions in 2020**

94. The Class Period begins on September 14, 2020, when the Company announced in a press release published on its Investor Relations webpage that it would be rebranding itself as Lumen. The press release stated that the Company had launched "Quantum Fiber," which it described as "***a fully digital platform for delivering fiber-based products and services to residents and small businesses***." The Company further stated that "***Quantum Fiber will use the power of Lumen's extensive fiber network and infrastructure***."

95. Soon after the Company announced the launch of Quantum Fiber in September 2020, Lumen continued to claim that the Company had carefully considered plans to invest in and grow its Quantum Fiber brand, and was doing so efficiently.

96. At the Goldman Sachs Communacopia Conference on September 15, 2020, Lumen's then-CEO, Defendant Storey, explained Defendants' commitment to investing in Quantum Fiber and discussed the Company's approach to microtargeting its fiber deployment, stating:

> And so ***there's a lot of opportunity that we see***, but it's fairly small, still 2.5 million homes passed or so. So it's still fairly small. ***We're going to continue to invest. One of the things that we've absolutely seen, where we invest, we grow.*** And we will continue to make sure that, that is true. Invest in those areas where customers want our services, where we can create a superior product to all of our competitors. And our fiber-based solution is superior and go through all the engineering reasons why that our fiber-based solution is superior. ***So we continue to invest where it makes sense for us to drive expanded opportunity***.
>
> [Analyst]: Why not do more than microtarget? You have a reasonably large footprint. Is that just what you're finding right now, there are pockets where it makes sense? What would have to change for you to be a little more broad-based in terms of the fiber deployment?

> [Storey]: Well, we always make decisions based on economics. And the microtargeting helps us identify those locations that are high economics. ***I don't think that there's a short supply of opportunities based on microtargeting. I think that just helps us be very efficient in generating a return for the investment that we make. So it's not a limiting factor. It's a targeting factor.***

97. During an earnings call on November 4, 2020 with investors to discuss the Company's financial and operating results for the third fiscal quarter of 2020, Defendant Storey began by misleadingly stating that Defendants' fiber offering was the "best in the market":

> This quarter, we added 46,000 gigabit subscribers, surpassing the record we set last quarter. Our results confirm our thesis for the Consumer business. We win customers where we invest in fiber, simplify the experience ad use micro-targeting in selecting the areas we serve. ***We believe our consumer fiber offering is the best in the market, and our customer satisfaction results are showing consumers value dedicated and reliable bandwidth.***
>
> ***As you've heard me say many times, our operational improvements lead to highly satisfied customers, more durable revenue and they allow us to reduce the cost of our operations.***

98. On that same call, in response to an analyst's question about Lumen's goal to be an EBITDA growth company, Defendant Storey reiterated the Company's commitment to focusing on Quantum Fiber, stating that "***from a going-forward perspective, we think that the products, the capabilities that we're layering on top of the great fiber and network infrastructure that we have in place today really position us to grow revenue, and we'll continue to focus on that***."

99. Defendant Storey also responded to a question about Lumen's microtargeting strategy, stating in relevant part:

> [Analyst]: And then second of all, to hit a topic we've hit a bunch of times in the past, but the fiber build-out in consumer, you talk about micro targeting. But there's a difficult history for companies that have cherry-picked parts of their markets getting to their target penetration, and an increasing number of those are post bankruptcy, pushing fiber much harder and building – planning to build their entire footprint. Why doesn't this make more sense for Lumen?

* * *

> [Storey]: And with respect to cherry-picking, I don't – I wouldn't describe what we're doing as cherry-picking. ***We're looking at where we can get the greatest return on our investments and the fastest return on our investments to drive penetration. And so that – it's a smart strategy for building out rather than just going out and building out an entire footprint. Let's look at what makes sense for our business to help us prioritize how to grow and where to grow that investmen***t. And so I don't view it as cherry-picking.
>
> On the small business side, we have 170,000 buildings[2] that are lit in our footprint. I definitely want to go to every one of those buildings and focus on our business customers in those buildings. And so we'll take advantage of where our network is strong and where we can make it even stronger to support those types of customers. And we have plenty of market opportunity to do that. ***There's not a limitation right now on us on where to go and build for our Quantum Fiber business, whether it's consumer or business customers***.

100. Later, during the same earnings call, Defendant Dev responded to a question about Lumen's consumer broadband business, misleadingly giving the impression that Defendants were devoting sufficient resources to support the Quantum Fiber rollout:

> So I think your question on consumer broadband, I think what I would say is if I just step back, we've been really focused on really improving the quality of the overall revenue base for consumer. And you can see that in our revenue numbers. Our revenue has been growing, and as Jeff mentioned, our ARPU has been growing. And I mentioned in my prepared remarks that for 100 meg and above, we're now at 13% of the base is at that speed compared to it was beginning of last year at about 5%. ***So that part of that business is where we're investing***, and we know that's a very competitive asset. ***It's growing very fast. And we continue to invest in fiber***.

101. As the earnings call demonstrated, Quantum Fiber and its impact on the Company's revenues was of great interest to market analysts. The final question of the investor call was from Frank Louthan, an analyst at Raymond James, who asked, "How big can Quantum get in terms of revenue? What's sort of the TAM [Total Addressable Market] there?" Defendant Storey responded in a way that misleadingly suggested that Lumen would devote adequate

---

[2] The 170,000 buildings refers to office buildings that are directly connected to Lumen's network without having to switch fiber networks. *See* 9.1% - Yielding CenturyLink Changes Its Name to Lumen: What it Means for Investors, Motley Fool (Sept. 15, 2020).

resources to the Quantum Fiber buildout and had a plan for the buildout, explaining "Without getting into specific TAMs, ***it's a strategy in footprint and out of footprint, where we have the ability to win and where we have the ability to build infrastructure.***"

102. During a Company conference presentation by Lumen's Chief Technology Officer on December 2, 2020, an analyst asked Defendant Dugan about Lumen's success with the consumer fiber business and the marketing strategy:

> [Analyst]: . . . I know you have a micro-targeting strategy to do it economically. So how do you look at your current footprint, the success you've had with that micro-targeting strategy? And do you think that where you're competing with whether it's another incumbent telco, a cable provider that you're winning your fair share of business when you have that fiber plant all the way to the premise?
>
> [Dugan]: Yes, yes. ***We have been investing heavily in our consumer fiber business***. Just to give you some stats on that. We exited last year with about 2 million homes passed with fiber. We have about 2.3 million homes now.
>
> ***The way that we look at that micro-targeting is we take -- we look at where can we build fiber to meet consumer demand. But the micro-targeting also includes where can we meet demand for SMB, where can we meet demand for other enterprise customers and where can we meet demand for towers to support wireless builders. And through that micro-targeting strategy, we've been pretty successful***.
>
> ***So we look at a couple of things when we decide to build in an area from a consumer standpoint. We look at the cost per home passed, and we have an expected penetration rate. We've been meeting our financial objectives where we've done that micro-targeting***. So it's been a really great thing for us, and it's really helped us increase our broadband revenues in the consumer business.
>
> Our broadband revenues are continuing to grow. We continue to increase the number of subscribers at that higher speed, which gives us a higher ARPU. If we take a look at where we exited last year with fiber customers as a percentage of our consumer business, we had about 5% of our customers being fiber-based. Where we are now is about 13% of customers being fiber-based. So yes, it's been great for us. It's something we're excited about.

103. The statements in ¶¶ 94, 96-102 above gave investors the false and misleading impression that the Company was devoting adequate resources—like materials, labor, and capital—to the Quantum Fiber buildout and was doing so efficiently, and that the Company had

carefully planned the buildout to maximize its return on investment. Thus, these statements were materially false and/or misleading when made because they failed to disclose that: (1) Lumen's Quantum Fiber venture was inadequately funded and inadequately planned from the start, ¶¶ 68-77, 87-91; (2) Lumen was failing to manage supply chain pressures adequately, ¶¶ 72, 75-76; (3) Lumen did not have sufficient field engineers to lay fiber or technicians to install fiber for the Quantum Fiber project, and therefore did not have sufficient labor resources for building additional fiber to expand the Quantum Fiber brand, ¶¶ 71-72, 76; (4) the key metric used by marketing to market to new customers called "premises passed" was unreliable and therefore Lumen's marketing department was not marketing Quantum Fiber to all available potential new customers, making it very difficult to generate the return on investment required to "grow", ¶¶ 68-69, 71; (5) Lumen's finance team was approving only about 20% of proposed builds, wasting 80% of its resources, and thus a substantial portion of Lumen's investment in Quantum Fiber was lost on proposed builds rather than actually expanding fiber-to-the-home, ¶¶ 89-91; (6) as a result, it was impossible for the Company to be able to expand Quantum Fiber at the pace Lumen had touted to the investing public; (7) Quantum Fiber's NPS scores were derived from a Company-created methodology based on biased data, and therefore its NPS scores could not be used to compare Quantum Fiber's customer satisfaction with the satisfaction of customers of other companies, ¶¶ 63-67; and (8) the Company relied upon unrealistic cost estimates that were based on a "gold-rush mentality as it relates to fiber to the home," ¶¶ 87-88.

### B. Defendants' Material Misrepresentations and Omissions in 2021

#### 1. Defendants Continue to Tout Lumen's Efficient Investment in and Growth of Quantum Fiber

104. During Lumen's Q4 2020 Earnings Call on February 10, 2021, Defendant Storey reiterated Lumen's confidence in Quantum Fiber and its high NPS scores in response to an analyst's question, stating:

> And I'll just add, from a market perspective, we're super excited about our Quantum Fiber brand and the capabilities that we bring to the market. ***The digital experience is, in my opinion, second to none where our NPS scores reflect a very high satisfaction, the quality of the product, the bidirectional nature of the product and the symmetry of that capacity, the peering networks that we tie that into. We're extremely excited about the capabilities that we give to the customers and their acceptance of it***.

105. The statements in ¶ 104 about the NPS scores were false and/or misleading because they failed to disclose that Quantum Fiber's NPS scores were derived from a Company-created methodology based on biased data, and therefore its NPS scores could not be used to accurately compare Quantum Fiber's customer satisfaction with the satisfaction of customers of other companies, ¶¶ 63-67. By omitting this information, Defendants gave investors the impression that customers were very satisfied with Quantum Fiber and would therefore continue to subscribe to it and recommend it to others, driving higher Quantum Fiber penetration rates.

106. In addition to making statements about Quantum Fiber's NPS score during the February 10, 2021 earnings call, Defendant Storey also discussed Lumen's strategy for its fiber-to-the-home expansion, stating that it views every opportunity for fiber construction through the lens of using "our capital efficiently":

> So it's a little bit of all of the above. ***All of the above has one characteristic and that is -- maybe 2 characteristics, that we think we can drive revenue growth at a low cost of capital and a low OpEx to do it. And so we view every opportunity through that lens: how do we make sure that we use our capital efficiency – efficiently and how do we make sure that we get the penetration that we want***. Neel touched on that as an opportunity for us. We still have an opportunity to

> improve our penetration in our fiber markets. But it is a little bit of all of the above: new construction, overbuilds in existing areas and then some expansion outside our traditional footprint.

107. During an Analyst/Investor Day presentation on April 7, 2021, Defendant Storey expressed a commitment to Quantum Fiber and its growth:

> The symmetrical nature of our fiber-to-the-premises solutions deliver differentiated performance for work from anywhere, remote education and similar use cases. ***As you know, we continue expanding our Quantum Fiber footprint and increasing our penetration.*** Our blended penetration of new and previous builds is almost 30%. To me, the existing penetration rate validates our Quantum Fiber strategy and represents an opportunity as we continue to drive penetration higher.
>
> ***Our investments to move to digital interactions are really paying off by reducing our costs and driving significant improvements in customer satisfaction. Our year-to-date NPS score for Quantum consumer customers is a positive 76.***

108. On the same April 7, 2021 call, Lumen's President of Consumer Markets Division, Defendant Maxine L. Moreau, assured investors of Quantum Fiber's success to date and Lumen's commitment to ongoing investment, stating in relevant part:

> It's not enough to have an amazing platform, we must also deliver results. In 2020, we expanded our fiber footprint by 400,000 locations. ***We've committed to future footprint expansion using our micro-targeted urban densification focus and disciplined approach that benefits multiple Lumen business units and customer segments. With urban densification, we can take advantage of many efficiencies in fiber enablement from planning to market readiness and achieve higher sales through targeted digital and local marketing tactics***.
>
> * * *
>
> We are also seeing a 50% reduction in churn before install from our enhanced communications and delivery processes. With an all-digital platform, superior fiber broadband service and the early successes we are seeing, what should you expect from Quantum Fiber in the future? ***Future investments will continue to focus on driving urban densification using our micro-targeted approach. With over 23 million living units and small businesses in our footprint, we have a vast footprint to select from to grow our fiber enablement. We have the ability to operate outside our footprint anywhere Lumen's fiber is in proximity to MDU and MTU developments***.

> ***Next, we are aggressively taking market share in our small business segment, especially with MTUs located in dense markets where we have fiber-lit buildings. In the first quarter, we are seeing a fourfold year-over-year improvement in small business fiber broadband net adds. With approximately 2.4 million locations fiber-enabled and 28% fiber penetration rate at year-end, we have a significant future growth opportunity with the investments we have already made. We expect to complete the launch of Quantum Fiber across all markets during 2021.***

109. Defendant Moreau also touted Quantum Fiber's NPS score, stating:

> Fiber is delivering a 20% reduction in run rate-level churn over historical levels, improving revenue and margin trends. Quantum Fiber eliminates complexity and enhances the support model for our customers. Our customers are loving the simplicity, ease of use and service that it provides. ***As a result, we are seeing significant improvement in the customer experience measured by Net Promoter Score. Our 2021 year-to-date aggregate NPS scores for Quantum Fiber customers is at positive 76, higher than Amazon or Apple. As you know, NPS scores above 50 are considered excellent.***

110. During that same April 7, 2021 investor day presentation, Defendant Storey emphasized that the Company's Quantum Fiber expansion strategy was "***proven***," that Lumen was "***investing at approximately the right pace***[,]" and that the Company would continue to "***heavily invest***" in the expansion:

> The symmetrical nature of our fiber-to-the-premises solutions deliver differentiated performance for work from anywhere, remote education and similar use cases. ***As you know, we continue expanding our Quantum Fiber footprint and increasing our penetration***. Our blended penetration of new and previous builds is almost 30%. ***To me, the existing penetration rate validates our Quantum Fiber strategy and represents an opportunity as we continue to drive penetration higher***.
>
> * * *
>
> ***And so we'll continue to heavily invest in that. We think that we are investing at approximately the right pace. We'll probably pick up speed as we move forward. But we've been making sure that we deliver on the value proposition, we get the return on investments and that we're able to drive the penetration.*** And what Maxine and her team have done have proven all of that strategy to us.

111. Defendant Moreau echoed Defendant Storey's sentiments regarding expansion, and declared that the Quantum Fiber buildout was "***not capital-constrained***[,]" stating:

> ***We don't -- we're not capital-constrained. So as we continue to improve our penetration and performance, we'll continue to expand our footprint, and we believe we've got a long runway for growth in -- within Lumen in Quantum Fiber***.

112. In response to an analyst question regarding Lumen's Quantum Fiber client footprint on a May 5, 2021 earnings call, Defendant Dev again touted the Company's Quantum Fiber strategy and the growth opportunity:

> Sure, Jeff. ***In terms of your question on Quantum Fiber, what we see is our micro-targeting approach is working***. ***And from an aggregate level, I know we're 28% penetration.*** And that's because as we are driving up our penetration, we're also adding more units. But if we look at certain neighborhoods, certain markets where we've been there for a while and we track the penetration by aging of those deployments, ***in some markets, we're up in the 40%, 50% ZIP code. So we clearly think there's a fair amount of opportunity to continue to drive the penetration up. So we'll continue with our focus on adding more Fiber to the Home and small business, and driving up those penetration rates.***

113. The statements in ¶¶ 106-112 above were materially false and/or misleading when made because they gave investors the false and misleading impression that the Company was devoting adequate resources—like materials, labor, and capital—to the Quantum Fiber buildout and was doing so efficiently, and that the Company had carefully planned the buildout to maximize its return on investment. Thus, these statements were materially false and/or misleading when made because they failed to disclose that: (1) Lumen's Quantum Fiber venture was inadequately funded and inadequately planned from the start, ¶¶ 68-77, 87-91; (2) Lumen was failing to manage supply chain pressures adequately, ¶¶ 72, 75-76; (3) Lumen did not have sufficient field engineers to lay fiber or technicians to install fiber for the Quantum Fiber project, and therefore did not have sufficient labor resources for building additional fiber to expand the Quantum Fiber brand, ¶¶ 71-72, 76; (4) the key metric used by marketing to market to new

customers called "premises passed" was unreliable and therefore Lumen's marketing department was not marketing Quantum Fiber to all available potential new customers, making it very difficult to generate the return on investment required to increase Quantum Fiber penetration, ¶¶ 68-69, 71; (5) Lumen was not using its capital "efficiently" and was "***capital-constrained***" because its finance team was approving only about 20% of proposed builds, wasting 80% of its resources, and thus a substantial portion of Lumen's investment in Quantum Fiber was lost on proposed builds rather than actually expanding fiber-to-the-home, ¶¶ 89-91; (6) as a result, it was impossible for the Company to be able to expand Quantum Fiber at the pace Lumen had touted to the investing public; and (7) Quantum Fiber's NPS scores were derived from a Company-created methodology based on biased data, and therefore its NPS scores could not be used to accurately compare Quantum Fiber's customer satisfaction with the satisfaction of customers of other companies, ¶¶ 63-67.

### 2. Defendants Announce that Lumen Will Ramp Up Quantum Fiber Builds

114. During the prepared remarks of an earnings call on August 3, 2021, with investors to discuss the Company's financial and operating results for the second fiscal quarter of 2021, Defendant Storey assured investors that the Company expected to accelerate the growth of its Quantum Fiber investment, due to its divestment of the LATAM and Apollo assets, and was working on a build plan to accelerate Quantum Fiber:

> ***First, we absolutely expect to accelerate the pace of our growth investments in Quantum Fiber***. By retaining the 16 states we have, fiber-based consumer and mass market services remain a huge opportunity for us and we have built a differentiated offering with Quantum Fiber, enabling an all-digital customer experience that uniquely positions us among mass-market broadband providers. ***As Neil will discuss, our Quantum Fiber results are bearing this out as we saw another quarter of net adds for our fiber and higher-speed offerings continuing results from previous quarters***.

> The jury isn't out on this one. When we invest in consumer fiber, we take share and we drive profitable growth. As I mentioned, upon closing the Apollo transaction, approximately 70% of our remaining mass market footprint will be the sort of urban and suburban markets that are best addressable with Quantum Fiber solutions. ***We are developing an accelerated build plan, and we'll share those details as they're finalized. What we can tell you today is that while we remain strategic and disciplined in our approach, we expect to build faster and with more scale in the markets that we prioritize for Quantum Fiber investment***.

115. In response to more questions from analysts, Defendants Storey and Dev continued:

> [Analyst]: And just maybe one more on the fiber expansion in consumer fiber. You have 2.4 million fiber-enabled homes today. I know you've said in the past, you still think you're underpenetrated. I mean how meaningful do you think that business can become? I mean where are you seeing opportunities where returns or penetration levels you can get are attractive. Maybe you could just expand a little bit on where you plan to take that business in the next few years.
>
> [Storey]: Sure. And we'll give you more information in coming quarters about the plans there. But we've looked at this business. ***We've been doing our micro-targeting that Neel mentioned, and we've been growing our penetration pretty successfully***. And so we believe there's a lot of opportunity. If you look at the retained 16 states, that's something like a little more than 20 million homes passed, and 70% of those we consider an urban or suburban market.
>
> ***So that's 15 million homes, something like that. We think all those are great opportunities for us to invest fiber into***. And so we want to ramp our plans and put some scale behind them because we think that they are – based on our experience over the last couple of years, we've done a very good job at continuing to invest fiber and grow where we invest.
>
> * * *
>
> [Analyst]: And when does the Quantum acceleration start? Is that kind of early next year? Or could that happen this year?
>
> [Dev]: Yes. That's what I was going to add, Simon. I think the underrun that Jeff highlighted is really related to the current environment and the enterprise business, and that's what we manage on a success-based basis. ***But we haven't slowed down on Quantum, and we are looking to accelerate that second half of this year and going into next year***. And that's not contingent on the deal. But with these things, it takes a while because there is this actual physical deployment, so permitting, et cetera, but we're scaling up.

116. During the August 10, 2021 Cowen Communications Infrastructure Summit, Defendant Moreau misleadingly told investors that Lumen is "***actively accelerating our fiber build and have been for some time and plan to continue to do so because we've seen from our efforts over the past couple of years, where we invest, we've grown***." She also again repeated, "***We are not capital constrained***."

117. At the September 22, 2021 Goldman Sachs Communacopia Conference, Defendant Storey reiterated Defendants' current financial commitment to Quantum Fiber in response to a question from Goldman Sachs analyst Brett Feldman:

> ***I mentioned that we've been ramping Quantum Fiber builds*** and more details are probably forthcoming in earnings calls and other things. But we're very pleased with the success that we've seen. We have 2.5 million homes within our fiber footprint. ***Our penetration rates are going up, our ARPU is strong, customer satisfaction and NPS scores.*** We've build a digital interaction model over the last couple of years for our Quantum Fiber customers that we think is second to none. ***And we will continue to – as we build more fiber into locations***, we'll bring that suite of capabilities to our customers more broadly.

118. During an earnings call on November 3, 2021, Defendant Storey repeated his earlier assurances that the Company was continuing its accelerated investment in Quantum Fiber and projected a major ramp up in 2022. He explained, "I'm excited to discuss the investments we're making to drive Enterprise and Quantum Fiber growth," and continued, "Let me start with Quantum Fiber. First of all, ***the quantum acceleration plan has already begun*** . . . . As we transition from micro-targeting to a broader market approach for deployment, ***we have high confidence in our ability to drive significant revenue growth for years to come***." He continued:

> As I mentioned during the second quarter call, we plan to accelerate Quantum Fiber investments in our retained markets. As of the end of the third quarter, we had approximately 2.5 million enabled locations within the retained 16 states. Historically, we've enabled around 400,000 locations per year, and we expect that pace will continue in the fourth quarter. ***As we accelerate our investment in Quantum Fiber, in 2022, we expect to ramp that enablement pace to over 1 million new locations, on our way to hitting a run rate of 1.5 million to 2 million enablements per year as we exit 2022***. ***When deploying Quantum Fiber,***

> ***we typically expect penetration rates of 40% or better with average build cost of less than $1,000 per location enabled.***
>
> After a thorough review of our footprint and given these economics, we expect our total addressable opportunity to be more than 12 million locations. ***Our Quantum Fiber plan for 2022 is fully funded, and we're very excited about these investments. But it's not just excitement born from hope. It's excitement born from experience and accomplishment. As we built Quantum Fiber, we've done more than simply construct new fiber. We built an excellent quantum experience and product capability that is now ready to ramp aggressively, providing higher ARPU, lower churn and greater customer lifetime value***.

119. Later in the call, in response to an analyst's question about the "consumer fiber investment opportunity," Defendant Storey explained, "***we have very high confidence in our ability to hit those numbers*** and grow the business aggressively."

120. Defendant Dev reiterated Defendants' commitment to "***scaling up our fiber investment***" in response to an analyst question about concerns for Lumen's consumer business and reassured the market that "we see that as a significant opportunity. ***I think the economics are fairly well understood. And so you're going to see us ramping that business***, and it's a long-life asset with predictable returns."

121. At the December 7, 2021 UBS Global TMT Conference, Defendant Andrews explicitly reiterated Defendants' Quantum Fiber growth and investment claims from the Q3 2021 conference call:

> Focus is definitely on investing for growth, investing for growth, investing for growth. ***And that comes in the form of investing in*** the Lumen platform, edge computing, unified communications, wrapping it with cybersecurity, managed services, and then ***the Quantum Fiber build that Jeff mentioned in our last earnings call, and doubling down there***. That's where most of the investment and the focus is in those two conversations.

122. The statements in ¶¶ 114-121 above gave investors the false and misleading impression that no obstacles were facing the accelerated Quantum Fiber expansion, that the Company was devoting adequate resources—like materials, labor, and capital—to the

accelerated Quantum Fiber expansion and was doing so efficiently, and that the Company had carefully planned the accelerated expansion to maximize its return on investment. Thus, these statements were materially false and/or misleading when made because they failed to disclose that: (1) Lumen's Quantum Fiber venture was inadequately funded and inadequately planned from the start, and the same was true of its acceleration plan, ¶¶ 68-77, 87-91; (2) Lumen was failing to manage supply chain pressures adequately, ¶¶ 72, 75-76; (3) Lumen did not have sufficient field engineers to lay fiber or technicians to install fiber for the Quantum Fiber project, and therefore did not have sufficient labor resources for building additional fiber to expand the Quantum Fiber brand, ¶¶ 71-72, 76; (4) the key metric used by marketing to market to new customers called "premises passed" was unreliable and therefore Lumen's marketing department was not marketing Quantum Fiber to all available potential new customers, making it very difficult to generate the return on investment required to, *inter alia*, "***drive significant revenue growth***", ¶¶ 68-69, 71; (5) Lumen was not being "***strategic and disciplined***" in its approach to expanding Quantum Fiber, and it was "***capital-constrained***" because Lumen's finance team was approving only about 20% of proposed builds, wasting 80% of its resources, and thus a substantial portion of Lumen's investment in Quantum Fiber was lost on proposed builds rather than actually expanding fiber-to-the-home, ¶¶ 89-91; (6) Lumen had not been able to build at an average "***cost of less than $1,000 per location enabled***" , ¶¶ 87-88; (7) as a result, it was impossible for the Company to be able to expand Quantum Fiber at the pace Lumen had touted to the investing public, *i.e.*, exiting 2022 with ***1 million*** more enablements at "***a run rate of 1.5 million to 2 million enablements per year***"; and (8) Quantum Fiber's NPS scores were derived from a Company-created methodology based on biased data, and therefore its NPS scores could

not be used to accurately compare Quantum Fiber's customer satisfaction with the satisfaction of customers of other companies, ¶¶ 63-67.

**C. Defendants' Material Misrepresentations and Omissions in January 2022**

123. Defendant Storey began 2022 at the January 6, 2022 Citi AppsEconomy Conference and reiterated Defendants' commitment to their prior Quantum Fiber building and investment plan, explaining and reaffirming multiple times within the call that "[w]e've already announced our accelerated Quantum Fiber build and plan to add more than 12 million locations over the coming years in the remaining 16 states that we operate in, in those states."

124. Defendant Storey gave no indication at all that there were issues with the rollout, explaining, "We have about 2.5 million, using rough numbers, today. So that's about 10 million more locations. ***We said that, in general, we target less than $1,000 per home.*** So you can do the math on that. It's a fairly significant investment over the next 4 to 5 years, ***but we're really pleased with the progress that we've made over the past couple of years and think that there's – it's a great opportunity for us***. If you look, that's a significant ramping from where we've been."

125. Defendant Storey explicitly cited Defendants' past success in the buildout for why there would be continued investment: "***And so we've proven that can build successfully. We've proven that we can deliver successfully and build all of the systems around the customer necessary to do that. So we'll continue to invest there***."

126. Even more specifically, Defendant Storey denied that there had been any change in strategy in confirming the acceleration of the Quantum Fiber buildout, in response to a question from a securities analyst:

> I don't think there's any change, actually. This is the path we've been on, but we need to do the prep work to get ready for it. We needed to have the all-digital

experience. We needed to continue to enhance our capabilities. And we wanted to prove to ourselves through micro-targeting that we had all of those capabilities to understand what they are, develop them.

And so it's not – there's no change in the strategy. ***There's an acceleration of the strategy because we think we have all those things in place. Our NPS scores show it. Our penetration rates show it.*** We think we have all of the capabilities in place.

***Now we just really want to ramp more aggressively.*** We said that we were – we've historically been at about 400,000 locations pass added every year. We've said that we will do about 1 million locations in 2022, and we'll finish the year at a run rate of about 1.5 million to 2 million locations passed in `23 and beyond. And so it's really the continuation of the strategy we've had. ***But now we have all the pieces in place to make that acceleration.***

127. Defendant Storey explicitly recognized the aggressiveness of these growth claims, noting "I just said, we're going to ramp from about 5x what our historical number is. So that's pretty quick. We're going to do that over the course of the next year. So I think we are being aggressive." Later in the call, he continued, "That's part of our Quantum Fiber strategy is to focus on dense urban clusters ***and make sure that we continue to expand it***."

128. The statements in ¶¶ 123-127 above were materially false and/or misleading when made because they gave investors the false and misleading impression that no obstacles were facing the accelerated Quantum Fiber expansion (*e.g.*, "***now we have all the pieces in place to make that acceleration***," ¶ 126), that the Company was devoting adequate resources—like materials, labor, and capital—to the accelerated Quantum Fiber expansion, and that the Company had carefully planned the accelerated expansion to reach its goals and maximize Lumen's return on investment. Thus, these statements were materially false and/or misleading when made because they failed to disclose that: (1) Lumen's Quantum Fiber venture was inadequately funded and inadequately planned from the start, and the same was true of its acceleration plan, ¶¶68-77, 87-91; (2) Lumen was failing to manage supply chain pressures adequately, ¶¶72, 75-76; (3) Lumen did not have sufficient field engineers to lay fiber or

technicians to install fiber for the Quantum Fiber project, and therefore did not have sufficient labor resources for building additional fiber to expand the Quantum Fiber brand, ¶¶71-72, 76; (4) the key metric used by marketing to market to new customers called "premises passed" was unreliable and therefore Lumen's marketing department was not marketing Quantum Fiber to all available potential new customers, making it very difficult to "***expand***" Quantum Fiber, ¶¶68-69, 71; (5) Lumen's finance team was approving only about 20% of proposed builds, wasting 80% of its resources, and thus a substantial portion of Lumen's investment in Quantum Fiber was lost on proposed builds rather than actually expanding fiber-to-the-home, ¶¶89-91; (6) Lumen had not been able to build for around $1,000 per enablement, ¶¶87-88; (7) as a result, it was impossible for the Company to be able to expand Quantum Fiber at the pace Lumen had touted to the investing public*i.e.*, exiting 2022 with ***1 million*** more enablements at "***a run rate of 1.5 million to 2 million enablements per year***"; (8) Quantum Fiber's NPS scores were derived from a Company-created methodology based on biased data, and therefore its NPS scores could not be used to accurately compare Quantum Fiber's customer satisfaction with the satisfaction of customers of other companies, ¶¶ 63-67; and (9) the Company relied upon unrealistic cost estimates that were based on a "gold-rush mentality as it relates to fiber to the home," ¶¶87-88.

### D. Defendants' Material Misrepresentations and Omissions Are Partially Corrected on February 9, 2022

129. On February 9, 2022, during a conference call to discuss the Company's financial and operating results for the fourth fiscal quarter and full year ended December 31, 2021, Defendant Storey partially revealed the negative effects of stressed supply chains on Lumen's operations:

> ***Both enterprise and mass market supply chains are stressed, and we continue working very closely with our diverse and valued suppliers to mitigate risk as we execute on our growth objectives.*** In addition, we're managing through this

> inflationary environment and, with some exceptions, do not expect pricing pressures to impede our goals.

130. During that same conference call, Defendant Storey confirmed that those supply chain obstacles negatively impacted operations regarding Quantum Fiber in response to analyst questioning:

> [Simon William Flannery – *Morgan Stanley*]: So good to hear on the Quantum Fiber revenue growth and the build plans. I guess on the build plans, should we think about the – I think you did 400,000 this year. Should we think about the 1 million this year as being fairly linear? Or is it still very much second half loaded, I guess, to get to that 1.5 million to 2 million? And ***I guess the question is why not go faster***? We've obviously seen the infrastructure bill award a lot of funding. We've seen fixed wireless gain some traction here. So if you see the opportunity here, you've got obviously a lot of homes with potential. ***So what's keeping you from accelerating that pace***? And then, Neel, just one on taxes. I saw you highlighting, I think, $100 million of cash taxes. But what should we be thinking about run rate cash taxes once the transactions are complete in terms of the ongoing – as a sort of a full taxpayer? Does that go up a few hundred million as we get out of '22 and to '23?
>
> [Defendant Jeffrey K. Storey – *CEO*]: ***So Simon, on the build plan for Quantum Fiber, it's not going to be linear. It takes a while to ramp these capabilities, to do the engineering, to make sure that we've got the construction resources in place. So it's not going to be linear*** but it's not going to be fully back-end loaded either. We're already at a pace of, call it, 400,000, 500,000 homes and business locations. So there's going to be that as a starting point, but we'll get to the full 1 million toward the end of the year, obviously. So it's a little back-end loaded but not substantially.
>
> What keeps us from going faster? This is hard work. It's hard work. There's a lot of things to do. We want to make sure that we do it right. We're exceptionally good at building networks and we will continue to do that with the Quantum Fiber build, ***but there's hard work. And we also have supply chain challenges***. And I mentioned that in the prepared remarks. ***I don't want to overemphasize it but it's an issue, and we see it with equipment vendors and chips and them getting access to chips. So we'll continue to manage that, but that's also a constraining factor on how to accelerate faster***. Now the main point is we want to accelerate to a point of 1.5 million to 2 million homes by the end of the year. So we want to be on that run rate finishing the year and going into 2023. And that's really a large effort to make sure that we do go as fast as we possibly can.

131. On this news, Lumen's stock price declined $1.99, or 16%, from a close of $12.82 per share on February 9, 2022, to a close of $10.83 on February 10, 2022. The stock continued to decline on February 11, 2022, falling another $0.74 or 7%, from $10.83 to $10.09, as a result of the Company's February 9 disclosures.

### E. Defendants' Material Misrepresentations and Omissions Are Partially Corrected on March 8, 2022

132. On March 8, 2022, during the Morgan Stanley 2022 Technology, Media & Telecom Conference, Laurinda Y. Pang, Lumen's President of Global Consumer Success, disclosed that Lumen was facing labor issues and that one of the Company's four top priorities was "around talent. I think in today's market, we all are very keenly focused in on making sure that we've got the right talent within the organization. It's becoming increasingly more difficult for – I think, for any industry, given the world that we live in today."

133. Later in the call, Pang was asked about the labor issues and explained how difficult times were in that area:

> [Analyst]: And I guess that's – you mentioned talent. ***I guess that that's one of the challenges is finding the people to build these networks***.
>
> [Pang]: ***Yes.*** It's definitely a challenge, right? There's a lot of people out there that are vying for the same talent. And so again, it's something that we have to actively manage ourselves. ***It's not like the good old days where it happened and that there was a surplus.*** It's something that has to be managed very carefully.

134. Additionally, Pang disclosed that supply chain issues were still plaguing the Company, stating that the supply chain is "not getting better any time soon" and that "[s]upply chain will affect us in a lot of different areas, whether it be the infrastructure, just upgrades in the network, customer equipment, Quantum Fiber."

135. On this news, Lumen's stock price declined 3%, from a close of $10.95 per share on March 8, 2022, to a close of $10.62 on March 9, 2022.

### F. Defendants' Additional Material Misrepresentations and Omissions in 2022

136. Although Defendants indicated on the February 9, 2022 earnings call and the March 8, 2022 Morgan Stanley 2022 Technology, Media & Telecom Conference that the buildout of Quantum Fiber was not proceeding according to the pace Defendants had previously represented during the Class Period due to supply chain and labor issues, they continued to conceal the status of the Quantum Fiber launch by issuing false and misleading statements to investors about Quantum Fiber.

137. Specifically, Defendants did this by downplaying the significance of the buildout slowdown even during the February 9, 2022 earnings call. For example, Defendant Storey claimed that the supply chain issues would not interfere with Lumen's goal of enabling 1 million homes and businesses with fiber by the end of 2022, stating, "[w]e're already at a pace of, call it, 400,000, 500,000 homes and business locations. So there's going to be that as a starting point, ***but we'll get to the full 1 million toward the end of the year, obviously***."

138. Moreover, Defendant Storey promised that "***[o]ur fully-funded 2022 Quantum Fiber plan*** will enable millions of customer locations to experience our best-in-breed Quantum experience and product capability that we believe will drive higher ARPU, lower churn and significant customer lifetime value. ***We will invest heavily to bring the Quantum experience to our customers***, ***especially in the areas of product development, marketing, brand and go-to-market sales initiatives***." Storey reiterated that one effect of Lumen's commitment to the "Quantum Fiber deployment plan" is that it would take longer to "reach our target net leverage ratio of 2.75 to 3.25x adjusted EBITDA . . . ."

139. In response to an analyst question about capital expenditures during the February 9, 2022 earnings call, Defendant Dev reiterated that the Quantum Fiber build was not capital

constrained and specified that "to the extent we can scale faster, if you look at the combination of free cash flow and deal proceeds, ***we can easily ramp up more spending for Quantum Fiber. That won't be the constraint***."

140. Defendant Dev also distinguished the 2022 investment in Quantum Fiber from other capital expenditures, that most other investments are "***success-based at a much lower intensity***," and that "***Quantum will ramp up***. We do view that as a discrete project, but the rest of the plan will be dynamic and will be success-based."

141. Defendant Storey echoed this commitment stating, "as we look at the CapEx, we are very committed to investing in Quantum Fiber." He further explained, in response to an analyst question about the future of Lumen's capital investment:

> So what Quantum Fiber investments are we going to make in 2022 that could come off in 2023, we're not giving guidance for 2023, but ***we do plan to ramp our Quantum Fiber investments***. We've said that. ***We said that our plan for the year in 2022 is 1 million homes, and then we plan to do 1.5 million to 2 million at a run rate basis by the end of the year. So we're not giving forward-looking guidance, but we have given you an indication of what we expect and how we expect to build***.

142. The downplaying of the supply chain and labor challenges continued throughout 2022, with Defendants falsely assuring investors that they were adequately managing these issues such that no obstacles were likely to prevent the Company from exiting 2022 with approximately 1 million more homes enabled at a run rate of 1.5 to 2 million locations per year.

143. For example, on March 14, 2022, Defendant Moreau stated:

> [Host]: Okay. You mentioned supply chain impacts on your fourth quarter earnings call like a lot of companies. Can you just talk about that, maybe provide an update? [. . .]
>
> [Moreau]: Sure. So we have seen supply chain challenges in equipment and labor. ***But we feel like we have a really good ecosystem that we've built over many years. We're a large company. So we have multiple suppliers for our equipment, for our fiber, for our labor, and we feel like that we have many***

> ***avenues to mitigate any near-term supply chain challenges, but we watch it every day***.
>
> We're in close contact with all of our suppliers. They understand what our investment plan looks like. They understand where we're building and the pace in which we plan to build. And so we feel like we're mitigating those not only with our suppliers but also internally as we stay aligned on what our strategic plan is.
>
> * * *
>
> So as we pivot from this micro-targeting to this market-based approach, ***you're going to see us ramp. We communicated late last year that that our expectation is that we're going to go from a pace of about 400,000 addressees a year to 1 million this year and exiting the year at anywhere between 1.5 million to 2 million capability exiting the year.***

144. Shortly thereafter, Wes Gibson, Lumen's Senior Vice President of Sales and Marketing, presented at a New Street Research and BCG Fiber to the Future – Global Infrastructure Conference on March 29, 2022, and again misled the market by downplaying the supply chain issues facing the Company in response to questions posed by the host:

> [Gibson]: . . . And then lastly, late last year, we announced that ***we are going to be investing for growth in mass markets.***
>
> ***We believe that we can pass 12 million or more locations with fiber over the next several years*** in the remaining 16 state footprint that I mentioned, which has a total of 21 million locations. So if you think of what's left after the 20 states are divested, it's about 21 million locations planned to build fiber to 12 million or more. And as a result of that, we really also announced that we're going to accelerate the pace of our investment.
>
> ***So the last couple of years, we've reported about a 400,000 living unit per year pace. We announced that we're planning to ramp that up to 1 million locations this year and then in the year with a run rate of 1.5 million to 2 million locations. So we're -- increase our pace in 2022, further increase our pace again in 2023.***
>
> So as part of this, we're really transitioning from really a micro-targeted approach to a market-based approach. And what that means is we're going to be targeting larger dense areas in a more ubiquitous way than just targeting certain areas within the market. The work we're doing with Quantum Fiber is really going to play an important role for the overall goal that we announced to return to revenue growth in the next 2 to 3 years.

> [Host]: These are obviously very impressive targets. So can you talk a little bit more about -- like you're shifting from doing 400,000 locations annually towards 2 million living units as you publicly talked about it. How do you -- what do you have to put in place to hit some of those milestone because there are obviously a whole set of issues from supply, resourcing, policy, permitting and internal capabilities. Can you talk a little bit more about like how you're thinking about it?
>
> [Gibson]: ***Sure. First, I'll probably start with the fact that we really started planning this build well in advance of our announcement, and we feel really good about where we are in the cycle currently.*** So if you -- and if you think about what I said earlier, the transition from micro targeting to a market-based approach, that really is the key enabler, allowing us to focus on these clusters of living units instead of cherry picking and micro targeting different areas within a market.
>
> * * *
>
> [Host]: And related to the subsidies, but even in conjunction of your overall fiber deployment, supply chain and labor, we hear those 2 words a lot nowadays. And you obviously, like any other telcos, use outside labor for fiber construction, for splicing, et cetera. Are you facing any labor constraints so far? Are you anticipating? And how are you going about working on it?
>
> [Gibson]: Yes. I mean we're not immune to supply chain challenges for sure. ***What I said earlier, though, is we started planning for these builds in the middle of last year. So we didn't really start -- we just thought about the planning once we announced that we were already kind of in the middle of the planning***.
>
> From a labor standpoint, we have diversity, we also have internal resources that we believe that we can redeploy to help project management, engineering and as well as other activities within the business. From an equipment and supply standpoint, we placed those orders well in advance, 9 to 12 months in advance to make sure that we get in the queue early. And we have a diverse supplier set that's on the labor side and the supplier side. ***So we feel really good about where we are.***
>
> ***We're not really seeing anything today, but it's something that you definitely have to say [sic] constantly engaged in and make sure you have mitigation plans in place that we do. So again, I feel good about the -- our ability to execute on the plans that we've laid out***. But I'm sure it won't be without challenges and bits along the way.

145. These statements about Lumen's prior planning for the Quantum Fiber rollout were reiterated by Defendant Stansbury at the June 1, 2022 Cowen Technology, Media &

Telecom Conference call, where he stated that Lumen had already ordered the supplies needed for the buildout, and that "***a dramatic ramp***" of builds would occur in the second half of the year:

> ***If you think about what has to happen to take Fiber to the Home, you've got to do your market identification, you got to do site walks, engineering, permitting, and so all of that activity to fill the 2022 build funnel really started in early fourth quarter last year***. And so the work to get 2022 [field] has been complete. We're waiting for permitting now. We're not waiting to order equipment.
>
> ***So any of the supplies we need to build out those markets has been ordered.*** And as soon as we get permit approvals, then we're going to be in market. ***So that's why Q1, and frankly, even Q2, you're not going to see huge numbers, but you will see a dramatic ramp in Q3 and Q4***. And importantly, as we exit this year, we will have the funnel full for next year.

146. Defendant Stansbury continued to brush off concerns by an analyst about the supply chain and whether that would be an issue for the Quantum Fiber rollout:

> Yes, ***we are getting what we need to build those markets. We're a big buyer of those supplies. So we have long memories. And our suppliers do a good job of getting us what we need, so that we can build those markets out. So I don't think that's a constraint.*** You know a lot of the labor that we use is internal labor, and we're . . .
>
> [Analyst]: And unionized.
>
> [Stansbury]: Yes. ***And so we're able to retrain that labor, which is important to that population***. It's important to us. And that's allowed us as well to ***help get these markets build [sic] out, going forward***.

147. During the prepared remarks of the Q1 2022 earnings call on May 4, 2022, Defendant Storey continued to reiterate that "***our Quantum Fiber build plan is ramping, and we expect momentum to continue to accelerate as we drive toward our expectation of hitting 1 million or so new fiber enablements in 2022. . . . As we see it, we are in the first inning of this exciting expansion and are laying the foundation for what we believe is a very large growth opportunity***."

148. More specifically, Storey explained "[w]e expect the Quantum capital investment to be concentrated over the next several years, but we believe the capabilities we are enabling will sustain our Quantum product for years into the future." Storey claimed that "***having accelerated our engineering and preconstruction work processes in the first quarter, we expect our build pace to continue to accelerate throughout the year, putting us on track to achieving our goal of 1 million or so enablements in 2022***" and that "***we are pleased with our accelerating build pace and look forward to taking meaningful market share as we continue to gain scale***."

149. In response to an analyst question about supply chain issues, Defendant Storey again de-emphasized them:

> ***Now the last point is we have great relationships***. And so I talked to our major vendors pretty regularly, and we work with them in good times and in bad to make sure that they have accurate forecasts for our services. And so during COVID, I worked with a lot of these vendors to make sure they knew what they could expect from us. And now we're working with them to make sure that we can expect from them. So we'll continue to work through the supply chain issues. ***It's a warning flag that I want you to hear, but I don't want you to overemphasize it in that either.***

150. During the May 19, 2022 Moffettnathanson Media & Communications Summit, Defendant Dugan reiterated the other Defendants' claims that "we're increasing our investments in our mass market space. We've historically built fiber to the home for about 400,000 units per year. ***We're increasing that this year to 1 million units. But we're planning to really end the year on an accelerated pace for more than 1 million units, 1.5 million or more***."

151. When questioned about their confidence in the Quantum Fiber rollout numbers, Defendant Dugan explained, "***I'd say confidence is high to get to the 1 million units this year***. But 1 thing you should recognize is that it's going to be a ramp to that . . . . ***So your expectations for the first half of the year, don't be too surprised if the volumes don't look like***

***the run rate that we're trying to get to for next year because work – the work is working its way through that pipeline***. Things that we're watching up for is certainly supply. It hasn't gotten in the way of meeting our needs this year. ***It's something that we're managing very actively and something that we think we can get through.*** " Specifically, Dugan claimed that "we're managing our suppliers there effectively" and that Lumen had confidence in its fiber suppliers to "get what we need as long as we forecast and order at the right intervals and we are doing that."

152. At the June 13, 2022 Wells Fargo Streaming & Connectivity Conference call, the first question Defendant Moreau was asked began with the observation by an analyst that "obviously, today, we'll focus a lot on your Quantum Fiber build. So maybe you could start by talking about the pace of the build this year." Defendant Moreau responded that "***we feel really good about our ability to enable 1 million or so locations this year and exit the year at that faster rate [1.5 million or upwards of 2 million thereafter] that you mentioned***." During the same call, she later confirmed that "***we have line of sight into reach that 1.5 million to 2 million run rate existing this year***."

153. Defendant Moreau was then asked about how she had previously spoken about the "average build cost expected to be less than $1,000 per enabled home," and she confirmed "***we feel really good about our assumptions to be able to build in these dense urban clusters averaging around $1,000 per location***."

154. During the prepared remarks of an earnings call on August 3, 2022, Defendant Storey assured investors that the Company was still on track for 1 million enablements by the end of 2022 and predicted further growth in 2023:

> ***Our Quantum Fiber build is ramping with second quarter enablements more than doubling since the fourth quarter of last year, and we expect further***

> ***acceleration in the second half of 2022 and into 2023. Permitting processes for our Quantum Fiber builds haven't improved as much as we would like, and we see supply chain challenges across our business. But we have not changed our target of 1 million or so enablements by year-end***.

155. Further, Defendant Storey explained, "We are excited to update you on our progress with Quantum Fiber, which is the critical growth engine for this segment. As I mentioned earlier, in just 2 quarters, we have doubled our pace of new Quantum enablements with further acceleration coming. ***Our Net Promoter Score remains above 50, demonstrating the quality of our product and the easy-to-use nature of our all-digital experience***."

156. In response to a question from an analyst concerned about whether Lumen could meet its fiber passing targets, Storey again affirmed Lumen's targets of 1 million passings by the end of 2022:

> On supply chain, Eric, you asked if is it equipment, labor or materials. The answer is yes on all 3 of them. We deal with each of them differently. But the inflationary pressures that you see, that the rest of the market sees are the same ones that we see, and they come in those 3 main areas. We've got great -- not the inflation – I'm sorry, the supply chain pressures.
>
> We've got great relationships with our large vendors. So whether that's material vendors or equipment vendors, we've got great relationships with them. ***We're working through their challenges with them, and we feel pretty good about that. And we think it's improving slightly***. But it's too early to call whether that's a blip or a trend. And we'll continue to stay very focused on that, working closely with our large suppliers and our large vendors. And we will continue to work on labor costs.
>
> [* * *]
>
> ***With respect -- does it slow the Quantum Fiber build? I have not changed my expectations that I've given our team, okay? I still want to get to close to 1 million homes this year***. It certainly does affect us. We've talked about permitting. I mentioned it in the comments. Their labor shortages in permitting departments causes problems for us. Labor challenges in electric companies cause problems with us for pole attachments. And so there are other people's labor challenges that do cause us to slow. ***But I have not changed my targets that I've given our team internally at this point.***

157. The statements in ¶¶ 137-141, 143-156 above were materially false and/or misleading when made because they gave investors the false and misleading impression that the Company was adequately managing the supply chain issues and labor shortages it faced such that no obstacles were likely to prevent the Company from exiting 2022 with approximately 1 million more homes enabled at a run rate of 1.5 to 2 million locations per year and at the fiscally conservative price of ***"around $1,000 per location***." Thus, these statements were materially false and/or misleading when made because they failed to disclose that: (1) Lumen's Quantum Fiber venture was inadequately funded and inadequately planned from the start, and the same was true of its acceleration plan, ¶¶ 68-77, 87-91; (2) Lumen was failing to manage supply chain pressures adequately, ¶¶ 72, 75-76; (3) Lumen did not have sufficient field engineers to lay fiber or technicians to install fiber for the Quantum Fiber project, and therefore did not have sufficient labor resources for building additional fiber to expand the Quantum Fiber brand, ¶¶ 71-72, 76; (4) the key metric used by marketing to market to new customers called "premises passed" was unreliable and therefore Lumen's marketing department was not marketing Quantum Fiber to all available potential new customers, making it very difficult to take "***meaningful market share"*** with Quantum Fiber, ¶¶ 68-69, 71; (5) spending was a "***constraint***" on Lumen's accelerated buildout because Lumen's finance team was approving only about 20% of proposed builds, wasting 80% of its resources, and thus a substantial portion of Lumen's investment in Quantum Fiber was lost on proposed builds rather than actually expanding fiber-to-the-home, ¶¶ 89-91; (6) Lumen had not been able to build for around $1,000 per enablement, ¶¶ 87-88; (7) as a result, it was impossible for the Company to be able to expand Quantum Fiber at the pace Lumen had touted to the investing public, *i.e.*, exiting 2022 with approximately ***1 million*** more enablements at "***a run rate of 1.5 million to 2 million enablements per year"***; (8) Quantum Fiber's NPS

scores were derived from a Company-created methodology based on biased data, and therefore its NPS scores could not be used to accurately compare Quantum Fiber's customer satisfaction with the satisfaction of customers of other companies, ¶¶ 63-67; and (9) the Company relied upon unrealistic cost estimates that were based on a "gold-rush mentality as it relates to fiber to the home," ¶¶87-88.

### G. Defendants' Material Misrepresentations Are Partially Corrected on November 2, 2022

158. On November 2, 2022, during a conference call to discuss the Company's financial and operating results for the third fiscal quarter and nine months ended September 30, 2022, Lumen's CEO, Defendant Storey, further revealed delays in the Quantum Fiber build:

> I'd like to talk more specifically about our digital transformation and the foundation we laid for our business going forward. ***Digital transformation is not a destination, but it's a journey.*** I'm very pleased with the significant strides we've made in driving simplicity and automation into our business. We are now easier to do business with, have greater efficiency and are evolving the way our customers interact with and experience our capabilities.
>
> Our customer experience is better than ever and continues to improve as demonstrated by our very high NPS and customer e-scores for both Quantum Fiber and the upper end of our enterprise customer base. ***Although not yet where we want to be***, our results with our mid-market customers clearly show ***we're making progress*** there as well.
>
> As I say to our team all the time, ***we have much more to do***, and I'm incredibly proud of their accomplishments so far. Top line growth is our principal focus, but ***we cannot overstate the importance of these transformation efforts in delivering the experience our customers want and driving the efficiencies we need to grow the profitability of our business***.

159. Furthering the admission that Lumen's Quantum Fiber was "not yet where we want to be" and that the Company has "much more to do" yet not revealing that Lumen had actually stopped the Quantum Fiber rollout, Defendant Storey continued:

> We have a powerful and robust fiber network complemented with an increasingly deep set of adjacent capabilities like orchestration, interacting with our customers' businesses via machine-to-machine applications rather than phone calls or e-

> mails. ***The market for these capabilities is still in the early stages of growth*** that I believe the ***foundation to Lumen to be a market leader has been laid and the opportunity for growth is significant***.
>
> On the Mass Markets side, we have ramped our investment in the Quantum Fiber footprint and our all-digital service delivery platform. We've doubled the number of new enablements per quarter over last year. ***So let me be clear, we are not yet at the pace of build we expect or want***. ***We will continue to ramp our enablements and overcome the supply chain, labor and inflationary constraints we've seen***.

160. During that same conference call, Lumen's CFO, Defendant Stansbury, also admitted that "we slowed some of our [digital] transformation efforts" while undertaking a series of divestiture transactions.

161. During the question and answer segment of the earnings call, a J.P. Morgan analyst asked "what's holding this [fiber build] back" and "[w]hat's your potential to accelerate from here?" Defendant Storey replied to the analyst:

> If you look at our fiber enablement, ***we're not doing it as fast as we want to do***. So let me lead with that. ***We're not doing it as fast as we want to be deploying new enablement***. ***There are a lot of things that go into that supply chain constraints, labor shortages, inflationary pressures and those types of things.*** And we'll continue to work through those. ***So I'm not terribly worried about it, but we'll work through them***.

162. On this news, Lumen's stock price declined $1.25, or 18%, from a close of $7.05 per share on November 2, 2022, to a close of $5.80 on November 3, 2022.

### H. Defendants Continue to Make Material Misrepresentations and Omissions

163. Although the November 2, 2022 announcement revealed that Lumen's fiber build had slowed down, the statements made on that date gave investors the false and misleading impression that the Company was continuing to invest in fiber builds, while failing to disclose that Lumen had actually ***stopped*** doing so that quarter.

164. For example, during the conference call, Defendant Storey explained, "We have strong conviction with focusing on growing markets where we can create dense urban clusters, and supporting all of the communities within those clusters ***is the best approach to maximize our investments and significantly expand the reach of our Quantum Fiber offering***."

165. Similarly, in response to a question about the fiber capital expenditure and its effect on Lumen's goal to pass 22 million homes, Defendant Stansbury again denied that Defendants' goals had changed or revealed that Lumen had stopped the Quantum Fiber rollout:

> I don't think this changes the goal. This is obviously a multiyear project, doing everything and, as Jeff mentioned earlier, ***to go as fast as we can***. Obviously, there's some near-term headwinds. ***But at this point, I don't think that changes our goal in terms of where we want to go or what we think we can do. it's [sic] really about all hands on deck right now to see what we can do*** given permitting and labor issues to get as many enablements in the ground as we can, as fast as we can.

166. Accordingly, on the December 1, 2022 Wells Fargo TMT Summit conference call, CFO and Defendant Stansbury reiterated that the Company was continuing to invest in fiber builds when he stated:

> There was extensive conversation with the Board leading up to the close of that deal. Kate was involved in that before she joined, so that she knew what was coming and had input to that decision. ***And really, what it all boiled down to is we've got a commitment on Quantum Fiber, and that opportunity is real***. We've got an enterprise business that in large enterprise and public sector is performing well, but that also requires capital. And really, over the next 4 to 5 years, ***we're in investment mode while we position the company for long-term strength and returning capital to shareholders***.

167. Later on that same call, Defendant Stansbury expressed his focus on having Quantum Fiber grow now and emphasized the work that the Company was purportedly doing to grow that business in the present:

> If you think about the consumer business for a second, when you think about Quantum Fiber, the whole mindset about, hey, cannibalization is bad, is exactly why we have roughly 10% copper penetration in the markets where we are and

> ***why we're out doing Quantum today.*** That mindset cannot influence the way we think about the enterprise segment.

168. In response to a specific question about Defendants' previously touted Quantum Fiber goals, Defendant Stansbury misleadingly gave the impression that the rollout was still progressing:

> [Analyst]: So I definitely wanted to talk about Quantum Fiber, fiber to the home has been a big topic of discussion at this conference. So you've called out a variety of labor, supply chain, permitting challenges as part of your Quantum Fiber build. And I know aspirationally in the past, you've talked about wanting to get to a run rate of building out 1.5 million to 2 million locations on an annual basis, so maybe you could talk about the pathway or anything on the timing to get there? And whether you see some light at the end of the tunnel on working through some of these supply chain challenges?
>
> [Stansbury]: Yes. So when I came in to Lumen, my biggest concern is that we -- I didn't want us just to be focused on number of enablements and cost per enablement, right? We need to be focused on good enablements, right? Enablements that allow us to generate solid penetration as we go forward. So there's no point in building fiber if a customer doesn't want that fiber, right***? And so we have gone through extensive work to make sure that those are the kinds of enablements we're building. So that's a real thing. I think there's been very good thinking that's been done on that***.
>
> And then yes, that is -- you layer on top of that some of the issues we've had on the supply chain side, and that's where we are today. So I'm not ready to give a time frame on when we get to necessarily those larger numbers***. I do think that the scaling of the factory, if you will, is moving in the right direction, but it's not going to be quick.*** It's -- when you look out in terms of engineering and permitting. At any point in time when you're having that discussion, you're really talking about something that's going to take place in 9 months. And so I think we're doing the right things, but I think it's going to be a little while until we see that really start to ramp.

169. As Defendant Stansbury further explained, again giving the misimpression that the Quantum Fiber rollout was still continuing: "I also would say that even with our focus on making sure we're building the right enablements, these are growing markets. And they're definitely –we're in Western markets, there's definitely a shift west. I think that will continue to

create future opportunity that we can't really measure today. ***But as building continues*** and population shift, that's in our favor**.**"

170. At the December 6, 2022 UBS Global TMT Conference, CFO and Defendant Stansbury claimed that Defendants had paused the Quantum Fiber buildout, but had restarted and was on a better trajectory, all while claiming he was offering "full transparency":

> ***So there's full transparency***. There's the external factors with tough labor markets and permitting, but there's also some internal stuff as well. And when I came in, I wanted to make sure that the investments that we were making were in the right markets. We obviously, when we go into a market, we want to cover it well. But we want to make sure that long term, we're going to earn a return on that. ***And so we hit pause to double down.***
>
> I wanted to make sure there was financial rigor around that. And as a result, we did make some adjustments in terms of what to do and what not to do. And so that slowed us somewhat. ***I would say the good news is, is I think it put us on a better path as we go forward.*** The bad news is it slowed us down.

171. Defendant Stansbury reaffirmed these points later on the same call when he stated:

> I would say that the planning – again, ***we had a bit of a shift because I hit pause for a few months, but we now know exactly where we're going, what we're doing and how we're going to go about that***. So we'll give more color as we go forward. ***But I think there's no more debate as to what are the right areas to focus on. It's now ongoing and executing***.

172. Defendant Stansbury again characterized Lumen as having previously paused the Quantum Fiber rollout later in the same call:

> And so right now, the #1 focus is growth. Let's make sure we're investing in smart areas and doing the right thing, like ***the hitting pause on Quantum to make sure that we were building the right markets***. But then from there, we go. So the real focus today is making sure that we understand where the gaps are, where we need to invest and then building that into our guidance for the next year. So that's what we're working on.

173. Moreover, when specifically asked by Batya Levi, Executive Director and Research Analyst, at UBS Investment Bank, about "the cost to connect" and whether "$1,000"

was "in the ballpark," Defendant Stansbury responded, "***That's in the ballpark. Yes***" before noting, "[a]nd again, there's this huge variation to that, we're depending on whether it's off of a pole or it's subterranean."

174. The statements in ¶¶ 164-173 above gave the impression that the Company's was continuing to invest in fiber builds and that its goals for the buildout had not changed. Thus, these statements were materially false and/or misleading when made because they failed to disclose that: (1) Lumen had ***stopped***—not paused—investment in fiber builds for the fourth quarter of 2022, ¶ 85; (2) Lumen's goals for the Quantum Fiber buildout were now 8-10 million homes and businesses, down from the over 12 million locations the market had previously expected, ¶ 85; and (3) the Company relied upon unrealistic cost estimates that were based on a "gold-rush mentality as it relates to fiber to the home," ¶¶ 87-88.

### I. Defendants' Material Misrepresentations and Omissions Are Partially Corrected on February 7, 2023

175. On February 7, 2023, during a conference call to discuss the Company's financial and operating results for the fiscal quarter and full year ended December 31, 2022 ("Q4 2022 Conf. Call"), Defendants disclosed the true state of Lumen's Quantum Fiber buildout. Lumen's new CEO, Kate Johnson stated in relevant part:

> ***Second, let's talk about our Quantum pacing. As we've said previously, we hit the pause button during the fourth quarter. Now to be frank, it was more of a stop button than a pause button, which impacted our Quantum metrics for the quarter***. That said, the evaluation we undertook was absolutely critical to position Quantum for long-term success. By focusing on all metrics and not just the location enablement goal, we've established a higher IRR, more predictable long-term outcome for this exciting project.
>
> A natural outcome of our assessment of Quantum is a more focused build target where we're able to achieve proper returns for shareholders. We believe the overall Quantum enablement opportunity is 8 million to 10 million locations. ***The engine is revving back up, and we're aggressively working to ramp our build activities in 2023***. And to that end, we made an important change during

> the fourth quarter to separate our operational activities like planning, engineering and all field operations between mass markets and business.
>
> Maxine Moreau, our President of Mass Markets, now has top to bottom operational and P&L responsibilities. ***This is a significant change internally that I expect will improve our Quantum deployment pacing, but it will take time to reach scale***. My expectation is that later this year, you'll see significant improvement in our execution on enablement.

176. During that same call, Defendant CFO Stansbury further explained the delays in Quantum Fiber expansion:

> As Kate discussed, ***we have made significant changes in how we are approaching the Quantum Fiber opportunity***. This was a thoughtful evaluation that will result in a significant improvement in long-term shareholder value. That said, ***our location and subscriber results were impacted by the pause we had in place through our evaluation. This change in strategy will continue to impact Quantum metrics until we get to scale with our new plan, which we expect to occur late this year***. During the quarter, total enablements were approximately 97,000, bringing the total enabled locations to over 3.1 million as of December 31. During the quarter, we added 19,000 Quantum Fiber customers, and this brings our Quantum Fiber subscribers to 832,000.

177. On this news, Lumen's stock price declined $1.04, ***or 21%***, from a close of $4.99 per share on February 7, 2023, to a close of $3.95 on February 8, 2023.

## VI. ADDITIONAL EVIDENCE OF SCIENTER

178. By virtue of the facts set forth above and the additional facts set forth below, it may be strongly inferred Defendants knew or recklessly disregarded that their Class Period statements were materially false or misleading to investors.

### A. Quantum Fiber Was a Core Operation at Lumen, Supporting a Strong Inference of Scienter

179. Quantum Fiber was so critical to Lumen's success during the Class Period that the misrepresented and omitted information at issue would have been readily apparent to the Company and the Individual Defendants, which contributes to a strong inference of scienter. Defendants' knowledge of, or reckless disregard for, the litany of issues with Lumen's Quantum

Fiber discussed herein can readily be inferred because these operations were existential to the Company's business. That Quantum Fiber (and the efforts to expand that business) constitute a "core operation" at Lumen is confirmed by Defendants' own statements and the Company's SEC filings. As detailed herein, Defendants spoke regularly about Quantum Fiber's significance to the Company and its future growth, the purported reasons for the growth of Quantum Fiber, and the Company's strategies for driving that growth.

180. Even before the Class Period, Defendants were touting the importance of fiber to the Company and its future. At the March 2, 2020 Morgan Stanley Technology, Media & Telecom Conference, Defendant Dev stated in response to a question from Simon Flannery, Managing Director, Morgan Stanley, Research Division, "To your question on our key priorities, the #1 priority for us is improving the revenue trajectory of the business." He continued, "[a]nd so really investing in order to do that. We're investing in fiber, we continue to expand our fiber network, we're investing in products and services that leverage our extensive fiber network."

181. Throughout the Class Period, Defendants would continue to tout that not only was fiber critical to the Company's growth, but that fiber for consumers (*i.e.*, Quantum Fiber) was vital to the Company's revenue and EBITDA. For example, at the September 22, 2021 Goldman Sachs Communacopia Conference, Defendant Storey was clear that "[w]e continue investing in EBITDA and revenue growth through our ongoing transformation" and focused on Quantum Fiber as an area with "a lot of opportunity for growth."

182. Similarly, on the Q3 2020 earnings call on November 4, 2020, Defendant Dev was clear that the Company's future performance hinged on the Quantum Fiber rollout when he reiterated that "[a]s we have mentioned before, we expect that future performance will be largely driven by our execution around our fiber to the home investment strategy in driving up

penetration of our competitive assets." Defendant Dev also explained on the Company's Q4 2020 earnings call on February 10, 2021, that "Quantum Fiber represents a growth opportunity for us along several fronts."

183. These statements were echoed on the Company's Q1 2021 earnings call by Defendant Storey on May 5, 2021, when he explained that "we tend to be success-based in our capital investments. And so we'll make sure that we can continue to accelerate growth by investing in those, and I'll point to mass markets for Quantum Fiber. . . . We invest in fiber. We are focused on fiber for that business. So opportunities to increase there are also things that it would be on the table. Investing in our sales force, all of the things that you mentioned to drive revenue because we are very focused on driving revenue, improving the revenue trajectory and driving that performance going forward." During that same call, Defendant Storey explicitly stated that Quantum Fiber was a core operation for the Company:

> But if you look at where we invest, we're investing heavily in certain markets, in certain capabilities, in certain products, and those are the things that we think are core. So our fiber infrastructure, our edge computing, our platform that we're building, our customer experience, ***Quantum Fiber, all of those things, we think, are core to us and core to the products and services that we sell, and so we'll continue to focus our investments there***.

184. During that same call, Defendant Dev explained "[w]e are very focused on the continued rollout of our Quantum Fiber product." Similarly, Defendant Andrews, at the Bank of America Media, Communications & Entertainment Conference on September 13, 2021, explained that Lumen's focus is "on really investing where we can grow and focusing on the Quantum Fiber experience in Mass Market and then the growth aspects of Enterprise."

185. Defendant Storey summarized on Lumen's Q4 2021 investor call on February 9, 2022: "In closing, 2022 is all about executing on our growth initiatives for the Enterprise Lumen platform and scaling our Quantum Fiber business that fuel our return to growth." Later in that

same call, in response to a question from David Barden, Managing Director at Bank of America Securities, Research Division, Storey equated Lumen's growth with Quantum Fiber, explaining, "I am very clear, I hope I'm very clear, on the priorities for our capital allocation, and the first one being investing in growth. So as we look at the CapEx, we are very committed to investing in Quantum Fiber."

186. Quantum Fiber was the focus of growth for not only the whole company, but especially the Mass Markets division. At the April 7, 2021 Lumen Technologies Inc. Analyst Day Conference, Defendant Dev explained, "Within mass markets, the primary driver is Quantum Fiber." Defendant Storey reiterated this point at Lumen's Q2 2022 Earnings Call on August 3, 2022, when he explained that "[w]e are excited to update you on our progress with Quantum Fiber, which is the critical growth engine for this segment." Defendant Moreau echoed this sentiment multiple times throughout the Class Period. For example, at the May 26, 2021 JPMorgan Global Technology, Media and Communications Conference, in response to a question about the Company's fiber strategy, Phillip Cusick of JPMorgan showed that he believed Defendants' claims that "Quantum Fiber has been a big growth driver," and Defendant Moreau explained, "our fiber-first strategy is our focus and will continue to be our focus," as evidenced by the fact that Defendants "focused our reporting going forward on Quantum Fiber because that's where our growth is coming from." Similarly, at the December 2, 2021 Wells Fargo TMT Summit, Defendant Moreau explained that, for the Company's Mass Markets division, which she ran, "our future growth is going to come from Quantum Fiber as we expand our fiber footprint." But, as Defendant Moreau made clear at the June 13, 2022 Wells Fargo Streaming & Connectivity Conference, the Mass Markets growth fueled by Quantum Fiber was

intended to be big enough to move "Lumen overall to reach revenue growth within the next 2 to 3 years. And this fiber investment in Mass Market is a big piece of that growth plan."

187. Defendants' focus on Quantum Fiber not only affected the Company's investment strategy, but also how the Company reported its financial results. As Defendant Stansbury explained on the May 4, 2022 Q1 2022 earning call, "we are adjusting our mass market product revenue reporting categories this quarter to fiber broadband, other broadband and voice and other. The 2 key reasons for these changes are the increasing importance of our Quantum Fiber platform and the completion of the CAF II program." On the same call, Stansbury reaffirmed Defendants' focus on Quantum Fiber because of its importance to the Company's future growth, by explaining, "[o]ur team is focused on executing on our growth initiatives for Lumen Enterprise and scaling our Quantum Fiber business, which we expect as we drive our return to top line growth."

188. Quantum Fiber was also critical to Lumen's EBITDA. As Defendant Stansbury explained at the May 25, 2022 JPMorgan Global Technology, Media & Communications Conference, "And as you look at kind of Lumen's investment time horizon, really the next 2 to 3 years when you're looking at both sides of the business, right, consumer and Enterprise, that's the window where we've got to manage things really closely. Once we get beyond that and Mass Markets is growing in total, and we're starting to see the EBITDA generation from the fiber build-out, I think the EBITDA generation of the company is going to be really strong. So we're super excited about Quantum."

189. As Defendant Andrews explained at the UBS Global TMT Conference on December 7, 2021, "So 2 years ago, we didn't have the Quantum Fiber launch. Now Quantum Fiber is out in the market. It's resonating. We're reaching the penetration rates we want. And

it's really thrilling customers with crazy high NPS scores. So you kind of take the success that [Defendant Moreau] is seeing with Quantum Fiber and the increased focus as a result of the divestiture, and that's what gets us to the plan to kind of double down and dramatically increase build."

190. In the Company's 2021 10-K, filed on February 24, 2022 (certified by Defendants Storey and Dev), Lumen explained that one of its major strategic goals was to "expand our network capacity through our Quantum Fiber buildout plan and other initiatives[.]" Similarly, in the Company's Q2 2022 10-Q (certified by Defendants Storey and Stansbury), the Company explained, "[o]ur capital expenditures continue to be focused on enhancing network operating efficiencies, supporting new service developments, and expanding our fiber network, including our Quantum Fiber buildout plan." The Company's focusing of its capital expenditures on Quantum Fiber was reiterated in the Q3 2022 10-Q, which was filed on November 3, 2022, and again certified by Defendants Storey and Stansbury.

191. The Individual Defendants also expressly disclosed their own specific focus on Quantum Fiber. For example, during the September 15, 2022 Goldman Sachs Communacopia + Technology Conference, Defendant Stansbury also revealed that he and Defendant Storey paid extremely close attention to the Quantum Fiber rollout. In response to a question from Brett Feldman, an Equity Analyst at Goldman Sachs Group, Inc., Research Division, Stansbury confirmed Lumen's goal to build Quantum Fiber to 1 million homes in 2022 and further, "I'll also be really open and transparent in saying, it's hard work. I mean, our operations team[3]

[3] As Defendant Stansbury noted during a March 7, 2023 conference call, the planning function for Quantum Fiber at that time was "in operations."

probably gets far more attention from Jeff [Storey] and me than they'd like because the – doing this is not easy."

192. In response to a question from Jonathan Chapin from New Street Research LLP about Lumen's consumer business at the New Street Fiber to the Future Conference on March 28, 2023, Defendant Moreau explained she had "been solely responsible for this part of the business for over 6 years, both the consumer and small business," which included Quantum Fiber. CW-5 confirmed that Moreau and Defendant Gibson were the "Quantum Fiber leadership."

193. On the August 9, 2022 Cowen Communications Infrastructure Summit, Defendant Andrews responded to an analysts' question about his role as follows:

> [Analyst]: And any updates you've (inaudible) on the fiber-to-the-home? And you're in charge of marketing for that as well, what's the go-to-market strategy once you light up a neighborhood and tell us about the traction there?
>
> [Andrews]: I mean yes, so I partner closely with our President of Mass Markets, Maxine, and she's leaning in on the customer experience she provides. The NPS scores that we have with Quantum Fiber are through the roof and where we deploy and put Quantum Fiber in with the new Quantum Fiber experience, the NPS resonates and the penetration is coming through.

194. The Individual Defendants' detailed pronouncements on these topics provide strong circumstantial evidence that they were receiving specific information about such matters. Alternatively, the Individual Defendants were not knowledgeable about these matters (on which they spoke in detail), and such severe recklessness demonstrates an inference of scienter.

### B. The Sudden Departures of the Company's CEO and CFO Support a Strong Inference of Scienter

195. That both of Lumen's Chief Executive and Chief Financial Officers abruptly departed within six months of one another and shortly after the Company began issuing partially corrective disclosures further supports a strong inference of scienter. On March 28, 2022 –

shortly after Defendants began disclosing the supply chain and labor issues facing the Company – Lumen abruptly announced the departure of Defendant Dev, its EVP and CFO, effective April 4, 2022. On September 13, 2022 – just six months later – the Company also abruptly announced that Defendant Storey, its President and CEO, would also be departing, effective January 1, 2023.

196. Defendant Dev's abrupt termination shortly after Lumen began issuing partially corrective disclosures and shortly before the Company would stress increased transparency in its reporting supports a strong inference of scienter. Described by one analyst "as not anticipated, and comes at an interesting time for the company," the termination marked an abrupt end to Defendant Dev's 18-year contribution to Lumen and its predecessor companies. Having ascended to CFO of CenturyLink in 2018 and continuing in the role through the Lumen rebrand, Defendant Dev's transition out of the Company would become effective on April 4, 2022, with his replacement, Defendant Stansbury, assuming the title just seven days after the announcement. Defendant Stansbury's objectives provide useful context and prove to be particularly salient when considered against the Company's contemporaneous partially corrective disclosures. Though indicating he was contemplating few short-term changes in the Company's strategy related to the transition, Defendant Stansbury repeatedly highlighted a drive to increase transparency in the Company's reporting, stating in the May 4, 2022 Q1 2022 earnings call that "***we made a real effort this quarter to provide more disclosure and transparency around mass markets***, and we'll continue to do that" and "***one thing near term that I think is critically important is giving more transparency to the investment community*** around what's under the covers." Thus, bookended by Lumen's initial partially corrective disclosures on the one end and

a pivot toward increased transparency in the Company's reporting on the other, Defendant Dev's abrupt termination as Lumen's CFO further supports a strong inference of scienter.

197. Defendant Storey's abrupt departure in the midst of Lumen's partially corrective disclosures and prior to the stock's ultimate collapse further supports a strong inference of scienter. Though Lumen's Board claimed it had been in succession planning for several years, the announcement came hard on the heels of the CFO shake-up just six months earlier and after Defendant Storey had only served five years in the Company's top role after contributing to the Company for 18 previous years. More significantly, however, Defendant Storey's announcement came just eight weeks before he participated in his last earnings call with Lumen, in which he disclosed further delays in the Quantum Fiber build. *See* ¶¶ 158-161. Even more tellingly, however, Defendant Storey would depart just a few months before February 2023, when his successor would admit in the February 7, 2023 Q4 2022 earnings call that Lumen had hit the "stop button" on Lumen's Quantum "pacing" during the very same quarter that Defendant Storey had left the Company. Thus, trailing Defendant Dev's abrupt termination as CFO and coming just before the Company's stock price would finally collapse under the weight of partially corrective disclosures, Defendant Storey's abrupt departure as CEO also supports a strong inference of scienter.

**C. Defendants' Certifications Pursuant to the Sarbanes-Oxley Act of 2002 Demonstrate Scienter**

198. Within the Forms 10-K and 10-Q filed with the SEC by Lumen during the Class Period, Defendants Storey, Dev and Stansbury certified, pursuant to the Sarbanes-Oxley Act of 2002, that they were "responsible for establishing and maintaining disclosure controls and procedures" and that such controls and procedures were designed "to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to

us by others within those entities, particularly during the period in which this report is being prepared[.]"

## VII. SCHEME LIABILITY

199. Defendants engaged in a scheme to defraud investors by knowingly or recklessly omitting the true state of Lumen's Quantum Fiber rollout, which was behind schedule right from the start of the Class Period. This conduct caused the price of Lumen common stock to trade at artificial levels during the Class Period, as the market was unaware that Lumen was experiencing major supply chain issues, labor shortages, and other internal issues that were plaguing the Quantum Fiber rollout. Each Defendant is liable as a participant in the fraudulent scheme described herein.

## VIII. LOSS CAUSATION

200. Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs' and Class members' economic loss. The market for Lumen's common stock was open, well-developed and efficient at all relevant times. Throughout the Class Period, Lumen's common stock traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiffs and other members of the Class purchased or otherwise acquired Lumen common stock relying upon the integrity of the market price for Lumen's common stock and market information relating to Lumen, and have been damaged thereby. When the relevant truth began to emerge, the price of Lumen's common stock declined immediately as the artificial inflation was removed from the market price of the stock, causing substantial damage to Plaintiffs and the Class.

201. As set forth above in ¶¶ 78, 129-131, 136-141, on February 9, 2022, during a conference call to discuss the Company's financial and operating results for the fourth fiscal

quarter and full year ended December 31, 2021, Defendants continued to point to its Quantum Fiber project as key to the Company's growth. However, during that same call, Defendant Storey revealed the negative effects of stressed supply chains. *See* ¶¶ 78, 129-130.

202. Analysts reacted to the news that Quantum Fiber buildout was not accelerating as expected. For example, on February 10, 2022, Morgan Stanley report highlighted that "Fiber penetration remains low at just 29% [and that the Company pointed to] supply chain challenges at several points as a constraint to the pace of the build, while also noting that equipment delivery delays are in some cases delaying customer installs and therefore delaying revenue from customers." Likewise, on February 13, 2022, RBC Capital Markets lowered its price target to $10 from $11, with a key point highlighting that "Management noted some supply chain challenges from equipment vendors and chip inventories, which are constraining its ability to accelerate the Quantum Fiber build."

203. As a result of these disclosures, Lumen's stock price declined $1.99, or 16%, from a close of $12.82 per share on February 9, 2022, to a close of $10.83 on February 10, 2022. In contrast, the S&P 500 Index decreased by 2%, while the S&P 500 Communication Services Sector Index decreased by only 1%.[4] The stock continued to decline on February 11, 2022, falling another $0.74 or 7%, from $10.83 to $10.09, as a result of the Company's February 10 disclosures. In contrast, the S&P 500 Index decreased only by 2%, while the S&P 500 Communication Services Sector Index decreased by 3%.

---

[4] Lumen regularly compares its performances against the S&P 500 and the S&P 500 Communication Services Sector Indices. As of December 31, 2022, the S&P 500 Communications Service Sector Index consisted of Omnicom Group, Inc., Verizon Communications, Inc., The Walt Disney Company, Alphabet Inc., AT&T Inc., Charter Communications Inc., Match Group Inc., Netflix Inc., Warner Bros Discovery Inc., Comcast Corp., Activision Blizzard Inc., Paramount Global, Electronic Arts Inc., Meta Platforms Inc., Take-Two Interactive Software Inc., Interpublic Group, T-Mobile US, Inc. and Fox Corp.

204. The new Company-specific material information released on February 9, 2022 was directly related to the false or misleading statements previously made by Defendants. However, the corrective impact of the first partial disclosure was tempered by Defendants' continued false and misleading statements that continued to conceal the true nature of Defendants' fraud. The partial disclosure did not on its own fully remove the inflation from Lumen's stock price, because it only partially revealed the nature and extent of the fallout from Defendants' previously misrepresented Quantum Fiber buildout. Defendants' continued misrepresentations maintained the price of Lumen's common stock at a level that was inflated by fraud, inducing members of the Class to continue purchasing shares in Lumen even after Defendants' partial disclosure.

205. As set forth above in ¶¶ 79, 132-134, on March 8, 2022, during the Morgan Stanley Technology, Media & Telecom Conference, Laurinda Y. Pang, Lumen's President of Global Consumer Success, disclosed that labor and supply chain issues were still plaguing the Company, confirming that "one of the challenges is finding the people to build these networks" and further stating that the supply chain is "not getting better any time soon" and that "[s]upply chain will affect us in a lot of different areas, whether it be the infrastructure, just upgrades in the network, customer equipment, Quantum Fiber."

206. As a result of these disclosures, Lumen's stock price declined 3%, from a close of $10.95 per share on March 8, 2022, to a close of $10.62 on March 9, 2022. This is in contrast to both the S&P 500 and the S&P 500 Communication Services Sector Indices, which both increased by 3% over the same period. However, Lumen's stock price remained inflated because Defendants continued to conceal the full impact of their fraudulent scheme from investors and continued to make false and misleading statements regarding the Company's ability to meet its

Quantum Fiber buildout plan. For example, during that same conference call, Pang assured investors that a key area "of growth to look at is the fiber infrastructure line item," that "certainly, mid-markets and up into large enterprise will take advantage of the quantum builds," and that the supply chain "is something that we are managing."

207. As set forth above in ¶¶ 83, 158-161, on November 2, 2022, during a conference call to discuss the Company's financial and operating results for the third fiscal quarter and nine months ended September 30, 2022, Defendants disclosed that the Quantum Fiber buildout was not where the Company needed it to be to offset its increasing broadband losses, with only 210,000 locations enabled over the quarter.

208. Financial analysts responded negatively to these revelations. A Wells Fargo analyst highlighted the impact of the Quantum Fiber issues in a November 2, 2022 report, stating that Lumen's "Quantum Fiber investment is also off to a slower-than-expected start due to supply chain delays. . . . The Quantum Fiber build continues to run into supply chain snags, with ~200K enablements in the quarter (and +31K net fiber adds). It appears unlikely that LUMN will hit its 1MM passings aspiration for 2023." The Wells Fargo analyst also discussed the revelation that the "higher capex with Quantum Fiber" contributed to Lumen's dividend elimination. Likewise, in a November 3, 2022 report, Morgan Stanley quoted Defendant Storey's statement that the Company's Quantum Fiber build was not on pace, and highlighted that this failure came as "broadband losses accelerate." JP Morgan issued a report on November 3, 2022 stating that "Consumer broadband losses worsen" and that "Management is going to miss its target of 1m [Quantum Fiber] builds in 2022 . . . ."

209. On this news, Lumen's stock price declined $1.25, or 18%, from a close of $7.05 per share on November 2, 2022, to a close of $5.80 on November 3, 2022. In contrast, the S&P

500 Index declined by only 1% and the S&P 500 Communication Services Sector Indices declined by 3%. The new Company-specific material information released on that day was directly related to the false or misleading statements previously made by Defendants. However, Defendants continued their scheme and limited Lumen's stock price decline through additional false and misleading statements and omissions regarding the Quantum Fiber buildout, and Lumen's stock price remained inflated because Defendants continued to conceal the full impact of their fraudulent scheme from investors.

210. As set forth above in ¶¶ 85, 175-176, on February 7, 2023, during a conference call to discuss the Company's financial and operating results for the fiscal quarter and full year ended December 31, 2022, Lumen's new CEO, Johnson finally admitted for the first time that Defendants had pressed "more of a stop button than a pause button" on Lumen's investment into the Quantum Fiber network and expansion into the SMB [small business] and residential markets while the Company re-evaluated its strategic priorities.

211. Analysts again responded negatively to the February 7, 2023 revelations, with JP Morgan writing that the Company "hit the pause button on builds in 4Q22 to reevalutate its Quantum Fiber build strategy . . . . Lumen now plans to pass only 8-10m fiber homes over time vs the prior target of 12m" and that "[w]ith weaker financials and rising leverage, we remove our price target and maintain our Underweight rating until the company can demonstrate signs of stability." Other analysts also focused on the revelation that the Company stopped the Quantum Fiber rollout, with Morningstar Equity telling investors that the new management team "Tosses the Kitchen Sink in Painting an Ugly Near-Term Outlook[,]" and Bank of America Global Research describing 2023 as a "reset" year.

212. On this news, Lumen's stock price declined $1.04, or 21%, from a close of $4.99 per share on February 7, 2023, to a close of $3.95 on February 8, 2023. The S&P 500 Index declined by 1% and the S&P 500 Communication Services Sector Index declined by 4% during this same period.

213. Each disclosure of adverse facts that removed inflation from Lumen's stock price was connected to Defendants' materially false statements and omissions and the fraudulent conduct alleged herein. The following chart demonstrates the clear divergence of Lumen's stock prices from the overall market index (S&P 500 Index) and its peer index (S&P 500 Communication Services Sector Index) as the relevant truth became known to the market:



214. As detailed above, the rapid declines described herein served to remove the artificial inflation from the price of Lumen's common stock, and were direct and foreseeable consequences of the revelation of the relevant truth concealed by Defendants.

## IX. CONTROL PERSON ALLEGATIONS

215. By virtue of Individual Defendants' positions within the Company, they had access to undisclosed adverse information about Lumen, its business, operations, operational trends, finances, and present and future business prospects. The Individual Defendants would ascertain such information through the Company's internal documents, conversations, and connections with other corporate officers, bankers, traders, risk officers, marketing experts, employees, attendance at management and Board meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as the Company officers and/or directors.

216. It is appropriate to presume that the materially false, misleading, and incomplete information conveyed in Lumen's public filings and press releases and Defendants' public statements, as alleged herein, was the result of the collective actions of the Individual Defendants identified above. The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

217. The Individual Defendants were involved in drafting, producing, reviewing, approving, and/or disseminating the materially false and misleading statements and information alleged herein, were aware of, or were severely reckless in not knowing, the fact that materially

false and misleading statements were being issued regarding the Company and themselves, and approved or ratified these statements, in violation of the federal securities laws.

218. As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, each of the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Lumen's financial condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

219. The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of Lumen, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein.

220. The Individual Defendants are liable as participants in a scheme, plan, and course of conduct that operated as a fraud and deceit on Class Period purchasers of Lumen common stock.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE

221. Plaintiffs and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon omissions of material fact that Defendants were under a duty to disclose.

222. In addition, Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory, because Lumen's common stock traded in an efficient market during the Class Period, as follows:

(a) Defendants made public representations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's common stock traded in an efficient market;

(d) The omissions and misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e) Plaintiffs and other members of the putative Class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

223. At all relevant times, the market for the Company's common stock was efficient, for the following reasons, among others:

(a) Lumen common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated national stock market;

(b) As a regulated issuer, Lumen filed periodic public reports with the SEC and NYSE;

(c) Lumen regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) During the Class Period, the Company had between approximately 1.023 and 1.106 billion shares of common stock outstanding on the NYSE. The Company's common stock was actively traded on the NYSE, an informationally efficient market, throughout the Class Period. Shares were highly liquid during the Class Period, with an average daily volume of 13,768,872 shares traded;

(e) Lumen's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace; and

(f) Unexpected material news about Lumen was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

224. Therefore, the market for Lumen common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Lumen's share price. Under these circumstances, all purchasers of Lumen common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

225. Plaintiffs reserve their rights to modify these allegations by way of an amended complaint or a motion for class certification.

## XI. INAPPLICABILITY OF SAFE HARBOR

226. Many (if not all) of Defendants' false and/or misleading statements during the Class Period were not forward-looking statements ("FLS") and/or were not identified as such by Defendants, and thus did not fall within any "Safe Harbor."

227. Lumen's verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

228. Defendants are also liable for any false and/or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false and/or misleading and the FLS was authorized and/or approved by an executive officer of Lumen who knew that the FLS was false and/or misleading.

## XII. CLASS ACTION ALLEGATIONS

229. Plaintiffs bring this action on their own behalf and a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased or otherwise acquired the publicly traded common stock of Lumen during the period between September 14, 2020 and February 7, 2023, inclusive, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate families of the Individual Defendants; (iii) the Company's subsidiaries and affiliates; (iv) any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; (v) any entity in which any Defendant has a controlling interest; (vi) Lumen's employee retirement and employee benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such

plan(s); and (vii) the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

230. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, the Company had between approximately 1.023 and 1.106 billion shares of common stock outstanding and actively trading on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

231. Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

232. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in class and securities litigation.

233. There is a well-defined community of interest in the questions of law and fact in this case. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

(a) whether Defendants violated the Exchange Act;

(b) whether Defendants omitted and/or misrepresented material facts;

(c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e) whether Defendants knew or recklessly disregarded that their statements and/or omissions were misleading;

(f) whether Defendants' conduct impacted the price of Lumen's common stock;

(g) whether reliance may be presumed;

(h) whether Defendants' conduct caused the members of the Class to sustain damages; and

(i) the extent of damages sustained by putative Class members and the appropriate measure of damages.

234. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress the wrongs done to them individually. There will be no difficulty in the management of this action as a class action.

## XIII. COUNTS

### COUNT I

### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

235. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

236. This count is brought pursuant to § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

237. During the Class Period, Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that, by use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange, they:

(a) employed one or more devices, schemes, and/or artifices to defraud;

(b) made one or more untrue statements of material fact or omitted to state one or more material facts necessary in order to make their statements made in light of the circumstances under which they were made not misleading; and/or

(c) engaged in one or more acts, practices, and courses of business which operated as a fraud or deceit upon purchasers of Lumen common stock during the Class Period.

238. Defendants and the Company's officers, management, and agents, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information.

239. Lumen is liable for all misleading statements and omissions of fact during the Class Period, including those by the Individual Defendants and other Company officers and agents, as the maker of such statements and under the principle of *respondeat superior*.

240. The allegations above establish a strong inference that Lumen, as an entity, acted with scienter throughout the Class Period, as its officers and agents had actual knowledge of the scheme and/or omission of material facts, or acted with severe reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such misleading statements and/or omissions of material fact were done knowingly or with severe recklessness, and without a reasonable basis, for the purpose and effect of concealing the truth from investors. By concealing these material facts from investors, Lumen's stock price was artificially inflated during the Class Period.

241. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Lumen stock. Plaintiffs and the Class would not have purchased at the price paid if they had been aware that the market prices had been artificially and falsely inflated by Defendants' scheme and untrue statements of material fact and omissions of material fact.

242. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Lumen common stock during the Class Period.

## COUNT II

### Violation of § 20(a) of the Exchange Act Against the Individual Defendants

243. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

244. This count is brought pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

245. As detailed *supra*, Defendants each violated § 10(b) and Rule 10b-5, and Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of Lumen common stock as a direct and proximate result of Defendants' wrongful conduct.

246. During the Class Period, the Individual Defendants acted as controlling persons of Lumen within the meaning of § 20(a) of the Exchange Act. By virtue of their high-level positions and their ability to control and direct the Company's decision making and day-to-day operations, the Individual Defendants had the power and ability to control and influence – and, in fact, did control and influence, directly or indirectly – the wrongful conduct alleged herein, including, without limitation, the methods and means of the scheme set forth herein.

247. The Individual Defendants, individually and as a group, are liable as control persons within the meaning of § 20(a) of the Exchange Act. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act, jointly and severally with, and to the same extent Lumen is liable.

248. As a direct and proximate results of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages.

## XIV. PRAYER FOR RELIEF

249. WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

(a) Certifying this action as a class action pursuant to Rule 23 and designating Lead Plaintiffs to serve as Class Representatives and Co-Lead Counsel as Class Counsel;

(b) Awarding compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the federal securities laws, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, expenses, and expert fees; and

(d) Such equitable, injunctive, or other further relief as the Court may deem just.

## XV. JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: August 7, 2023

GOLD, WEEMS, BRUSER, SUES & RUNDELL

s/Bradley L. Drell

BRADLEY L. DRELL
(La. Bar Roll #24387)
HEATHER M. MATHEWS
(La. Bar Roll #29967)
2001 MacArthur Drive
Post Office Box 6118
Alexandria, LA 71307-6118
Telephone: 318-445-6471
Facsimile: 318-445-6476
bdrell@goldweems.com
hmathews@goldweems.com

*Local Counsel for Douglas and Barbara Evans, Individually, and as Trustees of the Douglas P. Evans Living Trust U/A Dated 08/24/2010*

FARUQI & FARUQI, LLP

s/James M. Wilson, Jr.

JAMES M. WILSON, JR.
(admitted *pro hac vice*)
ROBERT W. KILLORIN
(admitted *pro hac vice*)
KATHERINE M. LENAHAN
(admitted *pro hac vice*)
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
jwilson@faruqilaw.com
rkillorin@faruqilaw.com
klenahan@faruqilaw.com

*Co-Lead Counsel for Co-Lead Plaintiff Douglas and Barbara Evans, Individually, and as Trustees of the Douglas P. Evans Living Trust U/A Dated 08/24/2010*

LEMMON LAW FIRM, LLC
ANDREW A. LEMMON
(#18302)
5301 Canal Boulevard
New Orleans, LA 70124
Telephone: 985/783-6789
985-783-1333 (fax)
andrew@lemmonlawfirm.com

*Local Counsel for Co-Lead Plaintiff George Sanchez and Plaintiff Dale Brown*

ROBBINS GELLER RUDMAN & DOWD LLP
LUCAS F. OLTS
(admitted *pro hac vice*)
JENNIFER N. CARINGAL
(admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
lolts@rgrdlaw.com
jcaringal@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
JACOB G. GELMAN (admitted *pro hac vice*)
One Montgomery St., Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
jgelman@rgrdlaw.com

*Co-Lead Counsel for Co-Lead Plaintiff George Sanchez and Plaintiff Dale Brown*

CERTIFICATE OF SERVICE

We hereby certify that on August 7, 2023, a copy of the foregoing was filed with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by electronic mail.

s/James M. Wilson, Jr.
James M. Wilson, Jr.
(admitted *pro hac vice*)

s/Bradley L. Drell
Bradley L. Drell
(La. Bar Roll #24387)