# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

**In re: LUMEN TECHNOLOGIES, INC. SECURITIES LITIGATION**

**CIV. ACTION NO. 3:23-00286**

**JUDGE TERRY A. DOUGHTY**

**MAG. JUDGE KAYLA D. MCCLUSKY**

### REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, are four motions filed by Defendants: (1) for the submission of affidavits [doc. # 54]; (2) to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6) [doc. # 59]; to take judicial notice of various materials for the purpose of the motion to dismiss [doc. # 61]; and (4) for additional equitable relief [doc. # 66]. The motions are opposed. For reasons detailed below, it is ORDERED that the motions for submission of affidavits and additional equitable relief are DENIED and that the motion to take judicial notice is GRANTED IN PART and DENIED IN PART. It is further RECOMMENDED that the motion to dismiss be GRANTED.

### Background

This is a putative federal securities class action brought on behalf of all persons and entities ("Plaintiffs") that purchased or otherwise acquired Lumen Technologies, Inc. ("Lumen" or the "Company") (f/k/a  CenturyLink) common stock between September 14, 2020, and February 7, 2023 (the "Class Period"), and were damaged thereby (the "Class"), against  (1) Lumen; (2) former President and Chief Executive Officer ("CEO") Jeffrey K. Storey ("Storey"); (3) former Chief Financial Officer ("CFO") and Executive Vice President ("EVP") Indraneel

Dev ("Dev"); (4) CFO and EVP Christopher D. Stansbury ("Stansbury"); (5) President of Mass

Markets Maxine L. Moreau ("Moreau"); (6) former Chief Marketing Officer and EVP Shaun C.

Andrews ("Andrews"); (7) Chief Technology Officer Andrew Dugan ("Dugan"); and (8) Senior

Vice President, Sales and Marketing, Consumer Markets Wes Gibson ("Gibson") (collectively,

"Defendants"), for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934

(the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and United States Securities and Exchange

Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240. (Amended Class

Action Complaint [doc. # 47], Preamble).

The facts, at the pleading stage, are drawn from the operative pleading, which, in this

case, is the Amended Class Action Complaint ("ACAC").[1]  Given the proposed Class Period

and the considerable number of alleged material misstatements made by various Defendants, the

ACAC consists of 88 pages of allegations and pertinent background information and includes

disclosures from confidential witnesses.  While normally reluctant to incorporate wholesale

sections of a complaint in an opinion, the Court is constrained to do so in this instance where it

presents the most efficient means to provide necessary background information pertinent to the

issues raised by the pending motion(s).  Accordingly, the Court will recite or paraphrase

provisions of the ACAC, while, at times, omitting unsupported or conclusory characterizations,

where warranted.[2]  In short, to be clear, the ensuing provisions represent allegations made by the

---

[1] An "amended complaint supersedes the original complaint and renders it of no legal effect, unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading." *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (citing *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir.1985)).  Here, there is no indication that the amended complaint adopted or referenced the earlier pleading.  Furthermore, the parties agreed that any motion to dismiss would be directed toward the ACAC.  *See* June 16, 2023 Order [doc. # 44].

[2] The Court has added quotation marks to some phrases utilized by Plaintiffs in the ACAC to emphasize that they are Plaintiffs' words.  However, the ACAC also uses quotation marks of its

Plaintiffs, not findings by the Court.  Thereafter, the Court will recount the procedural posture of the case, before proceeding to discuss the pending motions.

## I. Overview[3]

1.  This case concerns alleged straightforward effort by Defendants to engage in a fraudulent scheme to mislead the market over several years about Lumen's widely publicized expansion of its fiber optics operations.  For years, Lumen's (then CenturyLink's) antiquated business of providing customers with increasingly outdated telecommunications services had resulted in declining earnings and revenue and caused the Company to be one of the worst-performing stocks in the S&P 500.  To reverse the Company's stock price slide and preserve their jobs, Defendants are alleged to have decided to "rebrand" and sell investors on a "bold new purpose."

2.  Defendants' alleged "scheme" began on the first day of the Class Period when Defendants announced that CenturyLink would be renamed "Lumen Technologies," a company that would "lead [its customers] through the challenges and opportunities of the 4th Industrial Revolution."  The cornerstone of their bold vision for the future of the Company, Defendants claimed, was their new "Quantum Fiber"—a "fully digital platform" of fiber-based high-speed internet products and services to be made available to residents and small businesses.

3.  Defendants touted the importance of Quantum Fiber to the rebranded Company, claiming that "we expect that future performance will be largely driven by our execution around our fiber to the home investment strategy in driving up penetration of our competitive assets[,]"

---

own, so the quotation marks are of limited utility.  The Court has largely deleted Plaintiffs' generous use of italics and bold-face type.
[3] Unless otherwise noted, all further references are to the ACAC.  For ease of reference, the opinion employs the same paragraph numbering as the ACAC.

that "we have a dedicated leadership team whose sole focus is to leverage our Quantum investments to grow the consumer and small business markets[,]" and "Quantum Fiber represents a growth opportunity for us along several fronts."

Based on information provided by Defendants, financial analysts and the market estimated that Lumen could enable approximately 14–23 million locations with Quantum Fiber, thereby turning the Company's prospects around.

**4.** But Defendants' turnaround plan was "a lie." From the start, Defendants knew that Lumen was never capable of building the Quantum Fiber rollout that they sold to investors. In fact, according to former employees and Defendants' own post-Class Period admissions, the Quantum Fiber buildout was critically behind schedule right from the beginning of the Class Period because of several operational and financial failings about which Defendants knew but failed to disclose, including,

(1) that the Company could not deploy nearly enough technicians to install fiber at customers' premises and there were not enough field engineers to lay the fiber;

(2) Lumen had a "horrific backlog" of necessary materials for the Quantum Fiber buildout due to the COVID-19 pandemic; and

(3) Lumen's "planning yield"— a critical internal metric it used to determine where to build fiber and measured "weekly"—showed that the Company was not using its capital efficiently to expand fiber, and it was not close to being able to meet the pace of buildouts that it touted to the market.

The foregoing information was not fully disclosed to the market during the Class Period. Rather, Defendants sought to cover up the failure of the Quantum Fiber launch through their "false and misleading" public statements. Indeed, as Defendant Stansbury admitted after the Class Period, Lumen's "planning yield" during that time was "horrendous." In 2021, the Company's planning yield was below 20%, meaning that Lumen was wasting "over 80% of [its] resources" on proposed builds that were not approved. In 2022, it was "as low as 10% . . . "

4

Defendant Stansbury later admitted that Lumen's cost estimates were based on a "gold-rush" mentality and "emotional exuberance" that—after the Class Period—were tempered "with some more rational thought."

**5.**  Defendants misleadingly told investors and the market that Quantum Fiber had tremendously high "NPS" or "Net Promoter Scores," which was a means of measuring customer satisfaction.  In their calls with analysts and investors, Defendants tied Quantum Fiber's purportedly high NPS scores to growing revenue growth and EBITDA, and claimed their scores were "higher than Amazon or Apple.  As you know, NPS scores above 50 are considered excellent."

But, according to former employees, the NPS scores Defendants presented to the market were widely known within the Company to be faulty because they were based on a Lumen-developed methodology designed to generate the most favorable numbers, not a methodology that was in line with the science of how NPS should be reported.  In fact, Lumen's customer service was inundated with complaints that the Quantum Fiber rollout was a disaster, with customers unable to get service.  The NPS scores were a fabrication to create a smokescreen to hide the desultory Quantum Fiber operation from the market.

**6.**  The importance of Quantum Fiber to Lumen continued to increase throughout the Class Period, as Defendants continued to "lie" to the market stating, for example, that the "Quantum Fiber build plan is ramping"; "confidence is high to get to the 1 million units this year"; and that it was "really about all hands on deck right now to see what we can do."

In addition, the Company made large divestitures in mid-2021 that supposedly enabled Lumen to invest more attention and capital on its Quantum Fiber expansion.  In July and August 2021, for example, Lumen announced sales of more than $11 billion in assets, which, according

to the Company, would "sharpen Lumen's enterprise focus, accelerate the Quantum Fiber deployment, and drive growth on the Lumen Platform."  As Defendant Storey, explained, "[w]hat we can tell you today is that while we remain strategic and disciplined in our approach, we expect to build faster and with more scale in the markets that we prioritize for Quantum Fiber investment."  These intentions were not realized.

7.  Defendants' "scheme to falsely inflate the growth" in Lumen's Quantum Fiber business began to unravel in a series of disclosures in 2022 by the Company's admissions that stressed supply chains and labor issues in building its fiber network had prevented them from achieving the fiber buildout. Then, both Lumen's CEO Defendant Storey and CFO Defendant Dev abruptly left the Company within months of each other.

Despite these disclosures and departures, Defendants continued to downplay the significance of the buildout slowdown, assuring investors that they were still on track to enable 1 million homes with fiber by the end of 2022, and that further acceleration of the build would occur in the second half of 2022.  Defendants also represented that "[w]e will continue to ramp our enablements and overcome the supply chain, labor and inflationary constraints we've seen." Unbeknownst to investors, however, the Company was doing nothing of the sort.

8.  It was only after Kate Johnson was brought in as the new CEO on November 7, 2022, did the Company finally start to come clean with the market and correct the years-long "fraud" by disclosing how bad the Quantum Fiber operation was.  As she would finally admit on February 7, 2023, rather than ramping up Quantum Fiber, Lumen had actually pressed "a stop button" on the Company's investment in the Quantum Fiber network and expansion.

As it turns out, Lumen managed to enable only 605,000 units with fiber in 2022, well under the 1 million target they repeatedly promised the market they would complete.  CEO

Johnson also announced that day that Lumen had revised its enablement forecast to "8 million to 10 million" locations, which was down significantly from the approximately 14-23 million locations originally anticipated by the market and the 12 million plus locations the Company had revised it to after the mid-2021 divestitures.

9.  When the relevant truth was disclosed, the Company's stock price plummeted, causing millions of dollars of damages to Lumen investors who bought Lumen stock at inflated prices.

**II.     Parties**

A.     <u>Plaintiffs</u>

15.  Lead Plaintiff George Sanchez, as set forth in his previously filed certification [doc. # 11-4], acquired Lumen common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.  Sanchez was appointed co-Lead Plaintiff on May 24, 2023.  [doc. # 35].

16.  Lead Plaintiffs Douglas and Barbara Evans, Individually, and as Trustees of the Douglas P. Evans Living Trust U/A Dated 08/24/2010, as set forth in their previously filed certifications [doc. # 17-4], acquired Lumen common stock at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures. The Evans were appointed co-Lead Plaintiffs on May 24, 2023.  [doc. # 35].

17.  Plaintiff Dale Brown, as set forth in his certification [doc. # 47-1], acquired Lumen common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

18.  Lead Plaintiffs Sanchez and Evans are sometimes referred to herein collectively as "Lead Plaintiffs," and collectively with Plaintiff Brown as "Plaintiffs."

B.    <u>Defendants</u>

**19.**  Lumen, formerly known as CenturyLink, is a Louisiana corporation, with its principal executive offices located at Monroe, Louisiana.  The Company's common stock trades on the New York Stock Exchange ("NYSE") and the Berlin Stock Exchange and is traded under the symbols "LUMN" and "CYTH," respectively.  Prior to September 18, 2020, when the Company rebranded itself as Lumen, the Company's stock traded on the NYSE under the ticker symbol "CTL."

**20.**  Defendant Storey served as President and CEO of Lumen from the beginning of the Class Period through his departure on November 7, 2022.  Lumen announced Defendant Storey's departure on September 13, 2022, and reported that Defendant Storey would remain with Lumen through December 31, 2022, to assist with the transition.

**21**.  Defendant Dev served as CFO and EVP of Lumen from the beginning of the Class Period through his departure from Lumen on April 4, 2022, which was announced on March 28, 2022.

**22.**  Defendant Stansbury served as CFO and EVP of Lumen following Dev's departure, effective April 4, 2022, through present.

**23.**  Defendant Moreau served as President of Mass Markets at Lumen at all relevant times.

**24.**  Defendant Andrews served as Chief Marketing Officer and EVP at Lumen at all relevant times.

**25.**  Defendant Dugan served as Chief Technology Officer at Lumen at all relevant times.

**26.**  Defendant Gibson served as Senior Vice President, Sales and Marketing, Consumer Markets at Lumen.

**27-28.**  Storey, Dev, Stansbury, Moreau, Andrews, Dugan, and Gibson are sometimes collectively referred to herein as the "Individual Defendants."  Lumen and the Individual Defendants are collectively referred to herein as "Defendants."

C.     Relevant Non-Parties

**29.**  Kate Johnson ("Johnson") has served as President and CEO of Lumen since November 7, 2022, following the departure of Defendant Storey.

**30.**  Laurinda Y. Pang ("Pang") served as President of Global Customer Success, Wholesale & International, from the beginning of the Class Period, until her departure from Lumen in December 2022.

D.     Confidential Witnesses

**31.**  Several former Company employees have provided information that Defendants' Class Period statements were false and misleading, that Defendants knew or recklessly disregarded the falsity or misleading nature of their statements and that Defendants engaged in a scheme to defraud investors.

The confidential witnesses ("CWs") include individuals formerly employed at the Company during the Class Period, whose accounts corroborate one another, other sources set forth herein, and facts now admitted by Lumen.  The CWs provided information to Plaintiffs' counsel and/or Plaintiffs' counsel's investigators on a confidential basis and are particularly described by job description and/or responsibility and duration of employment.

**32.  Confidential Witness No. 1 ("CW-1")** was a former Senior Director of Marketing who worked at the Company from 2020 to 2023.  Specifically, CW-1 worked in Marketing Intelligence on the consumer side of Lumen's business, which included support of the

Quantum Fiber business. CW-1's team did marketing research to support both marketing efforts and strategic decision-making. CW-1 also oversaw a team that engaged in data analytics, which involved predictive modeling to determine which customers were likely to have a propensity to buy fiber on a per-home and per-zip code basis; examining churn; and customer segmentation to determine those "audiences" that were most interested in Quantum Fiber.

**33. Confidential Witness No. 2 ("CW-2")** was a former Director of Experience Management at Lumen from November 2011 through May 2023. CW-2 was part of the Company's Business-to-Business group.

**34. Confidential Witness No. 3 ("CW-3")** was a former Vice President of Marketing & Demand Generation at Lumen from September 2020 to approximately April/May 2022. CW-3 was hired to work on the launch of the Quantum Fiber initiative at Lumen.

**35. Confidential Witness No. 4 ("CW-4")** worked as a Vice President, Global Customer Experience at Lumen from November 2018 to March 2023. CW-4 had been with Lumen and its predecessor companies on and off since 2002. As Vice President of Global Customer Experience, CW-4 looked at and used data, data analytics, and AI to understand the experiences of Lumen's customers so as to help improve that experience. CW-4 was involved with the Company's calculation of Net Promoter Scores ("NPS").

**36. Confidential Witness No. 5 ("CW-5")** worked as a Senior Manager, Brand & Communications at Lumen from October 2020 to September 2022. CW-5's role included branding and communications work for a Quantum Fiber project, which involved working on "an entire tech stack," including the billing system. CW-5 was brought onto the project because Lumen's goal for Quantum Fiber was to develop and introduce an entirely new brand.

### III.    Plaintiffs' Allegations

A.    High Speed Internet Services Background

**37.**  One of Lumen's primary products and services is based upon providing highspeed broadband services to residential and small business customers.  Broadband (short for "broad bandwidth") is a type of high-speed internet access.  Bandwidth refers to the total speed at which data can be delivered to internet-connected devices, like a computer.  The higher the bandwidth of an internet service, the faster the connection speed will be.

**38.**  There are several types of broadband internet connections, including Digital Subscriber Line ("DSL") and fiber, among others.  DSL internet uses copper phone lines to transmit internet and TV signals.  Cable technology uses a coaxial cable, which uses copper phone lines as well, but with a different outer material that allows the signal to travel further than DSL.

**39.**  While the copper phone lines for DSL and cable use electrical pulses for transmission, fiber-optics use light to transmit data along tiny glass strands that are bundled together into a cable, allowing information to travel close to the speed of light.  In addition to providing higher speeds, fiber is more likely than copper to provide symmetrical bandwidth to customers, which means that it has equal upload and download speeds.

**40.**  There are three types of fiber optic cable internet. The fastest and most reliable is "Fiber to the Home" ("FTTH") or "Fiber to the Premises," where the fibers come straight to a building.  "Fiber to the Curb" is fiber that gets to the utility pole near one's home and uses coaxial cable to get from there to the home.  "Fiber to the Node" or "Neighborhood" is fiber that gets within one mile of a home, but metal wires carry the connection the rest of the way.

B.    <u>Defendants Were Facing a Dying Legacy Technology Business and a Changed Telecommunications Landscape</u>

**41**.  In the years leading up to the Class Period, there was a historical trend of growing demand for fiber optics' speed and reliability and a reduced demand for DSL.  Lumen (then CenturyLink) had been working to expand its fiber network for years, which included expanding CenturyLink's Fiber-to-the-Home broadband services – an important part of the Company's growth that was intended to help offset losses from the Company's lower speed legacy DSL/copper services.  As of December 31, 2019, however, it still had nearly twice as much old copper wire planted than the newer, faster and more reliable fiber optic cables.  This was true throughout 2020 as well.

**42**.  As a *Barron's* analyst noted in February 2019, "the majority of CenturyLink's revenues" are made up of "legacy services" which have been "eaten away" by "increasingly affordable wireless plans and new fiber-optic networks[.]"  As a result, for several years prior to the beginning of the Class Period, the Company's revenues had been steadily declining. According to Lumen's (then known as CenturyLink) 2016 Annual Report, Lumen's 2014 operating revenues were $18.031 billion.  These revenues declined to $17.9 billion in 2015 and $17.47 billion in 2016.  The Company knew that revenues would continue to decline without major changes, due to the fact that its business model was in jeopardy from the decreasing need for the many legacy services it offered.

**43**.  Simultaneously, the Company was facing the consequences of a corporate strategy that for over a decade focused on business-to-business rather than business-to-consumer operations. Securities analysts in September 2020 estimated that "Lumen's enterprise businesses" accounted for "roughly 75% of total revenue, [and] we think revenue is likely to continue declining. Lumen's business customers will continue to benefit from the ability to use

shared, rather than private, networks and technological advancements that require less bandwidth and enable more efficient routing."  Additionally, the Company's enterprise business was under pressure at the time because, as at least one analyst observed, although "Lumen has 170k buildings that have fiber and a large number of potential buildings where fiber can be built, . . . there is limited demand as many potential customers are still out of the office . . ."

**44.**  As part of its efforts to "boost its fiber footprint and gain scale," CenturyLink acquired Level 3 Communications, Inc. ("Level 3") in late 2017.  A March 4, 2019 article in *Barron's* touted the acquisition as setting CenturyLink "apart from its wireline peers" and "better position[ing] it for growth."

**45**.  While the Level 3 acquisition helped buoy CenturyLink's fortunes, 2019 was a difficult year for CenturyLink's shares.  Indeed, according to a September 27, 2019 article in *Barron's*, CenturyLink was "one of the worst performing stocks in the S&P 500" in 2019.  That year, the Company cut its dividend by more than half, sending shares tumbling 10%.  This cut was made to help the Company lower its net debt to earnings before interest, taxes, depreciation and amortization to 2.75 times to 3.25 times, while continuing to pay dividends and invest in growth initiatives.

C.     CenturyLink Rebrands Itself and Launches Quantum Fiber

**46.**  On September 14, 2020 – the first day of the Class Period – Defendants widely publicized a major effort to turn things around and compete more effectively against rivals who were far ahead of the Company in the fiber-optics space.  Specifically, CenturyLink announced that it was rebranding itself as Lumen and proclaimed that it was ready to enable "Amazing Things" with a "bold new purpose" to help lead enterprises through the challenges and opportunities of the "4th Industrial Revolution."  Lumen explained that in addition to its

13

"heritage" operations through CenturyLink for residential and small businesses over traditional networks, it was also announcing the new "Quantum Fiber, a fully digital platform for delivering fiber-based products and services to residents and small businesses." According to Lumen, "Quantum Fiber is a subscription-based, prepaid, online platform for delivering premier fiber-based connectivity to residents and small businesses."

47. Quantum Fiber's success was largely dependent on Lumen's fiber-to-the-home strategy. That is, for customers to be able to subscribe to Quantum Fiber, their homes or businesses would first need to be *fiber-enabled* — meaning connectable to, or "passed" with, Lumen's fiber. Thus, the number of homes and businesses passed is an important metric for gauging the successful rollout of Quantum Fiber, as it is the first step to connecting potential Quantum Fiber customers to Lumen's fiber network.

48. Analysts estimated, based on information provided by Lumen, including information on Lumen's geographic "footprint," Lumen could enable between approximately 14– 23 million locations with fiber. Accordingly, the market was very interested in the progress of Lumen's fiber build, including the number of fiber-enabled locations, the number of Quantum Fiber subscribers, and Quantum Fiber's penetration (*i.e.*, the percentage of fiber-enabled homes subscribed to Quantum Fiber). Indeed, analysts asked about the progress of the Quantum Fiber buildout on nearly every conference call during the Class Period.

49. Unbeknownst to investors, the Quantum Fiber buildout was behind from the start, plagued by inadequate planning, inadequate funding, supply chain and labor issues, as well as other internal issues that made it impossible for the Company to be able to expand Quantum Fiber at the pace Lumen had touted to the investing public. "Despite being well aware of all this," Defendants nonetheless falsely and misleadingly reassured the market throughout the Class

14

Period that the Quantum Fiber buildout had been carefully planned, that the Company was devoting adequate resources—like materials, labor, and capital—to the Quantum Fiber buildout, and was doing so efficiently to maximize its return on investment.

50. For example, Defendants repeatedly stressed that the Quantum Fiber buildout was not "capital constrained," and routinely discussed the capital efficiency of its investment strategy. Indeed, from the very beginning of the Class Period, Lumen discussed its "microtargeting" investment strategy for expanding fiber-to-the-home, which meant that it was supposedly "building in selective areas where the return on capital is supportive[.]"

During the August 5, 2020 Q2 2020 Conference Call, Defendant Dev described this strategy as "pick[ing] the neighborhoods where we can get high returns because it's a function of population density or housing density and the cost to build."

As Defendant Storey explained, "we always make decisions based on economics. And the microtargeting helps us identify those locations that are high economics. I don't think that there's a short supply of opportunities based on microtargeting. I think that just helps us be very efficient in generating a return for the investment that we make."

51. Defendants also repeatedly touted the importance of its fiber-to-the-home investment strategy and its commitment to it, stating, *inter alia*, "we expect that future performance will be largely driven by our execution around our fiber to the home investment strategy in driving up penetration of our competitive assets[,]" that "we have a dedicated leadership team whose sole focus is to leverage our Quantum investments to grow the consumer and small business markets[,]" and "Quantum Fiber represents a growth opportunity for us along several fronts." They also stressed to the market that the buildout was not "capital constrained."

15

52. The importance of Quantum Fiber continued to increase throughout the Class Period, as large divestitures enabled Lumen to invest more attention and capital on its Quantum Fiber expansion. For example, on July 26, 2021, Lumen announced that it would sell its Latin American business to Stonepeak, an alternative investment firm, for $2.7 billion.

According to Lumen and Defendant Storey, "[t]his transaction allows Lumen to focus investments in key areas of the business to drive future growth while providing flexibility for our capital allocation strategy."

53. On August 3, 2021, Lumen announced that it would sell its incumbent local carrier operations ("ILEC") in 20 states to Apollo Global Management, Inc. for $7.5 billion, including debt assumption of approximately $1.4 billion ("Apollo transaction"). ILECs are phone service providers that are mandated by the Telecommunications Act of 1996 to provide and maintain copper services across the nation.

According to Lumen, this transaction "will sharpen Lumen's enterprise focus, accelerate the Quantum Fiber deployment, and drive growth on the Lumen Platform."

54. Lumen retained its ILEC assets in 16 states, as well as its national fiber routes and competitive local exchange carrier networks. Of Lumen's 2.6 million fiber-enabled units, only 200,000 were included in the divestiture. On the earnings call that same day, Defendant Storey explained that, after the closing of the Apollo transaction, "approximately 70% of our remaining mass market footprint" – about 15 million units – "is well suited for Quantum Fiber investment."

55. Defendant Storey further explained on that call that Lumen would be accelerating its Quantum Fiber push: "[w]e are developing an accelerated build plan, and we'll share those details as they're finalized. What we can tell you today is that while we remain strategic and

disciplined in our approach, we expect to build faster and with more scale in the markets that we prioritize for Quantum Fiber investment."

**56.** Defendant Dev further stated that Lumen would be moving from a micro-targeted approach to a market level approach "to really scale up our investment" for fiber construction.

As part of this scale up, Defendant Moreau represented during the August 10, 2021 Cowen Communications Infrastructure Summit that Lumen would "continue to be disciplined in how [it] deploy[s] capital."

**57**. On November 3, 2021, during the Q3 2021 earnings call, Defendant Storey announced that Lumen planned to "ramp" its fiber-enablement pace from about 400,000 locations per year to over 1 million new locations by the end of 2022, "on our way to hitting a run rate of 1.5 million to 2 million enablements per year as we exit 2022."

At that point in time, Lumen had approximately 2.7 million fiber-enabled locations, 774,000 Quantum Fiber subscribers, and Quantum Fiber penetration of around 29%.

D.    Lumen Touts Its Net Promoter Scores to Assuage Concerns

**58**. Defendants falsely assured the market that no major obstacles were impeding the progress or cost of Lumen's fiber expansion or the Quantum Fiber rollout, but the market still had concerns about Lumen's business.  For example, one analyst noted that "[a]part from geographic areas where it is the only provider option, we don't see any advantage or even reason for consumers to choose Lumen."  Additionally, early in the Class Period, other analysts noted that Lumen's "~28% fiber penetration among fiber homes passed [means] there is ample room for improvement."

The market's concerns persisted throughout the Class Period, along with growing concerns that Lumen's fiber build was not proceeding quickly enough, with one analyst noting

that "[w]hile the company says it is not capital constrained, the build pace is clearly subdued despite the frenzy driven by Telco builds, overbuilders, low interest rates (lower hurdle rate), favorable regulatory environment (proposed infrastructure bill calls for $100B for broadband), a high-tide of PE/Infra Fund capital, and lockdown-driven improved business case."

Relatedly, another analyst noted that "debate is emerging about what the value of fiber assets that don't grow are actually worth." Compared to its peers, there was concern among analysts that Lumen was not growing its fiber investments aggressively enough.

**59**. "To address these concerns," Defendants falsely claimed that Quantum Fiber had tremendously high "Net Promoter Scores" or "NPS," which is a means of measuring customer satisfaction by asking customers how likely they are to recommend a service to a friend or colleague.

For example, Defendant Storey tied Lumen's claimed high NPS scores to revenue growth and EBITDA during the February 10, 2021, Q4 2020 Company earnings call, explaining that "we grew both adjusted EBITDA and adjusted EBITDA margin in the fourth quarter" and linking that to "improvement in our Net Promoter Scores particularly in those areas where we've invested for growth in fiber-based services for enterprise and consumers," which had the effect of "improving revenue trajectory[.]"

Similarly, Defendant Storey, at the September 22, 2021 Goldman Sachs Communacopia Conference, explained that "We've been investing in growth in our consumer and small business customers through Quantum Fiber . . . . Penetration rates, ARPU [Average Revenue Per User], churn, NPS give us confidence across the board with our mass market business.[4] And with

---

[4] According to the Company's 2021 10-K, Lumen's "mass market" business provided products and services to consumer and small business customers and included Quantum Fiber.

around 15 million urban/suburban units in our retained markets, we think there's a lot of opportunity for growth.  We continue investing in EBITDA and revenue growth through our ongoing transformation."

Additionally, at the December 7, 2021 UBS Global TMT Conference, Defendant Andrews claimed, "The other one is the success we're having with the Quantum Fiber launch.  So 2 years ago, we didn't have the Quantum Fiber launch.  Now Quantum Fiber is out in the market.  It's resonating.  We're reaching the penetration rates we want.  And it's really thrilling customers with crazy high NPS scores.  So you kind of take the success that Maxine [Moreau] is seeing with Quantum Fiber and the increased focus as a result of the divestiture, and that's what gets us to the plan to kind of double down and dramatically increase build."

As late as September 15, 2022 at the Goldman Sachs Communacopia + Technology Conference, Defendant Stansbury continued to tout Quantum Fiber's NPS scores.

**60**.  The market was focused on what Defendants were saying about NPS throughout the Class Period and believed what Defendants were saying.  For example, Wells Fargo, in a June 13, 2022 report, discussed Defendants' claims of high NPS scores and explained those scores helped it "remain confident in LUMN's ability to achieve its build and IRR [Internal Rate of Return] targets on the FTTH build . . . ."

E.    Lumen Touts Its Financial Planning for the Fiber Buildout

**61**.  Similarly, Defendants touted their financial planning, including statements throughout the Class Period that the average cost per build was $1,000 or less, when it ultimately cost more.  For example, on the November 3, 2021 Q3 2021 Lumen earnings call, Defendant Dev stated that Lumen was "[i]n terms of the $1,000, we are building at a significantly lower cost today . . .  But what we are confident in is the return profile of that business . . . . So we still

– irrespective of the actual cost, we think we have a really big margin of error, if you will, in terms of generating great returns."

Defendant Storey reiterated these build cost figures at the January 6, 2022 Citi Apps Economy Conference, explaining, "we think that we have a great cost position in our ability to deliver for less than $1,000 per home passed – or at $1,000 per home passed."

**62**. At the March 29, 2022 New Street Research and BCG Fiber to the Future – Global Infrastructure Conference, Defendant Gibson emphasized the conservativeness of Lumen's financial planning by explaining, "So we publicly announced that we believe we can build out these 10 million locations for $1,000 or less. And so – and we built some inflation in the numbers into that because we believe that's a good number . . . But you're absolutely right, we're going to be prudent about where we invest to make sure that the cost is in place and the penetration targets are in place that we continue to drive a really good return on invested capital and return for shareholders . . ."

    F.    <u>Defendants Generate and Utilize "Biased" Data and Unsupported Financial Metrics</u>

**63**. The NPS data that Lumen heralded was "false and misleading" and used to make the Quantum Fiber rollout appear to be much more successful than it actually was. Similarly, Defendants' claims that the financial planning for the buildout was prudent and "capital efficien[t]," including as to the cost and progress of the buildout, was also "false and misleading."

**64.** According to **CW-2**, it was widely known within Lumen that although the Company touted how good Quantum Fiber's "experience scores" were, the public numbers were not reliable and based on "funky math" because the scores were derived from "too small a data set." Moreover, according to **CW-2**, there was an internal war within Lumen over the NPS

numbers because of "inconsistencies" in how they had been derived.  **CW-2** believed that the faulty calculation of the experience scores had been derived to satisfy Defendant Storey.

65.  **CW-1** was the employee that **CW-2** said had "went to war" over the calculation of the NPS scores.  **CW-1** explained that the NPS scores had been "massaged and recalibrated to come up with the most favorable numbers."  **CW-2** explained that the NPS numbers had come from Defendant Moreau and **CW-4**, who agreed that Lumen calculated NPS "a bit different" than how they normally were derived.  **CW-1** specifically described an all-hands marketing meeting where Moreau gave the high NPS numbers that were "laughable" to another colleague of **CW-1**.

66.  According to **CW-1**, Lumen had "developed its own methodology for reporting NPS that was not in line with the science" of how NPS should be reported, specifically focusing on the sampling issue discussed by **CW-2**.  As **CW-1** explained, the samples used for NPS reporting by Lumen were  i) only comprised of interviews with customers who had called Lumen's customer service and ii) only about specific issues.  Customers who called to cancel their service were not included in the NPS pool.  Similarly, **CW-5** confirmed that the NPS scores were "really smoke and mirrors" because they were derived from "so few customers."

67.  According to **CW-1**, while the traditional NPS method focused on "relational NPS," which is a holistic survey of customer satisfaction, Lumen used "transactional NPS," which focuses just on particular transactions, specifically only "on-boarding transactions," which were "brand-new customers."  These customers were ones who had just started their service with Lumen and, therefore, were still happy with the Company.

68.  **CW-1** also explained that a major issue with the Quantum Fiber rollout was that Lumen was simply unable to accurately report "which homes they had turned on or not."  The

Company used a marketing database called DataMart, which was supposed to draw data relevant to marketing from the myriad systems Lumen used.  Unfortunately, according to **CW-1**, there was "never an accurate count" of "premises passed," *i.e.*, which customers had "Quantum Fiber turned on."  According to **CW-1**, the numbers produced by DataMart would be different than the numbers that were claimed by field engineers from other sources.  The marketing department literally did not know who they should be marketing to because the numbers across Lumen's different data systems did not match, and "no one knew" how many premises had been passed according to **CW-1**.

**69**.  **CW-1** believed that these data integrity issues had been conveyed to Defendant Moreau. Regardless of the source of the data for premises passed, *see infra* ¶¶ 71-74, none of the multiple sources available within Lumen had "accurate numbers" that matched with any other source.

      G.     <u>Former Employees Further Suggest that Defendants Hid Quantum Fiber Issues</u>

**70**.  Although Defendants repeatedly touted investments in and progress of the fiber rollout to the market, the CWs suggest that these statements were false and misleading because Lumen was experiencing major supply chain issues, labor shortages, and other internal issues that materially increased the risk that it could neither meet its goals nor continue to "heavily invest" in the Quantum Fiber expansion.

**71**.  According to **CW-1**, the Quantum Fiber buildout was "behind schedule right out of the gate due to a number of factors."  One reason was that there were not enough technicians to install fiber at a customer's premises and not enough field engineers to lay fiber.  Another problem was the inability of Lumen's operations department to accurately report "which homes they had turned on or not," as discussed above.

72. **CW-2** confirmed that the Company had a "run rate for the homes" they wanted to install fiber to, but what was missing was technology, time, money and "physics" to accomplish the Company's goals. According to **CW-2**, Lumen had a "horrific backlog" of necessary materials for the Quantum Fiber buildout because of the COVID pandemic.

73. **CW-5** reported similar issues. At the time **CW-5** joined the Quantum Fiber project, "almost nothing" had been done towards setting up a new brand, and as of September 14, 2020, the Quantum Fiber billing system was "not ready to go."

74. Additionally, according to **CW-5**, while Lumen's technicians operated from electronic notepads to map out where Lumen laid fiber and had fiber connections available, it did so in a way that did not match how the billing systems and CenturyLink.com website had mapped out fiber locations. As a result, the billing system might indicate that fiber was not available when it actually was.

75. In 2021, **CW-5** learned on calls held by Defendant Gibson and attended by **CW-5** and others that 85% of orders from existing (*i.e.*, CenturyLink fiber customers) and new customers who signed up for Quantum Fiber "fell through," and fiber was never installed due to ongoing problems with the billing system "not talking to the technicians." By July/August 2022, the percentage of orders that fell through because Lumen was unable to fulfill them dropped from 85% to 65%.

76. **CW-3** similarly stated that as of the first quarter of 2022 (approximately March/April 2022), upwards of 65% of customer orders for Quantum Fiber had not been filled. In some instances, Lumen apparently was taking so long to fulfill orders that after a while the Company simply opted not to show up at all because the personnel did not have enough time.

**77.** Just prior to when **CW-5** left the Company, Defendant Moreau told CW-5 that Quantum Fiber is "just a wreck."

H.    The Fraudulent Scheme Begins to Unravel, and Lumen's CEO and CFO Abruptly Depart

**78**. Defendants' fraudulent scheme began to unravel on February 9, 2022, when Defendants finally revealed for the first time the negative effects of stressed supply chains on Quantum Fiber, stating *inter alia*, that these supply chain issues were "a constraining factor on how to accelerate faster."

On this news, Lumen's stock price declined $1.99, or 16%, from a close of $12.82 per share on February 9, 2022, to a close of $10.83 on February 10, 2022.

**79**. Then, on March 8, 2022, Lumen's President of Global Consumer Success disclosed for the first time that Lumen was facing labor issues in building its fiber network and reiterated that supply chain issues were still plaguing the Company.

On this news, Lumen's stock price declined 3%, from a close of $10.95 per share on March 8, 2022, to a close of $10.62 on March 9, 2022.

**80**. Shortly after Lumen began revealing the truth, on March 28, 2022, the Company announced the abrupt departure of one of the Company's highest-ranking executives, EVP and CFO Dev, after an 18-year tenure at the Company.  Described by one analyst as "not anticipated," Defendant Dev's departure was set to be effective just one week later, on April 4, 2022.

**81.** Despite Lumen's initial partial disclosures, Defendants continued to mislead investors about the true state of the Quantum Fiber "disaster by" downplaying the significance of the buildout slowdown, falsely assuring investors that they were still on track to enable 1 million

homes with fiber by the end of 2022 and that further acceleration of the build would occur in the second half of 2022.

82. Six months later on September 13, 2022, Lumen announced the additional departure of the Company's President and CEO, Defendant Storey, effective January 1, 2023. Defendant Storey's departure came after serving only five years in the Company's top role.

83. On November 2, 2022, Defendants surprised the market again by disclosing that the Company is "not yet at the pace of build we expect or want[,]" sending Lumen's stock price down by $1.25, from a close of $7.05 per share on November 2, 2022 to a close of $5.80 on November 3, 2022, for a decline of 18%.

84. Nonetheless, Defendants falsely claimed that "[w]e will continue to ramp our enablements and overcome the supply chain, labor and inflationary constraints we've seen." Unbeknownst to investors, however, the Company was doing nothing of the sort.

85. As CEO Johnson would finally admit on February 7, 2023, Lumen had actually pressed "more of a stop button than a pause button" on the Company's investment in the Quantum Fiber network and expansion into the small business and consumer markets while it reevaluated its strategic priorities in the fourth quarter of 2022 – the last quarter that Defendant Storey presided over Lumen. Indeed, Lumen had managed to enable only 605,000 units with fiber in 2022, well under the 1 million they repeatedly claimed they would complete.

CEO Johnson also announced that day that Lumen had revised its enablement forecast to "8 million to 10 million" locations, which was down significantly from analysts' prior forecasts of approximately 14-23 million locations, and the 12 million plus locations they touted following the LATAM and Apollo divestitures in mid-2021.

86. On this news, the price of Lumen's common stock dropped $1.04, or 21%, from a

close of $4.99 per share on February 7, 2023, to a close of $3.95 per share on February 8, 2023.

I.     Defendants' Post Class Period Statements Provide Evidence That Defendants'
Class Period Statements Were False and Misleading

87.   After the Class Period, on a March 7, 2023 Raymond James Institutional Investors Conference call, Defendant Stansbury admitted that prior cost estimates per enablement location had not been realistic and that Lumen employees were not being rational:  "But I think there was also a little bit of a gold-rush mentality as it relates to fiber to the home.  And I think that emotional exuberance has been at least tempered somewhat with some more rational thought.  And I think people are pulling back on their build plans, more realistic cost estimates and ARPUs coming with that as well."

He also stated that "[w]hen I came to Lumen [in April 2022], the operations team only had 2 metrics, get to 12 million enabled locations at $1,000 per enablement.  Well, that's troublesome as a CFO and so you want to make sure that you're building to the right markets and maybe $1,000 isn't the right number.  We're now at $1,200."

88.   In another post-Class Period call on June 5, 2023, Defendant Moreau confirmed that the average cost of enablement was higher than Defendants claimed during the Class Period.  During the June investor day call, CEO Johnson confirmed that the cost per home "looks like it's inching a little higher" and confirmed that it was in the "range of the 1,000 to 1,500 per location."

89.   Additionally, Lumen's "planning yield" – a key internal metric measured weekly that was relied on by the Company during the Class Period to determine where to build fiber, but which metric was not specifically disclosed to investors during the Class Period – showed that, during the Class Period, Lumen was not using its capital efficiently to expand fiber, and it was not anywhere close to being able to meet the new accelerated pace of buildouts.

After the end of the Class Period at the March 6, 2023 Morgan Stanley Technology, Media & Telecom Conference, Defendant Stansbury explained what the "planning yield" metric is used for:

> So planning yield is the markets you want to build go on the top of the funnel. That then goes through things like site walks and engineering. They built a detailed engineering plan. The engineers come back with a cost that goes to finance. Finance has to make a decision on whether we're going to build or not, and that's what comes out the bottom of the funnel.

90. In other words, the Company expends money and resources to determine whether it can actually build in a certain location, and then only builds there if finance approves it. The percentage of proposed builds that result in approvals from finance is the "planning yield." On March 7, 2023, after the Class Period, Defendant Stansbury admitted that Lumen's planning yield was below 20% – *i.e.*, finance approved a proposed build only 20% of the time in 2021.

At the March 7, 2023 Raymond James Institutional Investors Conference, Defendant Stansbury's described this as "horrendous" and meant that Lumen was wasting "over 80% of [its] resources" on proposed builds that were not approved.

91. On May 2, 2023, during the Company's earnings call, CEO Johnson confirmed that Lumen's planning yield in 2022 was "as low as 10%[,]" a yield lower than what was previously reported and further illustrated problems with the roll out of Quantum Fiber.

CEO Johnson also acknowledged on February 7, 2023, that the penetration rate for the 2021 vintage (*i.e.*, the percentage of units that were fiber-enabled in 2021 that subscribed to Quantum Fiber), was 17%. As Defendant Stansbury would explain a month later on a March 7, 2023 conference call, this number was "not good enough in terms of the ramp that we expected[,]" and was one of the "layers" that caused the Company to stop investing in Quantum Fiber in the previous quarter.

## II.    Procedural Progression of the Case

Diane Voight filed the instant, putative class action against Lumen, et al, on March 3, 2023.  (Compl.).

On May 2, 2023, eight sets of interested parties filed competing motions for appointment as lead plaintiff and approval of counsel.  [doc. #s 10-12, 14-18].  On May 24, 2023, the Court adopted a proposed joint stipulation appointing Douglas and Barbara Evans, individually, and as Trustees of the Douglas P. Evans Living Trust U/A Dated 08/24/2010 and George Sanchez as Co-Lead Plaintiffs and approval of Co-Lead Counsel.  (Order [doc. # 35]); *see also* June 16, 2023 Order [doc. # 45] (denying remaining motions for appointment as lead plaintiff).

On June 16, 2023, the Court entered the parties' proposed scheduling order, which included an August 7, 2023 deadline to file an amended complaint, together with extended briefing deadlines for the anticipated motion to dismiss.  (Order [doc. # 44]).

On August 7, 2023, Plaintiffs duly filed their ACAC.  [doc. # 47].

On October 10, 2023, Defendants filed the instant motion for an order directing the submission of affidavits by counsel and CW-1, in the wake of defense counsel's discovery that CW-1 did not want to participate in this litigation.  [doc. # 54].

On October 13, 2023, Defendants filed the instant motion to dismiss for failure to state a claim upon which relief can be granted.  [doc. # 59].  They contemporaneously filed a motion to take judicial notice of various documents for the purpose of the motion to dismiss.  [doc. # 61].

On October 20, 2023, Defendants filed the instant motion for an order directing additional equitable relief relating to CW-4, after defense counsel learned that CW-4 also wanted no part of this litigation.  [doc. # 66].

28

On November 3, 2023, Plaintiffs filed a combined brief in opposition to Defendants' motions pertaining to CW-1 and CW-4.  [doc. # 69].

On November 6, 2023, Plaintiffs filed their opposition to Defendants' motion to take judicial notice of certain documents.  [doc. # 70].

On November 6, 2023, Defendants filed reply briefs in support of their motion to take judicial notice and their motions pertaining to the confidential witnesses.  [doc. #s 72-73].

On December 15, 2023, Plaintiffs filed their opposition to the motion to dismiss.  [doc. # 82].

Defendants filed their reply brief in support of their motion to dismiss on February 1, 2024.  [doc. # 86].

The parties filed a notice of supplemental authority, and a response thereto, on February 1 and February 6, 2024, respectively, regarding the motions directed at the confidential witnesses. [doc. #s 84 & 87].

Accordingly, briefing is complete, and the matter is ripe.

### Confidential Witness Motions

After the filing of the ACAC in August 2023, Lumen's in-house counsel reviewed the descriptions of CW-1 and CW-4 and determined their identities.  *See* Declarations of George Anhang; M/Submission of Affidavits, Exh. A and M/Equitable Relief, Exh. A [doc. #s 54-3 & 66-2, respectively].  Defense counsel contacted CW-1 and CW-4 in September and October 2023 and learned the following:

- CW-1 has no desire to be a part of this case;

- CW-1 did not know what had been attributed to her and does not want anything to do with it;

- CW-4 had a single call with two individuals who were investigating claims against Lumen;

- CW-4 told the investigators that she did not want to take part in any litigation against Lumen;

- CW-4 was never asked to verify the complaint to ensure that the information attributed to her was correct;

- CW-4 maintained that she did not wish to take part in litigation against Lumen and did not even want to discuss the material attributed to her in the Complaint.

*Id*.

Defendants contend that the foregoing statements from CW-1 and CW-4 raise concerns regarding the reliability and accuracy of the statements that Plaintiffs attributed to them in the ACAC. Moreover, the same issues may plague the statements purportedly made by CW-2, CW-3, and CW-5.

Therefore, consistent with actions taken by at least two other district courts under similar circumstances,[5] Defendants' initial motion asked the Court to order Plaintiffs' counsel to submit, for the Court's *in camera* review, an affidavit concerning their interactions with CW-1, and an affidavit from CW-1 regarding those interactions and the veracity of the complaint's references to her.

In the wake of defense counsel's conversation with CW-4 in October, Defendants filed a second motion pertaining to the confidential witnesses, wherein they asked the Court to order such additional relief as it deems just and equitable to fully address the concerns raised regarding CW-4 and the other confidential witnesses referenced in the ACAC.

---

[5] *See In re Millennial Media, Inc. Sec. Litig.*, Civ. Action No. 14-7923, 2015 WL3443918 (S.D.N.Y. May 29, 2015) and *In re Lumber Liquidators Holdings, Inc. Sec. Litig.*, Civ. Action No. 13-0157 (E.D. Va. July 14, 2015); *see also Campo v. Sears Holdings Corp.*, 371 F. App'x. 212, 216 n.4 (2d Cir. 2010) (finding no error where the district court ordered confidential witnesses deposed for the limited purpose of determining whether the confidential witnesses acknowledged the statements attributed to them in the complaint).

In their opposition to the motions, Plaintiffs stressed that neither confidential witness has recanted any of their statements or claimed that their statements were misquoted or taken out of context.[6]  Even if CW-1 and CW-4 *had* recanted their statements, Defendants' argue that the Court typically considers affidavits regarding the circumstances of the CWs' statements under Rule 12(d) without converting the motion to dismiss into a motion for summary judgment and according all parties a reasonable opportunity to present pertinent material.  FED. R. CIV. P. 12(d).  Furthermore, pursuant to the Private Securities Litigation Reform Act, "all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party."  15 U.S.C. § 78u-4(b)(3)(B).

Plaintiffs also cited persuasive authority where district courts declined to consider extrinsic evidence regarding former employees' statements at the motion to dismiss stage, even when the former employees had submitted declarations recanting their former statements.  *See, e.g.*, *Union Asset Mgmt. Holding AG v. Sandisk LLC*, 227 F.Supp.3d 1098, 1099 (N.D. Cal. 2017) (refusing to consider at the motion to dismiss stage a declaration from a CW that recanted his statements made in the complaint); *In re Par Pharm. Sec. Litig.*, Civ. Action No. 06-03226, 2009 WL 3234273, at *12 (D.N.J. Sept. 30, 2009) (striking a declaration from a CW recanting allegations in the original complaint on account of the PSLRA discovery stay); *In re Rayonier Inc. Sec. Litig.*, Civ. Action No. 14-0139, 2016 WL 3022149, at *1 (M.D. Fla. May 20, 2016) (noting that prevailing circuit case law, "seems to prohibit the Court from considering [the

---

[6] Of course, CW-1 did not know what had been attributed to her.  Moreover, CW-4 did not even want to discuss the contents of the complaint that were attributed to her.

recanting witness's] declaration without converting the motion to dismiss into a motion for summary judgment, a course of action neither party requests.").

In their reply brief, Defendants argue that courts must discount allegations from confidential sources when resolving a motion to dismiss in a securities class action. *See Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) (citations omitted) ("*In re:  Shaw*").  They further observe that, "as a matter of Fifth Circuit law, courts can take judicial notice of affidavits on a Rule 12(b)(6) motion."  (Defs. Reply Brief, pg. 8 n.7) (citing *Cooper v. Canidae Corp.*, 2020 WL 13532970, at *3-4 (N.D. Tex. Dec. 17, 2020); *Shepherd v. Fanning*, 2017 WL 2671706, at *2 n.1 (E.D. La. Jun. 21, 2017); *Betancourt v. Ingram Park Mall, L.P.*, 735 F. Supp. 2d 587, 592 n.3 (W.D. Tex. 2010)).  Combining these principles, Defendants argue that the Court may take judicial notice of affidavits from each confidential witness regarding the accuracy of the statements attributed to them in the ACAC in order for the Court to assess the reliability of the statements and appropriately discount them.

Defendants, however, have not identified binding Fifth Circuit precedent that authorizes courts to *compel* confidential witnesses to execute affidavits regarding the reliability of their statements for the purpose of a Rule 12(b)(6) motion to dismiss a securities action.  Moreover, in the cases cited by Defendants where courts *did* take judicial notice of affidavits at the motion to dismiss stage, the affidavits had been filed previously in other cases.  *See Cooper,* 2020 WL 13532970, at *3-4; *Shepherd,* 2017 WL 2671706, at *2 n.1; and *Betancourt,* 735 F. Supp. at 592 n.3.  Here, there is no showing that the requested affidavits were filed in other proceedings.

The default rule, of course, is Rule 12(d), which ordinarily prohibits consideration of matters outside the pleadings unless the Court converts the motion into a motion for summary judgment.  The Court is inclined to follow the default rule particularly where, as here, there

presently is no evidence that the statements were incorrectly attributed to the confidential witnesses.[7]  Thus far, Defendants have obtained evidence to show only that at least two confidential witnesses are unwilling participants in the case and that they lack knowledge of what statements are attributed to them.  However, Defendants have not identified a requirement that a witness be a willing participant in a case, at least at the pleading stage.  Furthermore, Rule 11 provides a potential remedy if it later is determined that allegations attributed to the confidential witnesses in the ACAC were incorrect and Plaintiffs' counsel failed to make reasonable inquiry before including them.  *See Union Asset Mgmt. Holding AG*, 227 F.Supp.3d at 1100–01 (discussing the availably of Rule 11 to address abusive confidential witness practices); *see also* 15 U.S.C. § 78u-4(c).

Finally, given the undersigned's recommended disposition of the pending motion to dismiss, even without giving effect to Defendants' confidential witness motions, *see* discussion, *infra*, it is manifest that the requested relief is unwarranted.  Accordingly,

IT IS ORDERED that Defendants' motions for submission of affidavits [doc. # 54] and for additional equitable relief [doc. #66] are DENIED.[8]

## Motion to Dismiss

Defendants seek dismissal of Plaintiffs' claims pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.  However, "[a] dismissal for failure to plead fraud with

---

[7] The PSLRA discovery stay would not present an insurmountable bar to the requested relief because it authorizes an exception to prevent undue prejudice to a party.

[8] As these motions are not excepted in 28 U.S.C. § 636(b)(1)(A), nor dispositive of any claim on the merits within the meaning of Rule 72 of the Federal Rules of Civil Procedure, this ruling is issued under the authority thereof, and in accordance with the standing order of this court.  Any objection/appeal must be made to the district judge in accordance with Rule 72(a) of the Federal Rules of Civil Procedure.

particularity under Rule 9(b) is treated as a dismissal for failure to state a claim under Rule 12(b)(6)." *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir. 1997) (citation omitted). Furthermore, in a securities case, a Rule 12(b)(6) motion must consider not only the strict pleading requirements of Rule 9(b), but also that of the Private Securities Litigation Reform Act. *Hall v. Rent-A-Ctr., Inc.*, Civ. Action No. 16-0978, 2017 WL 6398742, at *6 (E.D. Tex. Oct. 19, 2017), *R&R adopted,* 2017 WL 6379334 (E.D. Tex. Dec. 14, 2017) (citations omitted). Accordingly, the Court will begin with a recitation of the usual Rule 12(b)(6) standard.

## I.    Rule 12(b)(6) Standard of Review

The Federal Rules of Civil Procedure sanction dismissal where the plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). A pleading states a claim for relief, *inter alia*, when it contains a "short and plain statement . . . showing that the pleader is entitled to relief . . ." FED. R. CIV. P. 8(a)(2). Of course, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," that is, a plaintiff must "specify the alleged fraudulent statements, the speaker, when and where the statements were made, and why they are fraudulent. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 349 (5th Cir. 2002) (quoting FED. R. CIV. P. 9(b)) and *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) (citations omitted).

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). A claim is facially plausible when it contains sufficient factual content for the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. *Plausibility* does not equate to *possibility* or *probability*; it lies somewhere in between. *See Iqbal,* 556 U.S. at 678.

34

Plausibility simply calls for enough factual allegations to raise a reasonable expectation that discovery will reveal evidence to support the elements of the claim. *See Twombly*, 550 U.S. at 556. Although the court must accept as true all factual allegations set forth in the complaint, the same presumption does not extend to legal conclusions. *Twombly*, 550 U.S. at 555. A pleading comprised of "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" does not satisfy Rule 8. *Id.* "[P]laintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim." *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 153 (5th Cir. 2010) (citation omitted).

Assessing whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citation omitted). A well-pleaded complaint may proceed even if it strikes the court that actual proof of the asserted facts is improbable and that recovery is unlikely. *Twombly*, 550 U.S. at 556. Nevertheless, a court is compelled to dismiss an otherwise well-pleaded claim if it is premised upon an invalid legal theory. *Neitzke v. Williams*, 490 U.S. 319 (1989).

## II.    Documents to be Considered by the Court/Motion to Take Judicial Notice

In assessing whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, "the factual information to which the court addresses its inquiry is limited to the (1) facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019) (citations omitted). The Court also may consider documents that a defendant attaches to its motion, so long as the documents are referred to in the complaint and are central to the plaintiff's claims. *Id.* (citing, *inter alia*, *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004)); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (courts must consider the complaint, plus

35

documents incorporated into the complaint by reference, and matters of which a court may take judicial notice).  "In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated."  *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 499 (5th Cir. 2000).

The Federal Rules of Evidence provide that the court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b).  A court may take judicial notice on its own or if a party requests it and the court is supplied with the necessary information.  FED. R. EVID. 201(c).

"Judicial notice may be taken of matters of public record."  *Walker*, 938 F.3d at 735 (citing *Firefighters' Retirement Sys., v. EisnerAmper*, 898 F.3d 553, 558 n.2 (5th Cir. 2018)).  District courts may take appropriate judicial notice of publicly available documents and transcripts produced by government agencies, as they are matters of public record.  *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (citation omitted).  Moreover,

> [w]hen deciding a motion to dismiss a claim for securities fraud on the pleadings, a court may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC. Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents.

*Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) (citation omitted); *see also Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (citation omitted).  A court also may take judicial notice of court pleadings in other cases because they constitute public records.  *See Murchison Capital Partners, L.P. v. Nuance Commc'ns, Inc.*, 625 Fed. App'x. 617, 618 n.1 (5th Cir. 2015) (citations omitted).

36

When taking judicial notice, however, the courts generally are limited to recognizing the existence of a document, rather than taking as true potentially disputed factual statements or findings contained within that document, unless the facts themselves satisfy the Rule 201(c) criteria.  *See Taylor v. Charter Med. Corp.*, 162 F.3d 827, 831 (5th Cir. 1998); *Ferguson v. Extraco Mortgage Co.*, 264 F. App'x. 351, 352 (5th Cir. 2007) (court may take judicial notice of "a document filed in another court . . . to establish the fact of such litigation and related filings," but generally cannot take notice of the findings of fact from other proceedings because those facts are usually disputed and almost always disputable); *Gray ex rel. Rudd v. Beverly Enterprises-Mississippi, Inc.*, 390 F.3d 400, 408 n.7 (5th Cir. 2004) (same); *Giles v. City of Dallas*, 539 F. App'x. 537, 542 (5th Cir. 2013) (courts generally cannot take notice of findings of fact from other proceedings for the truth asserted therein because these findings are disputable and usually are disputed); *see also Luv n' care, Ltd. v. Jackel Int'l Ltd.*, 502 F.Supp.3d 1106, 1110 (W.D. La. 2020) ("To be clear, the Court is not taking notice of the truthfulness of the underlying facts. Instead, the Court is only taking notice that the identified documents exist and that they say what they say.").

Courts routinely decline to take judicial notice of facts asserted in news reports and newspapers because they are "not a source whose accuracy cannot be questioned."  *Ambler v. Williamson Cnty., Texas*, Civ. Action No. 20-1068, 2021 WL 769667, at *4 n.8 (W.D. Tex. Feb. 25, 2021) (collecting cases).   Furthermore, while the existence of information posted on a government website may be subject to judicial notice, the veracity of potentially disputed facts contained therein is not.  *See Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 432 (5th Cir. 2014) (website at issue does not appear to be a proper subject for judicial notice).[9]

---

[9] In *Jaso v. The Coca Cola Co.*, the Fifth Circuit acknowledged that, although, in prior cases, it

Ultimately, "judicial notice is discretionary by the district court, unless it is requested by a party and the court is supplied with the necessary information." *Ferguson*, 264 Fed. App'x. at 352. "Namely, the movant must identify the fact to be noticed, the purpose and relevance of that fact, and the source of indisputable accuracy for a fact that can be accurately and readily determined under Rule 201(b)(2)." *Luv n' care, Ltd.,* 502 F.Supp.3d at 1108 (citations and internal quotation marks omitted).

In support of their motion to dismiss, Defendants submitted a declaration from Lyle Roberts, to which he attached 51 exhibits. (Roberts Decl. & Exhs. [doc. #s 59-2-54]). Defendants also filed a motion to take judicial notice of various documents, which were either matters of public record, referenced in the ACAC, or both. (M/Take Jud. Notice [doc. # 61]). Defendants divided the proposed materials into two categories. According to Defendants, the Court may consider the Category I documents, without taking judicial notice, because they are attached to the motion to dismiss, are referenced (or related to materials referenced) in the ACAC and are central to Plaintiffs' claims.

Out of an abundance of caution, however, Defendants ask the Court to take judicial notice of the following Category I materials:

- Exhibits 1, 3, and 6 are SEC filings made by Lumen.

- Exhibits 7, 10, 12, 14, 16, 18-19, and 22 are Lumen earnings presentations and call transcripts that come from the same sources as those that Plaintiffs cite in the Complaint and therefore possess the same indicia of trustworthiness.

- Exhibits 46, 48-50, and 52 are analyst reports about Lumen. Like the analyst report cited in the Complaint, these reports reflect industry analysts' perspectives on information that Lumen had disclosed to the market. These reports are available to

---

has taken judicial notice of information posted on a government website, it was improper for the district court to do so for the purpose of gleaning a substantive fact from the website when that fact does not come from a source whose accuracy cannot reasonably be questioned. *Jaso v. The Coca Cola Co.*, 435 F. App'x. 346, 354 n.5 (5th Cir. 2011).

investors and are matters of public record.

- Exhibits 25 and 28 are industry conference transcripts that are the same type of transcripts that Plaintiffs quote in thirty paragraphs of the Complaint. These transcripts are publicly available, and they provide context for the comments at the heart of Plaintiffs' Complaint.

The Category II materials are taken from eight websites and are described, as follows:

- Exhibit 37, from Lumen's website, provides additional context for Plaintiffs' allegations with respect to the Company's expectations about Quantum Fiber and the retirement of Jeffrey Storey, subjects addressed in the Complaint. *See, e.g.*, ACAC ¶¶ 1-4, 41-45, 80-82.

- Exhibits 42-45, from industry publications, describe (i) similarly optimistic statements made in spring and summer of 2021 by Lumen's competitors about their fiber buildout projections, and (ii) the reductions in fiber buildout projections made by Lumen's competitors toward the end of 2022. These articles provide context for Plaintiffs' allegations. Fiber industry insiders published these articles, based on corporate disclosures and public statements by Lumen's competitors.

- Exhibits 40-41 and 43, also from industry publications and websites, provide background information and definitions of the terms "penetration rate" and "Net Promoter Score" (or NPS). These terms are used in the Complaint but are not defined. *See, e.g.*, CAC ¶¶ 59, 91, 102; 65.

- Exhibit 39 is a tabulation of securities cases filed across the country between 2013 and 2022 from an economic consulting firm. The study places into context the Complaint filed in this action.

In their response to Defendants' motion, Plaintiffs stated that they do not object to the Court's consideration of Exhibit Nos. 1-6, 8-24, 26-27, 29-36, 38, 47, and 51 for the limited purpose of ascertaining what they say (but not for the truth of the matters asserted therein) in certain U.S. Securities and Exchange Commission ("SEC") filings, press releases, conference call transcripts, presentations, and analyst reports.[10] Defendants conceded in their reply brief

---

[10] Specifically, Exhs. 1-6 are SEC filings; Exhs. 9, 11, 13, 15, 17, 19-24, 26-27, and 29- 36 represent conference call transcripts cited in the Complaint; Exhs. 8, 10, 12, 14, 16, and 18 are presentations accompanying certain of those calls; Exh. 38 is a press release cited in the Complaint; and Exhs. 47-48 and 51 are three analyst reports cited in the ACAC.

that they were not asking the Court to consider whether the statements were true, "only that they were truly made."  (Defs.  Reply Brief, pg. 2 [doc. # 72]).

However, Plaintiffs *do* object to the Court's consideration of Category I Exhibits 7, 25, 46, 49, 52 and Category II Exhibits 39-45.[11]  The Court will address the exhibits, in turn.

Exhibit 7 is Lumen's Second Quarter 2023 Earnings Call transcript, dated Aug. 1, 2023.  (M/Dismiss, Exh. 7 [doc. # 59-9]).   Plaintiffs contend that this transcript is not referenced in the ACAC, and, thus, it cannot be considered on that basis.  They further contend that Exhibit 7 is irrelevant because it discusses the number of enablements in the first and second quarter of 2023, and going forward, which is outside of the proposed Class Period.  Finally, Plaintiffs stress that, even if Exhibit 7 were relevant, Defendants are necessarily offering its contents for the truth of the matter asserted because the number of enablements in the first half of 2023 is only relevant if it is assumed to be true.  Upon consideration, the Court agrees.  While Exhibit 7 is relevant to the issues in the case, it is only relevant if the number of enablements is assumed to be correct.

Exhibit 25 is Lumen's Citi 2023 Communications, Media & Entertainment Conference transcript, dated January 5, 2023.  (M/Dismiss, Exh. 25 [doc. # 59-27]).  Defendants cite Exhibit 25 in their motion to dismiss for the proposition that Ms. Johnson explained in January 2023 that "quantity is not always better than quality" and that, in order to drive "profitable revenue," the Company would need to reduce "the numbers of pure enablements."  (M/Dismiss, Memo., pg. 11).  Of course, the statement falls within the Class Period, and, thus, is relevant to the information that was available to investors.  Accordingly, the Court finds that the statement may be considered for that purpose, but not for the truth of the matter asserted.

---

[11] Plaintiffs also objected to Exhibits 28, 50, and 37.  In their reply brief, however, Defendants withdrew their request to take judicial notice of these documents because they were not included in their motion to dismiss.

Exhibit 46 is a copy of a UBS Global Research and Evidence Lab analyst report by Batya

Levi, et al., titled, "LUMN: Highlights from UBS Conference," dated December 6, 2022.  The

Complaint includes paraphrased quotations and excerpts from the transcript of the underlying

conference (the UBS 50th Annual Global TMT Conference).  (M/Dismiss, Exh. 46 [doc. # 59-

48]).  Plaintiffs object to the Court's taking judicial notice of this transcript.  However, Plaintiffs

quote from this document in their ACAC.  *See, e.g.*, CAC ¶¶ 170-73.  Thus, to the extent that the

document is important to support Plaintiffs' claims, the Court may consider the entirety of the

document, without the need to take judicial notice of it.

Exhibit 49 is a copy of a Morgan Stanley analyst report by Simon Flannery, et al., titled

"2Q22 Quick Cross Asset Comment: Margins Under Pressure as Lumen Unveils New Segment

Disclosure," dated August 4, 2022.  (M/Dismiss, Exh. 49 [doc. # 59-51]).  According to

Defendants, the ACAC repeatedly refers to "[f]inancial analysts and the market," "securities

analysts," "market analysts," "investment analysts," "the securities market," and "analysts"

generally (*see, e.g.*, CAC ¶¶ 3, 42- 43, 48, 58, 80, 101, 196, 202, 208, 211), and relies upon

information "disseminated to the securities market, investment analysts, and the investing

public."  *Id*.  Plaintiffs object to the Court's consideration of the article because Defendants

improperly cited to analysts' reports for their perspectives.  However, Plaintiffs rely on similar

reports in their ACAC.  Furthermore, the Court may take judicial notice of the article to show

what information was available to investors in the public domain, but not for the truth of the

matter asserted, e.g., the analysts' opinions or beliefs.  *See Abady v. Lipocine Inc.*, Civ. Action

No. 19-0906, 2023 WL 2933080, at *3 (D. Utah Apr. 13, 2023).  Accordingly, the Court finds

that the article may be considered for the foregoing purpose only.

Exhibit 52 is a copy of a Truist Securities analyst research report by Greg P. Miller, et al.,

titled, "Lumen Technologies, Inc. (LUMN):  Mixed 4Q21 13 Results, Initial 2022 Guidance Miss, Target $11," dated February 9, 2022.  (M/Dismiss, Exh. 52 [doc. # 59-54]).  Defendants cite the report as expressing caution over "Lumen's fiber strategy given the increasingly competitive broadband market — notably the aggressive fiber buildout from peers." (M/Dismiss, Memo., pg. 6 n.2).  Plaintiffs object to the Court's consideration of the article because Defendants improperly cited to analysts' reports for their perspectives.  Again, however, the Court may take judicial notice of the article to show what information was available to investors in the public domain, but not for the truth of the matter asserted, e.g., the analyst's opinions or beliefs.

Exhibit 39 is an excerpt from a copy of a report by NERA Economic Consulting ("NERA"), titled "Recent Trends in Securities Class Action Litigation:  2022 Full-Year Review," dated January 24, 2023.[12]  (M/Dismiss, Exh. 39 [doc. # 59-41]).  Defendants cite this report to show that "motions to dismiss were filed in 96% of securities class action cases brought between 2013 and 2022 and, among cases where a decision was reached, 61% of motions to dismiss were granted . . ."  (M/Dismiss, Memo., pg. 4 n.1).  The frequency that motions to dismiss are filed and granted in other securities cases is not pertinent to the instant motion to dismiss, which must stand or fall on its own merits.  Accordingly, the Court will not consider this report.

Exhibit 42 is a copy of a LightReading article by Jeff Baumgartner, titled "*AT&T's fiber buildout pace could signal broader slowdown*," dated January 26, 2023. (M/Dismiss, Exh. 42

---

[12] NERA is a global economic consultancy firm that, for more than six decades, has been creating strategies, studies, reports, expert testimony, and policy recommendations for government authorities and the world's leading law firms and corporations.

[doc. # 59-44]).[13]  Defendants cite this article to show that, around this time period, Lumen's competitors were reducing their own planned fiber buildouts.  (M/Dismiss, Memo., pg. 11).  Plaintiffs contend that the information in the article is irrelevant and that, in any event, facts regarding Lumen's competitors are not "generally known," and the only thing readily determinable from the article is what the authors reported, not what Lumen's competitors were actually doing.  In their reply brief, Defendants suggest that the Court may consider the article as information that is available to a reasonable investor.  The Court agrees that the article may be considered for the limited purpose of what information was available to investors in the public domain, but not for the truth of the matter reported.

Exhibit 43 is a copy of a LightReading article by Mike Dano, titled "*Analysts fret over Lumen's fiber plans*," dated February 10, 2022.  (M/Dismiss, Exh. 43 [doc. # 59-45]).  Defendants cite this article to define the "penetration rate," as the ratio of subscribers to enablements, i.e., actual customers to potential customers.  (M/Dismiss, Memo., pg. 5).  However, "penetration" is defined in the ACAC.  (ACAC, ¶ 48).  Accordingly, Exhibit 43 is superfluous for that purpose and will not be considered.

Exhibit 44 is a copy of an IEEE Communications Society Blog article by Alan Weissberger, titled "*Frontier Communications Accelerates Fiber Build Out -10 Million locations passed by 2025*," dated August 6, 2021.[14]  (M/Dismiss, Exh. 44 [doc. # 59-46]).  Defendants cite this article to show that Frontier Communications announced plans to enable 10 million locations by 2025.  (M/Dismiss, Memo., pg. 5).   Plaintiffs contend that the information

---

[13] LightReading gathers and disseminates news from corporations' press releases and disclosures and is a recognized source for fiber and telecommunications industry news.

[14] IEEE is the world's largest technical professional organization, with over 427,000 members across more than 190 countries.

in the article is irrelevant and that, in any event, facts regarding Lumen's competitors are not "generally known," and the only thing readily determinable from the article is what the authors reported, not what Lumen's competitors were actually doing.  In their reply brief, Defendants suggest that the Court may consider the article as information that is available to a reasonable investor.  The Court agrees that the article may be considered for the limited purpose of what information was available to investors in the public domain, but not for the truth of the matter asserted.

Exhibit 45 is a LightReading article by Jeff Baumgartner, titled "*AT&T to plant fiber in 3M+ locations this year, sizes up 4M more in 2022*," dated March 12, 2021.  (M/Dismiss, Exh. 49 [doc. # 59-47]).  Defendants cited the article for the proposition that Lumen was facing challenges in expanding its fiber network because of competition from other telecommunications companies who were simultaneously expanding their fiber networks.  (M/Dismiss, Memo., pg. 5).  Plaintiffs contend that the information in the article is irrelevant and that, in any event, facts regarding Lumen's competitors are not "generally known," and the only thing readily determinable from the article is what the authors reported, not what Lumen's competitors were actually doing.  In their reply brief, Defendants suggest that the Court may consider the article as information that is available to a reasonable investor.  The Court agrees that the article may be considered for the limited purpose of what information was available to investors in the public domain, but not for the truth of the matter asserted.

Exhibit 40 is copy of the "Lumen Technologies" page from Companies History's website, as printed on September 30, 2023.  (M/Dismiss, Exh. 40 [doc. # 59-42]).[15]  Defendants

_____

[15] Companies History is a website dedicated to gathering and publishing accurate "history, facts, videos, and company profiles of the largest and most successful companies and brands in the world."

cite this page to show Lumen's 100-year history as a rural company that has grown into a publicly traded corporation with more than 30,000 employees.  (M/Dismiss, Memo., pg. 4). Upon consideration, the Court is not persuaded that it may take judicial notice of this website for the truth of the matter asserted.  Nonetheless, even Plaintiffs cite Lumen's most recent Form 10-K, which shows that Lumen has "approximately 29,000 employees . . ."  (Pl. Response Brief, pg. 14 [doc. # 70]).  Thus, this information may be considered.

Finally, Exhibit 41 is a copy of the "*What is Net Promoter Score®? Your introduction to NPS*" page from HotJar's website (last updated September 25, 2023).  (M/Dismiss, Exh. 41 [doc. # 59-43]).[16]  Defendants cite this article to define "NPS."  (M/Dismiss, Memo., pg. 7).  However, "NPS" is defined in the ACAC.  (ACAC, ¶ 59).  Therefore, Exhibit 41 is superfluous for that purpose.  Moreover, Defendants have not established that "NPS" is generally known within this jurisdiction or that the information in the article is accurate beyond reasonable questioning. Accordingly, the Court will not consider the article.

In sum, IT IS ORDERED that Defendants' motion to take judicial notice is GRANTED IN PART and DENIED IN PART, as detailed above.[17]  In addition, the Court will explain its citation to and reliance upon various documents below.

## III.    § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5

---

[16] Hot Jar is dedicated to assisting companies to understand and interpret user engagement with their websites and lists definitions of basic user-engagement metrics to educate both the public and its potential customers.

[17] As this motion is not excepted in 28 U.S.C. § 636(b)(1)(A), nor dispositive of any claim on the merits within the meaning of Rule 72 of the Federal Rules of Civil Procedure, this ruling is issued under the authority thereof, and in accordance with the standing order of this court.  Any objection/appeal must be made to the district judge in accordance with Rule 72(a) of the Federal Rules of Civil Procedure.

Plaintiffs' first count against Defendants is for violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), together with Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. (ACAC, ¶¶ 235-242).

Section 10(b) of the Securities Exchange Act provides that,

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .

**(b)** To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Pursuant to its rule-making authority, the SEC made it unlawful for anyone:

(a)     To employ any device, scheme, or artifice to defraud,

(b)     To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)     To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. "Rule 10b–5 encompasses only conduct already prohibited by § 10(b)." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008) (citing *United States v. O'Hagan,* 521 U.S. 642, 651 (1997)).

Although, by its terms, the Securities Exchange Act does not authorize a private cause of action for § 10(b) violations, the Supreme Court has recognized an implied right of action in the words of the statute and its implementing regulation. *Stoneridge Inv. Partners, LLC*, 552 U.S. at 157 (citing *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13, n. 9

46

(1971)).  "In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id*. (citation omitted); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011).

In an effort to curb the perceived abuse of federal securities laws by private plaintiffs,[18] Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 406 (5th Cir. 2001).  The PSLRA enhanced the particularity requirements for pleading fraud in two ways.  "First, plaintiffs must 'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . .'  Second, for 'each act or omission alleged' to be false or misleading, plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *In re: Shaw*, 537 F.3d at 533 (quoting 15 U.S.C. § 78u-4(b)(1)(B)& (2)).  Only the latter requirement alters the usual contours of a Rule 12(b)(6) ruling.  *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009).  In other words, under Rule 12(b)(6), courts must draw all reasonable inferences in the plaintiff's favor.  *Id*.

However, "for scienter only, as required by the PSLRA, a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter."  *Id*. (citations and internal quotation marks omitted).  Thus, to adequately plead scienter in a § 10(b) action, plaintiffs must set forth facts that render "an inference of scienter **at least as likely as any plausible opposing inference**."  *Lormand,* 565 F.3d at 250 (citing *Tellabs, Inc..*, 551 U.S. at

---

[18] E.g., "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers . . ." *Tellabs, Inc.*, 551 U.S. at 320 (citation omitted).

324) (emphasis added).  Ultimately, the inference of scienter must be "cogent and compelling," not merely "reasonable" or "permissible."  *Lormand*, 565 F.3d at 239 (citations omitted). "[W]here there are competing inferences that establish or negate the scienter requirement, 'a tie favors the plaintiff' on a motion to dismiss under 15 U.S.C. § 78u–4(b)(2)."  *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014)

Defendants' arguments pertaining to the § 10(b) and Rule 10b-5 claims are divided into two broad categories:  Plaintiffs failed to plead any actionable misstatements or omissions, and Plaintiffs failed to plead a strong inference of scienter as to any defendant.  Within the former category, Defendants argue that Plaintiffs engage in impermissible "puzzle pleading."  They further contend that the statements set forth in the ACAC are not actionable because they constitute "puffery," accurate historical statements, or forward-looking statements protected by the PSLRA's safe harbor.  Moreover, Plaintiffs fail to allege facts from which it could be inferred that the statements were false when made.  Finally, Defendants argue that (1) Plaintiffs fail to adequately plead that information about potential supply chain and labor issues was materially omitted, (2) Lumen made no disclosures about planning yield and had no duty to do so; and (3) Plaintiffs' allegations about NPS are irrelevant.

As to scienter, Defendants contend that Plaintiffs rely upon impermissible group pleading, make no allegations about motive or opportunity, do not sufficiently allege knowledge or recklessness, cannot rely on a conclusory "core operations" theory, and cannot establish scienter via executive resignations or SOX certifications.

The Court first will resolve Defendants' "puzzle pleading" and historically accurate statements arguments, then set forth generally applicable law regarding actionable misstatements or omissions, scienter, and loss causation, before proceeding to analyze the sufficiency of

Plaintiffs' allegations.

## IV.   Puzzle Pleading

District courts have defined impermissible puzzle pleading as "isolating allegations and elements while leaving it to the [c]ourt to infer a connection . . ."   " *In re Alamosa Holdings, Inc.,* 382 F.Supp.2d 832, 857–58 (N. D. Tex. 2005); *N. Port Firefighters' Pension--Local Option Plan v. Temple-Inland, Inc.*, 936 F.Supp.2d 722, 737 (N.D. Tex. 2013).  According to Defendants, last September, they conferred with Plaintiffs' counsel in an attempt to confirm the statements in the ACAC that Plaintiffs contend are false or misleading.  *See* Decl. of Lyle Roberts; M/Dismiss  Exh.  [doc. # 59].  Plaintiffs' counsel replied that the alleged statements in the ACAC were not limited to the statements in bold or italics,[19] and that some of the statements were included simply for context.  *Id*.  Defendants, however, managed to distill and collate bolded and italicized statements from the ACAC into Appendices A-C that it attached to its motion to dismiss.  *See* Appendices A-C; M/Dismiss, Exh. [doc. # 59-1]).[20]

In support of their motion, Defendants created appendices of allegedly false or misleading statements from the ACAC and argue why the statements are not false and misleading.  Plaintiffs emphasize that this action alone fatally undermines Defendants' puzzle pleading argument.  (Pl. Opp. Brief, pgs. 8-9).  The Court also observes that, while the ACAC recites several statements at a time, it eventually explains why that particular collection of

---

[19] While Plaintiffs' factual allegations from the ACAC have been incorporated in this Report and Recommendation,  the undersigned did not incorporate counsel's frequent use of bolding and italics.

[20] Appendix A represents alleges misstatements that Defendants contend are nonactionable puffery or statements of corporate optimism.  *Id*.  The alleged misstatements in Appendix B represent nonactionable statements of historical fact.  *Id*.  Finally, Appendix C is a collection of nonactionable forward-looking statements.  *Id*.

statements is false or misleading, rather than relying on the Court to make the inference.  *See* ACAC, ¶¶ 94, 96-128, 137-141, 143-157, and 164-174.  Accordingly, the Court rejects Defendants' puzzle pleading argument.

## V.    Historically Accurate Statements

Defendants contend that Plaintiffs' claims based on accurate statements of historical facts cannot be converted into falsehoods by alleging omissions about the Quantum Fiber buildout. (Defs. M/Dismiss, Memo., pgs. 18-19) (quoting *In re MCI Worldcom, Inc. Sec. Litig.*, 191 F.Supp.2d 778, 784 (S.D. Miss. 2002) ("A claim of securities fraud may not be based on accurate statements of historical facts.").  However, the Court is not persuaded that such statements are non-actionable per se.  As with any case based on material omissions, the statements must be analyzed in context.  *See* discussion, *infra*.

## VI.    Material Misrepresentations or Omissions:  Legal Principles

"Commission Rule 10b–5 forbids, among other things, the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'" *Lormand*, 565 F.3d at 238 (citing 17 C.F.R. § 240.10b–5). "To prevail on a § 10(b) claim, a plaintiff must show that the defendant made a statement that was '*misleading* as to a *material* fact.'" *Matrixx Initiatives, Inc.,* 563 U.S. at 38 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  "The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action." *Lormand*, 565 F.3d at 248 (citations omitted).  Under Rule 10b-5, a defendant has a duty to speak the full truth when that defendant elects to speak on a matter. *Id*. at 249 (citing *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994)).  In other words, "[o]nce the defendants engaged in public discussions . . . they had a duty

50

to disclose a 'mix of information' that is not misleading." *Oklahoma Firefighters Pension &
Ret. Sys. v. Six Flags Entm't Corp.*, 58 F.4th 195, 217 (5th Cir. 2023) ("*In re: Six Flags*") (citing
*Lormand*, at 248-49).

Although the duty to disclose does not extend to every fact or assumption underlying a
prediction, the defendant must disclose "material, firm-specific adverse facts that affect the
validity or plausibility of that prediction." *Lormand*, 565 F.3d at 249. Therefore, "[t]o warn that
the untoward may occur when the event is contingent is prudent, to caution that it is only
possible for the unfavorable events to happen when they have already occurred is deceit."
*Lormand*, 565 F.3d at 249 (quoted sources and internal quotation marks omitted).

Nonetheless, a "claim of incomplete disclosure is actionable only if what [defendants]
said is misleading. [I]n other words it must affirmatively create an impression of a state of affairs
that differs in a material way from the one that actually exists." *In re: Shaw*, 537 F.3d at 541
(citations and internal quotation marks omitted). Furthermore, some statements constitute "non-
actionable puffery," if they are "of the vague and optimistic type that cannot support a securities
fraud action . . . and contain no concrete factual or material misrepresentation." *Southland Sec.
Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) (citation omitted).

In addition, the PSLRA contains a safe harbor provision that precludes liability for
written or oral forward-looking statements, which are defined as,

(A) a statement containing a projection of revenues, income (including income
loss), earnings (including earnings loss) per share, capital expenditures, dividends,
capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations,
including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement
contained in a discussion and analysis of financial condition by the management or

in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

15 U.S.C. §§ 78u-5(c), 78u-5(i)(1)(A)-(C).

Under the PSLRA's safe harbor provision, a defendant is not liable if "(1) the statement is identified as forward-looking and 'is accompanied by meaningful cautionary statements'; or (2) the statement is 'immaterial'; or (3) the plaintiff fails to plead that the statement 'was made with actual knowledge . . . that [it] was false or misleading.'" *In re: Six Flags*, 58 F.4th at 210 (citing, *inter alia*, § 78u–5(c)(1)(A)–(B)). In other words,

> [t]he safe harbor has two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state of mind. Under the first prong, there is no liability if, and to the extent that, the forward-looking statement is: (i) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or (ii) "immaterial." Under the second prong, there is no liability if the plaintiff fails to prove that the statement (i) if made by a natural person, was made with actual knowledge that the statement was false or misleading, or (ii) if made by a business entity, was made by or with the approval of an executive officer of that entity with actual knowledge by that officer that the statement was false or misleading.

*Southland Sec. Corp.*, 365 F.3d at 371–72 (internal citations omitted).[21]

---

[21] Oral statements can qualify for the safe harbor:

> **(A)** if the oral forward-looking statement is accompanied by a cautionary statement-
> **(i)** that the particular oral statement is a forward-looking statement; and
> **(ii)** that the actual results might differ materially from those projected in the forward-looking statement; and
>
> **(B)** if--
> **(i)** the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof;
> **(ii)** the accompanying oral statement referred to in clause (i) identifies the

"The requirement for 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Id.* at 372 (citation omitted). A "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Spitzberg*, 758 F.3d at 691 (citations omitted). "Each statement that benefits from the safe harbor must be addressed individually." *Lormand*, 565 F.3d at 245 (citations omitted).

Even if forward-looking statements are not protected by meaningful cautionary language, they "may still qualify for safe harbor protection if Plaintiff fails to plead facts demonstrating the statements were made with 'actual knowledge' that they were misleading." *In re: Six Flags*, 58 F.4th at 212 (citations omitted). The Fifth Circuit has yet to determine whether the safe harbor's scienter standard of "actual knowledge" for forward-looking statements encompasses severe recklessness. *Id.*, at 214. However, "liability for a forward-looking statement must satisfy a more demanding standard than for current statements." *Id.* Therefore, "[l]iability arises only upon proof of *knowing falsity* because the provision explicitly specifies that a defendant must have made the statement with 'actual knowledge' of its falsity." *Id.* (emphasis added).

## VII.    Scienter:  Legal Principles

Scienter is defined as an "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant

---

document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and
**(iii)** the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

15 U.S.C. § 78u-5(c)(2).

or is so obvious that the defendant must have been aware of it." *R2 Investments LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005) (quoted source omitted).  Severe recklessness "comprises solely those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Id*. (citation omitted). [22]  "[P]leading[s] of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company." *In re: Shaw*, 537 F.3d at 535 (citation omitted).  Likewise, "'general allegations and conclusory statements, such as stating [defendants] knew . . . adverse material' do not contribute to a strong inference of scienter." *Id*. (quoted source omitted).[23]  Attempts to allege scienter based upon defendants' experience in the industry is analogous to alleging scienter premised upon a defendant's position in the company -- which does not suffice. *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002).[24]

"[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required

---

[22]  Although the Fifth Circuit has held that the PSLRA did not eliminate "severe recklessness" as a basis for scienter generally under § 10(b)/Rule 10b-5, the Court did suggest that for forward-looking statements, Congress modified the scienter definition by requiring plaintiffs to demonstrate that defendants' had "actual" knowledge. *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 409 (5th Cir. 2001); *cf. Southland Securities Corp*, (court analyzed defendants' forward-looking statements, and found that plaintiffs failed to allege facts demonstrating actual knowledge or severe recklessness).

[23]  In fact, the Fifth Circuit has more than once remarked that "rote conclusory allegations that the defendants 'knowingly did this' or 'recklessly did that' fail to meet the heightened pleading requirements of Rule 9(b)." *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1019 (5th Cir. 1996) (citation omitted).

[24]  A "bare allegation about industry custom is precisely the type of conclusory allegation that motivated the heightened pleading standards of Rule 9(b) in the first place." *Lovelace*, 78 F.3d at 1020.

state of mind.' " *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009) (quoting *Tellabs,* 551 U.S. at 326)).  Moreover, the Fifth Circuit has rejected the "group pleading approach to scienter."  *Id.*  Instead, courts must look toi

> the state of mind of the individual corporate official or officials "who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.

*Id.*  That being said, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  *Tellabs, Inc.*, 551 U.S. at 326.  Furthermore, "[i]n determining whether [plaintiff] has alleged facts sufficient to give rise to a strong inference of scienter, [the courts] consider the factual allegations contained in the complaint *in toto*."  *R2 Investments LDC*, 401 F.3d at 643 (citation omitted).

"Following *Tellabs,* courts must discount allegations from confidential sources," because "[s]uch sources afford no basis for drawing the plausible competing inferences required by *Tellabs.  In re:  Shaw*, 537 F.3d at 535 (internal citations omitted).  "At the very least, such sources must be described 'with sufficient particularity to support the probability that a person in the position occupied by the source . . . would possess the information pleaded.'"  *Id.*

## VIII.  Loss Causation

Defendants' motion focuses upon whether Plaintiffs properly alleged facts to satisfy the material misrepresentation or omission and scienter elements of their claims.  However, Defendants also contend that certain misrepresentations or omissions were not related to any "corrective disclosure," as required to support loss causation.  Pursuant to Rule 8(a)(2), plaintiffs are required to allege, in respect to loss causation, a facially "plausible" causal relationship between the fraudulent statements or omissions and plaintiffs' economic loss, including

allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiffs' economic loss. *Lormand*, 565 F.3d at 258 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)). Thus, "[l]oss causation requires disclosure; defendants in a securities fraud case may not be held liable for a decline in stock price before the fraud is disclosed." *City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*, Civ. Action No. 12-1609, 2013 WL 1100819, at *5 (W.D. La. Mar. 15, 2013) (citation omitted). "[U]ndisclosed information cannot drive down the market price of a stock. Only information known to the market can cause a loss." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009). "Absent the requirement of causation, Rule 10b-5 would become an insurance plan for the cost of every security purchased in reliance upon a material misstatement or omission." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981), *as corrected on denial of reh'g* (July 13, 1981), *aff'd in part, rev'd in part,* 459 U.S. 375 (1983) (citations omitted).

"[T]o establish loss causation this disclosed information must reflect part of the 'relevant truth'—the truth obscured by the fraudulent statements." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009). In turn, the "test for relevant truth simply means that the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true." *Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014) (citations omitted).

## IX.    Plaintiffs' Allegations of Material Misrepresentations and Omissions Analyzed

Plaintiffs contend that Defendants' omissions of material facts caused Lumen's shares to trade at artificially inflated prices during the Class Period. (ACAC, ¶ 92). In their ACAC,

Plaintiffs grouped Defendants' statements into sections by time period, and, at the end of each section, explained why the statements were false and/or misleading when made. For ease of reference, the Court will follow the structure and outline of the ACAC in addressing the challenged statements. While tedious, the Court feels compelled to recite each group of alleged misstatements and then discuss Plaintiffs' reasons why that grouping of statements is false and misleading. At the same time, the Court will address whether Plaintiffs allege facts to show scienter.

A. <u>Defendants' Material Misrepresentations and Omissions in 2020</u>

| ACAC ¶ | Alleged Misstatement/Omission | Speaker | Date |
|---|---|---|---|
| 94 | The press release stated that the Company had launched "Quantum Fiber," which it described as ***"a fully digital platform for delivering fiber-based products and services to residents and small businesses."*** The Company further stated that ***"Quantum Fiber will use the power of Lumen's extensive fiber network and infrastructure."*** | Lumen? | 9/14/20 |
| 96 | ***And so there's a lot of opportunity that we see,*** but it's fairly small, still 2.5 million homes passed or so. So it's still fairly small. ***We're going to continue to invest. One of the things that we've absolutely seen, where we invest, we grow . . .***<br><br>Well, we always make decisions based on economics. And the microtargeting helps us identify those locations that are high economics. ***I don't think that there's a short supply of opportunities based on microtargeting. I think that just helps us be very efficient in generating a return for the investment that we make. So it's not a limiting factor. It's a targeting factor.*** | Storey | 9/15/20 |
| 97 | This quarter, we added 46,000 gigabit subscribers, surpassing the record we set last quarter. Our results confirm our thesis for the Consumer business. We win customers where we invest in fiber, simplify the experience and use microtargeting in selecting the areas we serve. ***We believe our consumer fiber offering is the best in the market, and our customer satisfaction results are showing consumers value dedicated and reliable bandwidth.***<br><br>***As you've heard me say many times, our operational improvements lead to highly satisfied customers, more*** | Storey | 11/4/20 |

| | *durable revenue and they allow us to reduce the cost of our operations.* | | |
|---|---|---|---|
| 98 | *"from a going-forward perspective, we think that the products, the capabilities that we're layering on top of the great fiber and network infrastructure that we have in place today really position us to grow revenue, and we'll continue to focus on that."* | Storey | 11/4/20 |
| 99 | And with respect to cherry-picking, I don't – I wouldn't describe what we're doing as cherry-picking. *We're looking at where we can get the greatest return on our investments and the fastest return on our investments to drive penetration.  And so that – it's a smart strategy for building out rather than just going out and building out an entire footprint. Let's look at what makes sense for our business to help us prioritize how to grow and where to grow that investment.*  And so I don't view it as cherry-picking . . . <br><br>And so we'll take advantage of where our network is strong and where we can make it even stronger to support those types of customers. And we have plenty of market opportunity to do that. *There's not a limitation right now on us on where to go and build for our Quantum Fiber business, whether it's consumer or business customers.* | Storey | 11/4/20 |
| 100 | . . . And I mentioned in my prepared remarks that for 100 meg and above, we're now at 13% of the base is at that speed compared to it was beginning of last year at about 5%. *So that part of that business is where we're investing, and we know that's a very competitive asset. It's growing very fast. And we continue to invest in fiber*. | Dev | 11/4/20 |
| 101 | *"Without getting into specific TAMs [Total Addressable Markets], it's a strategy in footprint and out of footprint, where we have the ability to win and where we have the ability to build infrastructure."* | Storey | 11/4/20 |
| 102 | Yes, yes. *We have been investing heavily in our consumer fiber business*. Just to give you some stats on that. We exited last year with about 2 million homes passed with fiber. We have about 2.3 million homes now.  *The way that we look at that micro-targeting is we take -- we look at where can we build fiber to meet consumer demand. But the micro-targeting also includes where can we meet demand for SMB, where can we meet demand for other enterprise customers and where can we meet demand for towers to support wireless builders. And through that micro-targeting strategy, we've been pretty successful.*<br><br>*So we look at a couple of things when we decide to build in an area from a consumer standpoint. We look at the cost per home passed, and we have an expected penetration rate. We've been meeting our financial objectives where we've done that micro-targeting.* So it's been a really great thing | Dugan | 12/2/20 |

| | for us, and it's really helped us increase our broadband revenues in the consumer business.<br><br>Our broadband revenues are continuing to grow. We continue to increase the number of subscribers at that higher speed, which gives us a higher ARPU. If we take a look at where we exited last year with fiber customers as a percentage of our consumer business, we had about 5% of our customers being fiber-based. Where we are now is about 13% of customers being fiber-based. So yes, it's been great for us. It's something we're excited about. | | |
|---|---|---|---|

Plaintiffs set forth eight reasons why the foregoing statements were false and/or misleading and cite to supporting paragraphs of the ACAC.  (ACAC, ¶ 103).  The Court will address the paragraphs cited by Plaintiffs, before making findings as to the alleged misrepresentation or omission.

**¶¶ 63-67:**[25]  Plaintiffs make much of the fact that Lumen opted to ground its NPS scores on "transactional  NPS" based on "on-boarding transactions" from "brand-new customers," rather than the traditional NPS method focused on "relational NPS," which represented a holistic survey of customer satisfaction.  However, with the possible exception of Moreau, there are no allegations that any Defendant was aware of the non-traditional NPS methodology employed by Lumen's marketing department.  Even as to Moreau, the ACAC alleges only that she agreed that Lumen calculated NPS "a bit different" than how they normally were derived.

The Court further observes that NPS scores are only relevant insofar as they are reflected in subscriptions and penetration rates, which are metrics that Defendants consistently disclosed. *See* discussion, *infra*.  Moreover, it stands to reason that, when, as here, a company is introducing a new service such as Quantum Fiber, an NPS premised upon on-boarding transactions is going to represent a far more significant metric than a "holistic" survey.  While such a methodology

---

[25] The substance of these and the ensuing paragraphs are set forth previously in this opinion.

might not sit well with marketing department purists (as it obviously did here), there is a readily apparent basis for the exception. Finally, Defendants aptly observe that Plaintiffs have not alleged a corrective disclosure pertaining to NPS, as required to establish loss causation.

**¶ 68:** According to CW-1, one major issue with the Quantum Fiber rollout was that no one had an accurate count of "premises passed," i.e. that had "Quantum Fiber turned on." However, CW-1's definition of "premises passed," may differ from how Defendants and the ACAC otherwise define the phrase as a home that is "fiber-enabled – meaning connectable to, or 'passed' with, Lumen's fiber." *See*, *e.g.*, ACAC, ¶¶ 47 and 58. Moreover, CW-1 does not specify how long issues with the rollout lasted or how inaccurate the numbers were under her definition of "premises passed." Also, any difficulties experienced by Lumen's marketing department in identifying to whom to market the new service, should have been reflected in the number of subscribers they enlisted, *i.e.*, the penetration rate, which Defendants consistently reported. Finally, CW-1 does not indicate that any Defendant who purportedly made material misrepresentations during the relevant period knew about the inaccuracies with the "premises passed" count. Accordingly, the Court discounts this statement.

**¶ 69:** CW-1 provides no facts to support her "belief" that "these data integrity issues" had been conveyed to Defendant Moreau. She also does not specify when she "believes" these issues were made known to Moreau. In short, CW-1's "belief" does not support an inference of scienter. *See In re: Shaw,* 537 F.3d at 535 (the complaint does not indicate how or when the officers became aware of what the confidential source allegedly knew). Accordingly, the Court discounts this statement.

**¶70:** This paragraph is conclusory. It is simply a summary of the ensuing paragraphs. Accordingly, the Court accords it no weight.

¶71: As a marketing executive, CW-1 does not explain how she learned that there were not enough technicians to install fiber or field engineers to lay fiber. She also did not explain how long this shortage of personnel continued, considering it purportedly was present "right out of the gate." Furthermore, she provides no context regarding the extent or severity of the personnel shortage. Clearly, the alleged shortage did not halt all enablements or "premises passed" because Lumen continued to increase its pool of enabled households and subscribers both before and during the Class Period. In fact, in 2020, Lumen passed 400,000 homes with fiber and added 54,000 subscribers. (Lumen's Fourth Quarter 2020 Earnings Call Transcript, dated February 10, 2021; M/Dismiss, Exh. 21 [doc. # 59-23]).[26] Finally, CW-1 does not explain whether or how these initial personnel shortages were made known to any Defendant. Accordingly, the Court discounts this statement.

¶72: As a Director of Experience Management, CW-2 does not explain how she came to know that Lumen had a "horrific backlog" of necessary materials for the Quantum Fiber buildout stemming from the COVID pandemic. She also does not explain when, during the years-long COVID pandemic, this backlog transpired. Clearly, the backlog did not thwart all enablements because Lumen continued to enable premises throughout the relevant period. In addition, she provides no details or context to support her statement that the company was missing "technology, time, money, and 'physics'" to accomplish its unspecified "goals." Finally, CW-2 does not disclose a basis to suggest that any named Defendant knew of this backlog during the relevant period. Accordingly, the Court discounts this statement.

---

[26] The Court may consider the document because it is referenced in the ACAC and relied upon by Plaintiffs to support their claims. *See* ACAC, ¶¶ 104, 106.

**¶73:**  CW-5 provides no details to explain why or how the Quantum Fiber billing system was "not ready to go."  She also does not specify how long this condition lasted or how prevalent it was.  Certainly, the situation was redressed promptly because Lumen consistently reported revenue from subscribers during the relevant period.  Furthermore, CW-5 does not provide any basis to indicate that any named Defendant was aware that, at its inception, the Quantum Fiber billing system was "not ready to go."  Finally, Plaintiffs have not alleged a corrective disclosure pertaining to the billing system, as required to establish loss causation.  *See* discussion, *supra*.  Accordingly, the Court discounts this statement.

**¶¶74-75:**  These statements appear to be related.  Aside from Defendant Gibson, who did not make any alleged misrepresentations in 2020-2021, CW-5 does not detail how any other Defendant was aware of this mismatch.  Moreover, the seemingly high percentage of orders not being installed should have been reflected in the penetration rates that were consistently reported.  Furthermore, there is no indication that these issues undermined the accuracy of the number of homes passed and subscribers added that Lumen reported to investors.  *See* Lumen's Fourth Quarter 2020 Earnings Call Transcript, dated February 10, 2021; M/Dismiss, Exh. 21 [doc. # 59-23].  In addition, there is no indication that this high percentage of unfulfilled orders ever was the subject of a corrective disclosure as required to support loss causation.  Accordingly, the Court discounts this statement.

**¶76:**  *See* discussion of ¶¶ 74-75, *supra*.

**¶77:**  CW-5 left the company in September 2022.  *See* ACAC, ¶36.  However, CW-5 provides no context or details regarding Moreau's comment, which simply may reflect the planning yield and resource allocations issues that sparked Lumen to hit the pause or stop button on Quantum Fiber around that same time period.  Even so, Moreau did not make any statements

after June 2022, and, thus, there is no indication that she made a material misstatement or omission at the time she spoke.  Accordingly, the Court discounts this statement.

¶¶87-90:  These paragraphs are related.  However, to place the comments in context, the Court will set forth Stansbury's entire response to the questioning on March 7, 2023:

> Look, it's – there's a few layers to it.  When I came to Lumen, the operations team only had 2 metrics, get to 12 million enabled locations at $1,000 per enablement. Well, that's troublesome as a CFO and so you want to make sure that you're building to the right markets and maybe $1,000 isn't the right number.  We're now at $1,200.  If you can earn a return on the locations in the markets that you're in, that's what matters.  And so that's what the focus was. But the real early-tell was that what we were doing in '21, we were seeing lower penetration rates than we were seeing on the 2020 vintage.
>
> So the 2020 vintage after 12 months was at 22%.  It's now over 30%.  The goal is to get to 40%.  The '21 vintage was 17%.  That's not good enough in terms of the ramp that we expected.  So clearly, something wasn't right.  We hit pause to make sure that we were doing the right things.  Just 1 data point that we'll share as we go forward.  There's something that we look at internally called planning yield.  And if you think about the top of the funnel being here's all the locations we plan to go to and then people do site walks, and then the engineers start doing a whole lot of work around what the specific build is going to look like, and they come up with a cost estimate and then it goes to my finance team and the finance team says, yes, that makes sense or no, it doesn't.  Our planning yield was horrendous.
>
> It was sub 20%. So over 80% of our resources were wasted.  When Kate came in, she made some immediate changes in the first week.  The first thing she did is she took operations and split it.  It was a horizontal function that supported both enterprise and consumer.  Consumer -- the consumer build now reports to Maxine Moreau, who owns that entire business internally. So dedicated resources.  The second thing we did is we took the planning function out of operations and moved it into finance.  Within a month, that planning yield went to over 90%. And what we've seen consistently since when we measure it weekly is a 7- to 8-fold increase in the number of units coming through that are passing, if you will.  So that flywheel is really starting to get moving in the right direction.
>
> I think what's interesting now is even as we've done that, and we're going to build 0.5 million units this year, we've seen a lot of our competitors start to adjust.  I think some of that relates to the inflationary pressures that are real.  But I think there was also a little bit of a gold-rush mentality as it relates to fiber to the home. And I think that emotional exuberance has been at least tempered somewhat with some more rational thought.  And I think people are pulling back on their build plans, more realistic cost estimates and ARPUs coming with that as well.

(Lumen's presentation at the Raymond James 44th Annual Institutional Investors Conference on March 7, 2023; M/Dismiss, Exh. 23 [doc. # 59-25]).[27]

Plaintiffs seize upon these comments to show that Defendants had an irrational "gold-rush mentality as it relates to fiber in the home,"  a "horrendous" planning yield, and an average cost per enablement that increased by at least twenty-five percent than what had been originally targeted.  However, the Court does not discern any plausible material misrepresentations, omissions, or ill motives evidenced by subsequent developments and realizations.  Plaintiffs simply are engaged in Monday-morning-quarterbacking, i.e., impermissibly trying to prove fraud by hindsight.  *See Southland Securities Corp*., 365 F.3d at 383.

As Stansbury explained when he came onboard, the goals were to reach 12 million enablements at $1,000 per enablement.  Of course, fiber enablements by themselves, without associated subscribers utilizing or signing up for those enablements, represents a waste of resources.  Stansbury made this very point at Lumen's 2022 Fourth Quarter Earnings Call on February 7, 2023:

> [o]ur exposure to legacy voice and other services revenue has improved by 320 basis points year over year.  As Kate discussed, we have made significant changes in how we are approaching the Quantum Fiber opportunity.  This was a thoughtful evaluation that will result in a significant improvement in long-term shareholder value.  That said, our location and subscriber results were impacted by the pause we had in place through our evaluation.

> This change in strategy will continue to impact Quantum metrics until we get to scale with our new plan, which we expect to occur late this year.  During the quarter, total enablements were approximately 97,000, bringing the total enabled locations to over 3.1 million as of December 31.  During the quarter, we added 19,000 Quantum Fiber customers, and this brings our Quantum Fiber subscribers to 832,000.  Fiber ARPU was stable sequentially at approximately $60, but we've seen accelerating year-over-year growth each quarter during 2022.

---

[27] The Court may consider the document because it is referenced in the ACAC and relied upon by Plaintiffs to support their claims.  *See* ACAC, ¶ 87.

As of December 31, our penetration of legacy copper broadband footprint was less than 12%. Quantum Fiber penetration stood at approximately 26%. Our Quantum Fiber 2020 vintage penetration was approximately 29% at the 24-month mark and is now over 30%. Our 2021 vintage was at approximately 17% at the 12-month mark.

Our Quantum Fiber NPS score was greater than positive 50 again this quarter, an indication of the quality, value and superior service that Quantum Fiber delivers. As Kate mentioned, we have recalibrated our addressable footprint to ensure we are generating healthy returns for our shareholders. Based on that recalibration, we are targeting 8 million to 10 million locations for the overall build or roughly 5 million to 7 million incremental locations over the next few years. We continue to monitor how the economic environment is impacting our customers, and we have not observed any discernible changes in customer payment patterns . . .

As it relates to the Quantum piece, I mean I think your point is a valid one, and that's obviously, I think, a risk. But -- and frankly, I think you can even see it in some of the penetration numbers from 2021. I was very concerned about putting fiber in the ground for the sake of putting fiber in the ground, right? We need to make sure that we remain focused on those large metros that we've talked about and that we stop being so focused on a cost per enablement and on a number of enablements and more around making sure that in those markets that we're serving, that customers are going to want our product.

And so I think even though this is a little bit painful in the near term, we're seeing really good performance on our planning yield, meaning when we plan a market and it goes to engineering and then it comes out of engineering, that we've been able to accurately estimate the cost so that we can proceed to construction rather than having to go back to planning all over again.

So we're seeing some really good activities internally. But I would much rather have this conversation today than one 5 years from now where we hit $1,000, and we hit the 10 million enablements, and then **you guys are asking me where the annuity stream is on all that fiber. And my own opinion, our opinion, is that I think you're going to see that from some of the overbuilders in markets that are building for the sake of building rather than really having a returns mindset around it**.

(Lumen's Fourth Quarter 2022 Earnings Call Transcript, dated February 7, 2023; M/Dismiss, Exh. 9 [doc. # 59-11]) (emphasis added).[28]

---

[28] The Court may consider the document because it is referenced in the ACAC and relied upon by Plaintiffs to support their claims.  *See* ACAC, ¶¶ 85, 91.

Again, the Court does not infer any ill intent or intentional misrepresentation or omission attributable to Defendants as a result of Stansbury's 2023 admission, and apparent recognition by Lumen executives in the fourth quarter of 2022, that the industry's mad dash to enable fiber to as many homes as possible, at a $1,000 per home cost point, was not a profitable, long-term strategy. Rather, Lumen needed to ensure that it had subscribers for this fiber, as reflected in the penetration rate.

Furthermore, as early as November 2021, Defendant Dev made it clear that there was plenty of margin for error in the $1,000 cost per home, while acknowledging that no one had visibility on costs going forward:

> [y]es. So the 12 million is the total. So the incremental would be roughly in the 10 ZIP Code. So we have about 2.5 today in the retained states. In terms of the $1,000, we are building at a significantly lower cost today. So that's kind of -- think of it as -- we think as an average.
>
> But the reality is given the macro conditions in terms of labor costs, et cetera, trying to give you a number 2, 3 years out, **I don't think we -- anybody has that level of visibility.** But what we are confident in is the return profile of that business because we also see a lot of opportunities in terms of continuing to increase ARPU not only just for the base service but all the things that we're investing in, in terms of managed WiFi, security and other capabilities. So we still -- **irrespective of the actual cost, we think we have a really big margin of error**, if you will, in terms of generating great returns.

(Lumen's Third Quarter 2021 Earnings Call Transcript, dated November 3, 2021; M/Dismiss, Exh. 19 [doc. # 59-21]) [29] (emphasis added). One year later, Stansbury reiterated that the economics can work well above $1,000, depending on the density and the penetration rate, etc. (UBS 50th Annual Global TMT Conference on December 6, 2022; Def. M/Dismiss, Exh. 26

---

[29] The Court may consider the document because it is referenced in the ACAC and relied upon by Plaintiffs to support their claims. *See* ACAC, ¶ 61.

[doc. # 59-28]).[30]  Thus, even at a $1,200 average cost per home, Quantum Fiber was expected to return a profit for Lumen.

Plaintiffs further tout Stansbury and Johnson's admission that the "planning yield" for Quantum Fiber was "horrendous" because engineers would create a detailed engineering plan with a cost estimate, but then the finance department ultimately approved only twenty percent of the proposed builds in 2021 and ten percent of the proposed builds in 2022.  However, as Defendants emphasize, "planning yield" was an internal metric that they did not publicly discuss during the Class Period, and, consequently, were not obliged to update.  On the other hand, Plaintiffs observe that, during the relevant period, Defendants initially made comments about microtargeting and stressing their efficiency in generating return on investment.  *See, e.g.*, ACAC, ¶ 96.  Therefore, they maintain that planning yield was relevant to the total mix of available information.

However, by not approving proposed builds, the finance department ultimately was conserving Lumen's *build* resources.  It would not be surprising to learn that the finance department did not approve these builds because they would have cost more than Lumen's original target of $1,000 per home.  Tellingly, Plaintiffs did not put a dollar figure to the *engineering* resources that were wasted on these plan builds, and so it is not known whether the omission was significant and material.  Moreover, Plaintiffs have not alleged that they suffered any loss stemming from a decline in stock price once the disclosures of the "horrendous" planning yields came to light on March 6 and May 7, 2023, no doubt because there was no

---

[30] The Court may consider the document because it is referenced in the ACAC and relied upon by Plaintiffs to support their claims.  *See* ACAC, ¶¶ 170-173.

significant stock decline at all.[31]  Therefore, it is not plausible that Defendants' failure to disclose the "horrendous" planning yields was a material omission, and Plaintiffs did not plausibly allege resulting loss causation.  *See Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665 (5th Cir. 2004) (citation omitted).

Plaintiffs also repeatedly allege that the money wasted on unapproved build-out plans caused Lumen to suffer capital constraints on the Quantum Fiber buildouts.  However, there are no facts alleged to support this contention.  While an *analyst* opined in November 2022 that the "higher capex with Quantum Fiber" contributed to Lumen's dividend elimination, (ACAC, ¶ 208), one would be hard-pressed to find any basis for this opinion in the earnings call transcript.  *See* Lumen's Third Quarter Earnings Call Transcript, dated November 2, 2022; M/Dismiss, Exh. 11  [doc. #s 59-13].  Moreover, the opinion is further belied by Lumen's plans to spend up to $1.5 billion in a 2-year share buyback program.  *Id*.

¶ 91:  The planning yield allegation is addressed above.  As to the 17 percent penetration rate for units that were fiber-enabled in 2021, Plaintiffs do not specify why or how much earlier the specific penetration rate for that year should have been disclosed.  Defendants consistently reported overall penetration rates for fiber.  *See, e.g.*, Lumen's Fourth Quarter 2021 Earnings Call Transcript, dated February 9, 2022; Lumen's First Quarter 2022 Earnings Call Transcript, dated May 4, 2022; Lumen's Second Quarter 2022 Earnings Call Transcript, dated August 3, 2022; Lumen's Second Quarter 2022 Earnings Call Transcript, dated August 3, 2022;

---

[31] *See* https://finance.yahoo.com/quote/LUMN/history/?period1=1654041600&period2=1723736012 (last visited on August 18, 2024).  The Court may take judicial notice of stock prices. *Linenweber v. Sw. Airlines Co.*, 693 F.Supp.3d 661, 674 (N.D. Tex. 2023) (citing *Catogas v. Cyberonics*, 292 F. App'x 311, 316 (5th Cir. 2008)).

Lumen's Third Quarter Earnings Call Transcript, dated November 2, 2022; M/Dismiss, Exhs. 17, 15, 13, 11  [doc. #s 59-19, 17, 15, 13].[32]

Furthermore, Stansbury reported the 2020 vintage penetration rate as above 20 percent at the First Quarter 2022 Earnings Call, which means that Defendants did not disclose the penetration rate for the 2020 vintage until 20 months after the year in question.  *Id.*  Further, Storey was asked specifically about the 2021 penetration rate at the First Quarter 2022 Earnings Call but stated that they had not yet reported what they were seeing in 2021 and, instead, noted that the one-year mark was a good time to review it, which was why they had disclosed the 2020 vintage.  *Id.*

Ultimately, Johnson disclosed the penetration rate for the 2021 vintage rate at the Fourth Quarter 2022 Earnings Call, which was three months *earlier* than the disclosure delay associated with the better performing 2020 year.  *Id.*  In the meantime, at both of the intervening earnings calls on August 3 and November 2, 2022, Storey and/or Stansbury expressly warned investors that they expected the penetration rates to fall as they expanded their footprint/enablements.  *See* Exhs. 13, pg. 9, 11, pg. 10.  Accordingly, the Court does not discern any material representation or omission associated with penetration rates.

Upon consideration, the Court finds no material misrepresentation or omissions stemming from Defendants' statements set forth in ¶¶ 94-102.  Furthermore, some of the statements include language that represents mere puffery.  Considering the absence of any material misrepresentations or omissions, there also are no facts to support scienter, either individually or holistically.

---

[32] The Court may consider these documents because they are referenced in the ACAC and relied upon by Plaintiffs to support their claims.  *See* ACAC, ¶¶ 78, 129-130, 147-149, 154-156, 83-84.

B.    Defendants' Material Misrepresentations and Omissions in 2021

1.    *Defendants Continue to Tout Lumen's Efficient Investment in and Growth of Quantum Fiber*

| ACAC ¶ | Alleged Misstatement/Omission | Speaker | Date |
|---|---|---|---|
| 104 | And I'll just add, from a market perspective, we're super excited about our Quantum Fiber brand and the capabilities that we bring to the market. ***The digital experience is, in my opinion, second to none where our NPS scores reflect a very high satisfaction, the quality of the product, the bidirectional nature of the product and the symmetry of that capacity, the peering networks that we tie that into. We're extremely excited about the capabilities that we give to the customers and their acceptance of it***. | Storey | 2/10/21 |
| 106 | So it's a little bit of all of the above. ***All of the above has one characteristic and that is -- maybe 2 characteristics, that we think we can drive revenue growth at a low cost of capital and a low OpEx to do it. And so we view every opportunity through that lens:  how do we make sure that we use our capital efficiency – efficiently and how do we make sure that we get the penetration that we want.*** Neel touched on that as an opportunity for us. We still have an opportunity to improve our penetration in our fiber markets.  But it is a little bit of all of the above:  new construction, overbuilds in existing areas and then some expansion outside our traditional footprint. | Storey | 2/10/21 |
| 107 | The symmetrical nature of our fiber-to-the-premises solutions deliver differentiated performance for work from anywhere, remote education and similar use cases. ***As you know, we continue expanding our Quantum Fiber footprint and increasing our penetration.*** Our blended penetration of new and previous builds is almost 30%.  To me, the existing penetration rate validates our Quantum Fiber strategy and represents an opportunity as we continue to drive penetration higher.<br><br>***Our investments to move to digital interactions are really paying off by reducing our costs and driving significant improvements in customer satisfaction. Our year-to-date NPS score for Quantum consumer customers is a positive 76.*** | Storey | 4/7/21 |
| 108 | It's not enough to have an amazing platform, we must also deliver results. In 2020, we expanded our fiber footprint by 400,000 locations. ***We've committed to future footprint expansion using our micro-targeted urban densification focus and disciplined approach that benefits multiple Lumen business units and customer segments. With urban*** | Moreau | 4/7/21 |

| | | | |
|---|---|---|---|
| | *densification, we can take advantage of many efficiencies in fiber enablement from planning to market readiness and achieve higher sales through targeted digital and local marketing tactics.*<br><br>* * *<br><br>We are also seeing a 50% reduction in churn before install from our enhanced communications and delivery processes. With an all-digital platform, superior fiber broadband service and the early successes we are seeing, what should you expect from Quantum Fiber in the future? ***Future investments will continue to focus on driving urban densification using our micro-targeted approach. With over 23 million living units and small businesses in our footprint, we have a vast footprint to select from to grow our fiber enablement. We have the ability to operate outside our footprint anywhere Lumen's fiber is in proximity to MDU and MTU developments.***<br><br>***Next, we are aggressively taking market share in our small business segment, especially with MTUs located in dense markets where we have fiber-lit buildings. In the first quarter, we are seeing a fourfold year-over-year improvement in small business fiber broadband net adds. With approximately 2.4 million locations fiber-enabled and 28% fiber penetration rate at year-end, we have a significant future growth opportunity with the investments we have already made. We expect to complete the launch of Quantum Fiber across all markets during 2021.*** | | |
| 109 | Fiber is delivering a 20% reduction in run rate-level churn over historical levels, improving revenue and margin trends. Quantum Fiber eliminates complexity and enhances the support model for our customers. Our customers are loving the simplicity, ease of use and service that it provides. ***As a result, we are seeing significant improvement in the customer experience measured by Net Promoter Score. Our 2021 year-to-date aggregate NPS scores for Quantum Fiber customers is at positive 76, higher than Amazon or Apple. As you know, NPS scores above 50 are considered excellent.*** | Moreau | 4/7/21 |
| 110 | The symmetrical nature of our fiber-to-the-premises solutions deliver differentiated performance for work from anywhere, remote education and similar use cases. ***As you know, we continue expanding our Quantum Fiber footprint and increasing our penetration***. Our blended penetration of new and previous builds is almost 30%. ***To me, the existing penetration rate validates our Quantum Fiber strategy and represents an opportunity as we continue to drive penetration higher***. | Storey | 4/7/21 |

| | | | |
|---|---|---|---|
| | *     *     * <br> *And so we'll continue to heavily invest in that. We think that we are investing at approximately the right pace. We'll probably pick up speed as we move forward. But we've been making sure that we deliver on the value proposition, we get the return on investments and that we're able to drive the penetration.* And what Maxine and her team have done have proven all of that strategy to us. | | |
| 111 | *We don't -- we're not capital-constrained. So as we continue to improve our penetration and performance, we'll continue to expand our footprint, and we believe we've got a long runway for growth in -- within Lumen in Quantum Fiber.* | Moreau | 4/7/21 |
| 112 | *In terms of your question on Quantum Fiber, what we see is our micro-targeting approach is working. And from an aggregate level, I know we're 28% penetration.* And that's because as we are driving up our penetration, we're also adding more units. But if we look at certain neighborhoods, certain markets where we've been there for a while and we track the penetration by aging of those deployments**, *in some markets, we're up in the 40%, 50% ZIP code. So we clearly think there's a fair amount of opportunity to continue to drive the penetration up. So we'll continue with our focus on adding more Fiber to the Home and small business, and driving up those penetration rates.* | Dev | 5/5/21 |

Plaintiffs set forth seven reasons why the foregoing statements were false and/or misleading and cite to supporting paragraphs of the ACAC.  (ACAC, ¶ 113).  However, the reasons merely echo the reasons asserted relative to the first tranche of alleged misrepresentations and omissions in 2020, which the Court already has discounted.  *See* discussion, *supra*.

Accordingly, upon consideration, the Court finds no material misrepresentation or omissions stemming from Defendants' statements set forth in ¶¶ 104-112.  Furthermore, some of the statements represent non-actionable puffery or fluff.  Considering the absence of any material misrepresentations or omissions, there also are no facts to support scienter, either individually or holistically.

    2.    *Defendants Announce that Lumen Will Ramp Up Quantum Fiber Builds*

| ACAC ¶ | Alleged Misstatement/Omission | Speaker | Date |
|---|---|---|---|
| 114 | ***First, we absolutely expect to accelerate the pace of our growth investments in Quantum Fiber***. By retaining the 16 states we have, fiber-based consumer and mass market services remain a huge opportunity for us and we have built a differentiated offering with Quantum Fiber, enabling an all-digital customer experience that uniquely positions us among mass-market broadband providers. ***As Neil [sic] will discuss, our Quantum Fiber results are bearing this out as we saw another quarter of net adds for our fiber and higher-speed offerings continuing results from previous quarters***.<br><br>The jury isn't out on this one. When we invest in consumer fiber, we take share and we drive profitable growth. As I mentioned, upon closing the Apollo transaction, approximately 70% of our remaining mass market footprint will be the sort of urban and suburban markets that are best addressable with Quantum Fiber solutions. ***We are developing an accelerated build plan, and we'll share those details as they're finalized. What we can tell you today is that while we remain strategic and disciplined in our approach, we expect to build faster and with more scale in the markets that we prioritize for Quantum Fiber investment***. | Storey | 8/3/21 |
| 115 | Sure. And we'll give you more information in coming quarters about the plans there. But we've looked at this business. ***We've been doing our microtargeting that Neel mentioned, and we've been growing our penetration pretty successfully***. And so we believe there's a lot of opportunity. If you look at the retained 16 states, that's something like a little more than 20 million homes passed, and 70% of those we consider an urban or suburban market.<br><br>***So that's 15 million homes, something like that. We think all those are great opportunities for us to invest fiber into***. And so we want to ramp our plans and put some scale behind them because we think that they are – based on our experience over the last couple of years, we've done a very good job at continuing to invest fiber and grow where we invest.<br><br>*     *     *<br><br>Yes. That's what I was going to add, Simon. I think the underrun that Jeff highlighted is really related to the current environment and the enterprise business, and that's what we manage on a success-based basis. ***But we haven't slowed down on Quantum, and we are looking to accelerate that second half of this year and going into next year***. And that's not contingent on the deal. But with these things, it takes a | Storey & Dev | 8/3/21 |

| | | | |
|---|---|---|---|
| | while because there is this actual physical deployment, so permitting, et cetera, but we're scaling up. | | |
| 116 | Lumen is "*actively accelerating our fiber build and have been for some time and plan to continue to do so because we've seen from our efforts over the past couple of years, where we invest, we've grown.*" . . . "*We are not capital constrained.*" | Moreau | 8/10/21 |
| 117 | *I mentioned that we've been ramping Quantum Fiber builds* and more details are probably forthcoming in earnings calls and other things. But we're very pleased with the success that we've seen. We have 2.5 million homes within our fiber footprint. *Our penetration rates are going up, our ARPU is strong, customer satisfaction and NPS scores.* We've build [sic] a digital interaction model over the last couple of years for our Quantum Fiber customers that we think is second to none. *And we will continue to – as we build more fiber into locations*, we'll bring that suite of capabilities to our customers more broadly. | Storey | 9/22/21 |
| 118 | "I'm excited to discuss the investments we're making to drive Enterprise and Quantum Fiber growth . . . *Let me start with Quantum Fiber. First of all, the quantum acceleration plan has already begun . . . . As we transition from micro-targeting to a broader market approach for deployment, we have high confidence in our ability to drive significant revenue growth for years to come . . .*"<br><br>As I mentioned during the second quarter call, we plan to accelerate Quantum Fiber investments in our retained markets. As of the end of the third quarter, we had approximately 2.5 million enabled locations within the retained 16 states.  Historically, we've enabled around 400,000 locations per year, and we expect that pace will continue in the fourth quarter.  *As we accelerate our investment in Quantum Fiber, in 2022, we expect to ramp that enablement pace to over 1 million new locations, on our way to hitting a run rate of 1.5 million to 2 million enablements per year as we exit 2022. When deploying Quantum Fiber, we typically expect penetration rates of 40% or better with average build cost of less than $1,000 per location enabled.*<br><br>After a thorough review of our footprint and given these economics, we expect our total addressable opportunity to be more than 12 million locations.  *Our Quantum Fiber plan for 2022 is fully funded, and we're very excited about these investments. But it's not just excitement born from hope. It's excitement born from experience and accomplishment. As we built Quantum Fiber, we've done more than simply construct new fiber. We built an excellent quantum experience and product capability that is now ready to ramp* | Storey | 11/3/21 |

| | *aggressively, providing higher ARPU, lower churn and greater customer lifetime value.* | | |
|---|---|---|---|
| 119 | "*we have very high confidence in our ability to hit those numbers* and grow the business aggressively." | Storey | 11/3/21 |
| 120 | "we see that as a significant opportunity. *I think the economics are fairly well understood. And so you're going to see us ramping that business*, and it's a long-life asset with predictable returns." | Dev | 11/3/21 |
| 121 | Focus is definitely on investing for growth, investing for growth, investing for growth. *And that comes in the form of investing in* the Lumen platform, edge computing, unified communications, wrapping it with cybersecurity, managed services, and then *the Quantum Fiber build that Jeff mentioned in our last earnings call, and doubling down there*. That's where most of the investment and the focus is in those two conversations. | Andrews | 12/7/21 |

Plaintiffs enumerated eight reasons why the foregoing statements were false and/or misleading, with citations to supporting paragraphs of the ACAC. *See* ACAC, ¶ 122. However, the reasons largely echo the reasons asserted relative to the first tranche of alleged misrepresentations and omissions in 2020, which the Court has discounted previously. *See* discussion, *supra*.

Therefore, upon consideration, the Court finds no material misrepresentation or omissions stemming from Defendants' statements set forth in ¶¶ 114-121. Furthermore, some of the statements represent non-actionable puffery or fluff. Considering the absence of any material misrepresentations or omissions, there also are no facts to support scienter, either individually or holistically.

The Court emphasizes that Lumen candidly disclosed that it anticipated accelerating its Quantum Fiber build program. There are no facts to show that, in August 2021, Storey or any other Defendant made a statement that was misleading as to a material fact or that they actually

knew, or were reckless in not knowing, that their plans would not come to fruition.[33]  In fact, at a

December 2, 2021 conference, Defendant Moreau plainly cautioned summit participants that,

> [w]ell there's lots of moving parts there. We are shifting our focus to this market-based approach.  We're mobilizing our workforce and kind of all the key resources. We're working with local municipalities on permitting and zoning.  We're working collectively with our suppliers to ensure the entire supply chain understands what our future needs are, and they're ready to support us.
>
> We've got a high degree of confidence that we've got a clear line of sight to build to the numbers that Jeff shared in November.  **But we're going to continue our disciplined approach to these investments. If we feel it's prudent, we'll change our pace.**  But we have a – we're a large company with a long rich history and experience of building high-quality network assets.  So I feel like we're really positioned well for our future.

(Wells Fargo TMT Virtual Summit Conference on December 2, 2021; M/Dismiss, Exh.

32 [doc. # 59-34]) (emphasis added).[34]

It also is worth noting that, in August 2021, Lumen estimated that there were about 15

million homes available for investment with fiber.  Just three months later, Lumen walked that

number back 20 percent to 12 million homes.  The market, however, did not even blink; instead,

Lumen's stock price rose.[35]  Consequently, any alleged misstatement associated with the original

estimate of the pool of Quantum Fiber target homes was immaterial.

C.    Defendants' Material Misrepresentations and Omissions in January 2022

---

[33] The Court has discounted the statements from the confidential witnesses.  *See* discussion, *supra*.

[34] The Court may consider this document because it is referenced in the ACAC and relied upon by Plaintiffs to support their claims.  *See* ACAC, ¶ 186.

[35] *See* https://finance.yahoo.com/quote/LUMN/history/?period1=1654041600&period2=1723736012 (last visited on August 18, 2024).

| ACAC ¶ | Alleged Misstatement/Omission | Speaker | Date |
|---|---|---|---|
| 123 | "We've already announced our accelerated Quantum Fiber build and plan to add more than 12 million locations over the coming years in the remaining 16 states that we operate in, in those states." | Storey | 1/6/22 |
| 124 | "We have about 2.5 million, using rough numbers, today. So that's about 10 million more locations. ***We said that, in general, we target less than $1,000 per home.*** So you can do the math on that.  It's a fairly significant investment over the next 4 to 5 years, ***but we're really pleased with the progress that we've made over the past couple of years and think that there's – it's a great opportunity for us***.  If you look, that's a significant ramping from where we've been." | Storey | 1/6/22 |
| 125 | "***And so we've proven that can [sic] build successfully. We've proven that we can deliver successfully and build all of the systems around the customer necessary to do that. So we'll continue to invest there***." | Storey | 1/6/22 |
| 126 | I don't think there's any change, actually. This is the path we've been on, but we need to do the prep work to get ready for it. We needed to have the all-digital experience. We needed to continue to enhance our capabilities. And we wanted to prove to ourselves through micro-targeting that we had all of those capabilities to understand what they are, develop them.<br><br>And so it's not – there's no change in the strategy. ***There's an acceleration of the strategy because we think we have all those things in place.  Our NPS scores show it.  Our penetration rates show it.*** We think we have all of the capabilities in place.<br><br>***Now we just really want to ramp more aggressively.*** We said that we were – we've historically been at about 400,000 locations pass added every year.  We've said that we will do about 1 million locations in 2022, and we'll finish the year at a run rate of about 1.5 million to 2 million locations passed in '23 and beyond. And so it's really the continuation of the strategy we've had.  ***But now we have all the pieces in place to make that acceleration.*** | Storey | 1/6/22 |
| 127 | "I just said, we're going to ramp from about 5x what our historical number is. So that's pretty quick. We're going to do that over the course of the next year. So I think we are being aggressive . . . That's part of our Quantum Fiber strategy is to focus on dense urban clusters ***and make sure that we continue to expand it***." | Storey | 1/6/22 |

Plaintiffs set forth nine reasons why the foregoing statements were false and/or misleading and cite to supporting paragraphs of the ACAC. (ACAC, ¶ 128). However, Plaintiffs largely echo the same arguments that the Court has rejected previously. *See* discussion, *supra*.

Accordingly, upon consideration, the Court finds no material misrepresentation or omissions stemming from Defendants' statements set forth in ¶¶ 123-127. Furthermore, some of the statements represent non-actionable puffery. Storey reported that they had built homes successfully in the past at the rate of 400,000 per annum. There are no credible facts to suggest that Storey or any other Defendant actually knew or was reckless in failing to disclose that the target of 1 million enablements by the end of 2022 was unobtainable. *See* discussion, *supra*. Therefore, Plaintiffs also have not alleged facts to support scienter either individually or holistically.

D.    <u>Defendants' Material Misrepresentations and Omissions are Partially Corrected on February 9, 2022</u>

| ACAC ¶ | Alleged Misstatement/Omission | Speaker | Date |
|---|---|---|---|
| 129 | ***Both enterprise and mass market supply chains are stressed, and we continue working very closely with our diverse and valued suppliers to mitigate risk as we execute on our growth objectives.*** In addition, we're managing through this inflationary environment and, with some exceptions, do not expect pricing pressures to impede our goals. | Storey | 2/9/22 |
| 130 | [Simon William Flannery – *Morgan Stanley*]: So good to hear on the Quantum Fiber revenue growth and the build plans. I guess on the build plans, should we think about the – I think you did 400,000 this year. Should we think about the 1 million this year as being fairly linear? Or is it still very much second half loaded, I guess, to get to that 1.5 million to 2 million? And ***I guess the question is why not go faster***? We've obviously seen the infrastructure bill award a lot of funding. We've seen fixed wireless gain some traction here. So if you see the opportunity here, you've got obviously a lot | Storey | 2/9/22 |

<table>
<tr>
<td></td>
<td>

of homes with potential. ***So what's keeping you from accelerating that pace . . . ?***

[Defendant Jeffrey K. Storey – *CEO*]: ***So Simon, on the build plan for Quantum Fiber, it's not going to be linear. It takes a while to ramp these capabilities, to do the engineering, to make sure that we've got the construction resources in place.  So it's not going to be linear*** but it's not going to be fully back-end loaded either. We're already at a pace of, call it, 400,000, 500,000 homes and business locations. So there's going to be that as a starting point, but we'll get to the full 1 million toward the end of the year, obviously.  So it's a little back-end loaded but not substantially.

What keeps us from going faster? This is hard work. It's hard work. There's a lot of things to do. We want to make sure that we do it right. We're exceptionally good at building networks and we will continue to do that with the Quantum Fiber build, ***but there's hard work. And we also have supply chain challenges***.  And I mentioned that in the prepared remarks. ***I don't want to overemphasize it but it's an issue, and we see it with equipment vendors and chips and them getting access to chips.  So we'll continue to manage that, but that's also a constraining factor on how to accelerate faster***. Now the main point is we want to accelerate to a point of 1.5 million to 2 million homes by the end of the year. So we want to be on that run rate finishing the year and going into 2023.  And that's really a large effort to make sure that we do go as fast as we possibly can.

</td>
<td></td>
<td></td>
</tr>
</table>

Plaintiffs included these paragraphs in their section on Defendants' alleged material misrepresentations and omissions, but do not make any arguments regarding their falsity or misleading nature.  Certainly, the statements themselves do not evidence any material misrepresentations or omissions because, *as early as February 2022*, Storey was cautioning investors about supply chain issues.

Interestingly, later in the ACAC, Plaintiffs excerpt additional statements from this same Fourth Quarter of 2021 earnings call as evidence of further misrepresentations and omissions by Defendants, notwithstanding the above-quoted "corrections" and disclosures.  *See* discussion, *infra*.  In fact, these statements are not materially different from the same sort of statements that

Plaintiffs, when it suits them, contend are misleading.  Nonetheless, like Plaintiffs, the Court

includes the foregoing statements for context.

     E.    <u>Defendants' Material Misrepresentations and Omissions are Partially Corrected on March 8, 2022</u>

| ACAC ¶ | Alleged Misstatement/Omission | Speaker | Date |
|---|---|---|---|
| 132 | Pang disclosed that Lumen was facing labor issues and that one of the Company's four top priorities was "around talent. I think in today's market, we all are very keenly focused in on making sure that we've got the right talent within the organization. It's becoming increasingly more difficult for – I think, for any industry, given the world that we live in today." | Pang | 3/8/22 |
| 133 | It's definitely a challenge, right? There's a lot of people out there that are vying for the same talent. And so again, it's something that we have to actively manage ourselves. ***It's not like the good old days where it happened and that there was a surplus.*** It's something that has to be managed very carefully. | Pang | 3/8/22 |
| 134 | the supply chain is "not getting better any time soon . . . [the] [s]upply chain will affect us in a lot of different areas, whether it be the infrastructure, just upgrades in the network, customer equipment, Quantum Fiber." | Pang | 3/8/22 |

     Plaintiffs included these paragraphs in their section on Defendants' alleged material

misrepresentations and omissions, but do not make any arguments regarding their falsity or

misleading nature.  Certainly, the statements themselves do not evidence any material

misrepresentations or omissions.  *Rather, they plainly disclose the labor and supply issues*

*experienced by Lumen*.  Like Plaintiffs, the Court includes the foregoing statements for context.

     F.    <u>Defendants' Additional Material Misrepresentations and Omissions in 2022</u>

| ACAC ¶ | Alleged Misstatement/Omission | Speaker | Date |
|---|---|---|---|
| 137 | "[w]e're already at a pace of, call it, 400,000, 500,000 homes and business locations. So there's going to be that as a starting point, ***but we'll get to the full 1 million toward the end of the year, obviously***." | Storey | 2/9/22 |
| 138 | "***[o]ur fully-funded 2022 Quantum Fiber plan*** will enable millions of customer locations to experience our best-in-breed | Storey | 2/9/22 |

| | | | |
|---|---|---|---|
| | Quantum experience and product capability that we believe will drive higher ARPU, lower churn and significant customer lifetime value. *We will invest heavily to bring the Quantum experience to our customers, especially in the areas of product development, marketing, brand and go-to-market sales initiatives*."<br><br>Storey reiterated that one effect of Lumen's commitment to the "Quantum Fiber deployment plan" is that it would take longer to "reach our target net leverage ratio of 2.75 to 3.25x adjusted EBITDA . . . ." | | |
| 139 | "to the extent we can scale faster, if you look at the combination of free cash flow and deal proceeds, *we can easily ramp up more spending for Quantum Fiber.  That won't be the constraint*." | Dev | 2/9/22 |
| 140 | most other investments are "*success-based at a much lower intensity . . . Quantum will ramp up*. We do view that as a discrete project, but the rest of the plan will be dynamic and will be success-based." | Dev | 2/9/22 |
| 141 | "as we look at the CapEx, we are very committed to investing in Quantum Fiber."<br><br>So what Quantum Fiber investments are we going to make in 2022 that could come off in 2023, we're not giving guidance for 2023, but *we do plan to ramp our Quantum Fiber investments*. We've said that. *We said that our plan for the year in 2022 is 1 million homes, and then we plan to do 1.5 million to 2 million at a run rate basis by the end of the year. So we're not giving forward-looking guidance, but we have given you an indication of what we expect and how we expect to build*. | Storey | 2/9/22 |
| 143 | So we have seen supply chain challenges in equipment and labor. *But we feel like we have a really good ecosystem that we've built over many years. We're a large company. So we have multiple suppliers for our equipment, for our fiber, for our labor, and we feel like that we have many avenues to mitigate any near-term supply chain challenges, but we watch it every day*.<br><br>We're in close contact with all of our suppliers. They understand what our investment plan looks like. They understand where we're building and the pace in which we plan to build. And so we feel like we're mitigating those not only with our suppliers but also internally as we stay aligned on what our strategic plan is.<br><br>                        *   *   *<br><br>So as we pivot from this micro-targeting to this market-based approach, *you're going to see us ramp. We communicated late last year that that our expectation is that we're going to go* | Moreau | 3/14/22 |

| | | | |
|---|---|---|---|
| | *from a pace of about 400,000 addressees [sic] a year to 1 million this year and exiting the year at anywhere between 1.5 million to 2 million capability exiting the year.* | | |
| 144 | And then lastly, late last year, we announced that *we are going to be investing for growth in mass markets.*<br><br>*We believe that we can pass 12 million or more locations with fiber over the next several years* in the remaining 16 state footprint that I mentioned, which has a total of 21 million locations.  So if you think of what's left after the 20 states are divested, it's about 21 million locations planned to build fiber to 12 million or more. And as a result of that, we really also announced that we're going to accelerate the pace of our investment.<br><br>*So the last couple of years, we've reported about a 400,000 living unit per year pace. We announced that we're planning to ramp that up to 1 million locations this year and then [end] the year with a run rate of 1.5 million to 2 million locations. So we're -- increase our pace in 2022, further increase our pace again in 2023.*<br><br>So as part of this, we're really transitioning from really a micro-targeted approach to a market-based approach. And what that means is we're going to be targeting larger dense areas in a more ubiquitous way than just targeting certain areas within the market.  The work we're doing with Quantum Fiber is really going to play an important role for the overall goal that we announced to return to revenue growth in the next 2 to 3 years.<br><br>[Host]: These are obviously very impressive targets. So can you talk a little bit more about -- like you're shifting from doing 400,000 locations annually towards 2 million living units as you publicly talked about it. How do you -- what do you have to put in place to hit some of those milestone because there are obviously a whole set of issues from supply, resourcing, policy, permitting and internal capabilities. Can you talk a little bit more about like how you're thinking about it?<br><br>[Gibson]: *Sure. First, I'll probably start with the fact that we really started planning this build well in advance of our announcement, and we feel really good about where we are in the cycle currently.*  So if you -- and if you think about what I said earlier, the transition from micro targeting to a market-based approach, that really is the key enabler, allowing us to focus on these clusters of living units instead of cherry picking and micro targeting different areas within a market.<br><br><div align="center">*    *    *</div> | Gibson | 3/29/22 |

| | | | |
|---|---|---|---|
| | [Host]: And related to the subsidies, but even in conjunction of your overall fiber deployment, supply chain and labor, we hear those 2 words a lot nowadays. And you obviously, like any other telcos, use outside labor for fiber construction, for splicing, et cetera. Are you facing any labor constraints so far? Are you anticipating? And how are you going about working on it?<br><br>[Gibson]: Yes. I mean we're not immune to supply chain challenges for sure. ***What I said earlier, though, is we started planning for these builds in the middle of last year. So we didn't really start -- we just thought about the planning once we announced that we were already kind of in the middle of the planning.***<br><br>From a labor standpoint, we have diversity, we also have internal resources that we believe that we can redeploy to help project management, engineering and as well as other activities within the business. From an equipment and supply standpoint, we placed those orders well in advance, 9 to 12 months in advance to make sure that we get in the queue early. And we have a diverse supplier set that's on the labor side and the supplier side. ***So we feel really good about where we are.***<br><br>***We're not really seeing anything today, but it's something that you definitely have to say [sic] constantly engaged in and make sure you have mitigation plans in place that we do. So again, I feel good about the – our ability to execute on the plans that we've laid out.*** But I'm sure it won't be without challenges and bits along the way. | | |
| 145 | ***If you think about what has to happen to take Fiber to the Home, you've got to do your market identification, you got to do site walks, engineering, permitting, and so all of that activity to fill the 2022 build funnel really started in early fourth quarter last year.***  And so the work to get 2022 [field] has been complete. We're waiting for permitting now. We're not waiting to order equipment.<br><br>***So any of the supplies we need to build out those markets has been ordered.***  And as soon as we get permit approvals, then we're going to be in market. ***So that's why Q1, and frankly, even Q2, you're not going to see huge numbers, but you will see a dramatic ramp in Q3 and Q4***. And importantly, as we exit this year, we will have the funnel full for next year. | Stansbury | 6/1/22 |
| 146 | Yes, ***we are getting what we need to build those markets. We're a big buyer of those supplies. So we have long memories. And our suppliers do a good job of getting us what we need, so that we can build those markets out. So I don't think that's a constraint***. You know a lot of the labor that we use is internal labor, and we're . . . | Stansbury | 6/1/22 |

| | | | |
|---|---|---|---|
| | [Analyst]: And unionized.<br><br>[Stansbury]: Yes. ***And so we're able to retrain that labor, which is important to that population.*** It's important to us. And that's allowed us as well to ***help get these markets build [sic] out, going forward.*** | | |
| 147 | ***"[O]ur Quantum Fiber build plan is ramping, and we expect momentum to continue to accelerate as we drive toward our expectation of hitting 1 million or so new fiber enablements in 2022 . . . As we see it, we are in the first inning of this exciting expansion and are laying the foundation for what we believe is a very large growth opportunity***." | Storey | 5/4/22 |
| 148 | "We expect the Quantum capital investment to be concentrated over the next several years, but we believe the capabilities we are enabling will sustain our Quantum product for years into the future . . . ***having accelerated our engineering and preconstruction work processes in the first quarter, we expect our build pace to continue to accelerate throughout the year, putting us on track to achieving our goal of 1 million or so enablements in 2022***" and "***we are pleased with our accelerating build pace and look forward to taking meaningful market share as we continue to gain scale***." | Storey | 5/4/22 |
| 149 | ***Now the last point is we have great relationships***. And so I talked to our major vendors pretty regularly, and we work with them in good times and in bad to make sure that they have accurate forecasts for our services. And so during COVID, I worked with a lot of these vendors to make sure they knew what they could expect from us. And now we're working with them to make sure that we can expect from them. So we'll continue to work through the supply chain issues. ***It's a warning flag that I want you to hear, but I don't want you to overemphasize it in that either.*** | Storey | 5/4/22 |
| 150 | "we're increasing our investments in our mass market space. We've historically built fiber to the home for about 400,000 units per year. ***We're increasing that this year to 1 million units. But we're planning to really end the year on an accelerated pace for more than 1 million units, 1.5 million or more***." | Dugan | 5/19/22 |
| 151 | "***I'd say confidence is high to get to the 1 million units this year***. But 1 thing you should recognize is that it's going to be a ramp to that . . . ***So your expectations for the first half of the year, don't be too surprised if the volumes don't look like the run rate that we're trying to get to for next year because work – the work is working its way through that pipeline***. Things that we're watching up for is certainly supply. It hasn't gotten in the way of meeting our needs this year. ***It's something that we're managing very actively and something that we think we can get through.***" | Dugan | 5/19/22 |

| | | | |
|---|---|---|---|
| | Specifically, Dugan claimed that "we're managing our suppliers there effectively" and that Lumen had confidence in its fiber suppliers to "get what we need as long as we forecast and order at the right intervals and we are doing that." | | |
| 152 | "*we feel really good about our ability to enable 1 million or so locations this year and exit the year at that faster rate [1.5 million or upwards of 2 million thereafter] that you mentioned . . . we have line of sight into reach that 1.5 million to 2 million run rate existing this year.*" | Moreau | 6/13/22 |
| 153 | "*we feel really good about our assumptions to be able to build in these dense urban clusters averaging around $1,000 per location.*" | Moreau | 6/13/22 |
| 154 | *Our Quantum Fiber build is ramping with second quarter enablements more than doubling since the fourth quarter of last year, and we expect further acceleration in the second half of 2022 and into 2023. Permitting processes for our Quantum Fiber builds haven't improved as much as we would like, and we see supply chain challenges across our business. But we have not changed our target of 1 million or so enablements by year-end.* | Storey | 8/3/22 |
| 155 | "We are excited to update you on our progress with Quantum Fiber, which is the critical growth engine for this segment. As I mentioned earlier, in just 2 quarters, we have doubled our pace of new Quantum enablements with further acceleration coming. *Our Net Promoter Score remains above 50, demonstrating the quality of our product and the easy-to-use nature of our all-digital experience.*" | Storey | 8/3/22 |
| 156 | On supply chain, Eric, you asked if is it [sic] equipment, labor or materials. The answer is yes on all 3 of them. We deal with each of them differently. But the inflationary pressures that you see, that the rest of the market sees are the same ones that we see, and they come in those 3 main areas. We've got great -- not the inflation – I'm sorry, the supply chain pressures.<br><br>We've got great relationships with our large vendors. So whether that's material vendors or equipment vendors, we've got great relationships with them. *We're working through their challenges with them, and we feel pretty good about that. And we think it's improving slightly.* But it's too early to call whether that's a blip or a trend. And we'll continue to stay very focused on that, working closely with our large suppliers and our large vendors. And we will continue to work on labor costs.<br><br>        \*   \*   \*<br><br>*With respect -- does it slow the Quantum Fiber build? I have not changed my expectations that I've given our team, okay? I still want to get to close to 1 million homes this year.* It certainly does affect us. We've talked about permitting. I mentioned it in the comments. Their labor shortages in | Storey | 8/3/22 |

| | permitting departments causes problems for us. Labor challenges in electric companies cause problems with us for pole attachments. And so there are other people's labor challenges that do cause us to slow. ***But I have not changed my targets that I've given our team internally at this point.*** | | |
|---|---|---|---|

Plaintiffs again set forth nine reasons why the foregoing statements were false and/or misleading and cite to supporting paragraphs of the ACAC. (ACAC, ¶ 157). However, the Court has considered and rejected most all of these same arguments previously. *See* discussion, *supra*.

Furthermore, through mid-year 2022, Defendants remained cautiously confident that they could exit 2022 with approximately one million more enablements, with a run rate of 1.5 million to 2 million annually thereafter. Their optimism, at least through the first and second quarters of 2022, was not misplaced because, during that period, Lumen managed to enable 130,000[36] and 185,000 homes, respectively. (Lumen's First Quarter 2022 Earnings Presentation, dated May 4, 2022; M/Dismiss, Exh. 16 [doc. # 59-18]; Lumen's Second Quarter 2022 Earnings Presentation, dated August 3, 2022; M/Dismiss, Exh. 14 [doc. # 59-16]).[37] Certainly, if enablements had continued to ramp at that same pace as they did in the first two quarters of 2022, i.e., 42 percent increase quarter on quarter, then, as forecasted, Lumen would have exited 2022 at close to one million enablements for the year, with an anticipated 1.5 million annualized run rate for 2023.[38]

---

[36] The 130,000 homes enabled in the first quarter of 2022 represented an increase in the quarterly average for the previous year where Lumen had enabled 400,000 homes for the entire year. *See* ACAC ¶¶ 57, 118.

[37] The Court may consider these documents because they accompanied the respective earnings call transcripts relied upon by Plaintiffs in the ACAC.

[38] 185,000 multiplied by 1.42 equals 262,700; 262,700 multiplied by 1.42 equals 373,034. The sum of the prior and anticipated quarters for 2022 is 950,734 (130,000 + 185,000 + 262,700 + 373,034). If the ramp up for enablements remained at 373,034 per quarter exiting 2022, then four quarters of enablements at that rate would have resulted in almost 1.5 million enablements

The question thus becomes at what point did Defendants realize that they were not going to meet their enablements guidance for the second half of 2022 going into 2023?  At the August 3, 2022 second quarter earnings presentation, the number of enablements still appeared to be on target.  However, Defendants clearly conveyed concerns with the supply chain, including equipment, labor, or materials.  Storey stated point blankly that the supply chain issues "certainly . . . affected[ed]" them, including labor shortages with permitting departments and electric companies.  Nonetheless, he maintained that he had not changed his expectations that he had given to the team to get close to one million homes that year.  Storey clearly had not given up hope to reach the internal targets that he had given his team.  Moreover, Plaintiffs have not alleged facts to show that at any time through August 3, 2022, Defendants actually knew or were reckless in not realizing and disclosing that the projected one million enablements for 2022 was out of reach.

In addition, there are no facts to plausibly suggest that Lumen had "paused" or "stopped" its fiber build-out by August 3, 2022.  First, Stansbury disclosed on December 6, 2022, that he had initiated the pause for a "few months," but "now" they were moving forward.  *See* ACAC, ¶¶ 170-171, and discussion, *infra*.  Second, the "pause" or "stop" could not have commenced earlier than August 2022 because Lumen still succeeded in enabling 195,000 locations in the third quarter of 2022.  *See* Lumen's Third Quarter 2022 Earnings Call Transcript, dated November 2, 2022; M/Dismiss, Exh. 11 [doc. # 59-13]).[39]

---

in 2023.

[39] The Court may consider the document because it is referenced in the ACAC and features prominently in Plaintiffs' claims.  *See* ACAC, ¶¶ 158-161.

Plaintiffs do not identify any statements made by Defendants between Lumen's second quarter earnings call on August 3, 2022, and its third quarter earnings call on November 2, 2022. Therefore, Defendants were under no obligation to disclose anything during the intervening period. Of course, by November 2, 2022, there was evidence that Lumen was not going to achieve its goal of one million enablements for the 2022 year. One obvious clue is that Lumen added only 195,000 enablements for the third quarter, which, while still *more* than the enablements from the prior quarter, was not at the pace needed to ramp to one million enablement by year end. *See* fn. 37, *supra*. Consequently, on November 2, 2022, Storey made it "clear" that they were not yet at the pace of build they expected or wanted. *See* ACAC, ¶¶ 158-161 and discussion, *infra*.

Upon consideration, the Court finds no material misrepresentation or omissions stemming from Defendants' statements set forth in ¶¶ 137-156. Furthermore, some of the statements represent non-actionable puffery. There are no credible facts to suggest that, through August 3, 2022, Storey or any other Defendant actually knew or was reckless in failing to disclose that the target of $1 million enablements by the end of 2022 was unobtainable. In addition, at each of its quarterly earnings presentations that were held in 2022, beginning with the fourth quarter of 2021, Lumen included an express disclaimer that its

> **forward-looking statements are not guarantees of future results and are based on current expectations only, are inherently speculative, and are subject to a number of assumptions, risks and uncertainties, many of which are beyond our control**. Actual events and results may differ materially from those anticipated, estimated, projected or implied by us in those statements if one or more of these risks or uncertainties materialize, or if underlying assumptions prove incorrect. Factors that could affect actual results include but are not limited to: our ability to successfully and timely attain our key operating imperatives, including simplifying and consolidating our network, simplifying and automating our service support systems, **attaining our Quantum Fiber buildout plans** . . . our ability to successfully maintain the quality and profitability of our existing product and service offerings and to introduce profitable new offerings on a timely and cost-

effective basis . . . **changes in our operating plans, corporate strategies**, dividend payment plans or other capital allocation plans, whether based upon changes in our cash flows, cash requirements, financial performance, financial position, market conditions or otherwise . . . **continuing uncertainties regarding the impact that COVID-19 disruptions and vaccination policies could have on our business, operations, cash flows and corporate initiatives** . . . You are cautioned not to unduly rely upon our forward-looking statements, which speak only as of the date made. We undertake no obligation to publicly update or revise any forward-looking statements for any reason, whether as a result of new information, future events or developments, changed circumstances, or otherwise. Furthermore, **any information about our intentions contained in any of our forward-looking statements reflects our intentions as of the date of such forward-looking statement**, and is based upon, among other things, regulatory, technological, industry, competitive, economic and market conditions, and our related assumptions, as of such date. **We may change our intentions, strategies or plans without notice at any time and for any reason**.

(Lumen's First Quarter 2022 Earnings Presentation, dated May 4, 2022; M/Dismiss, Exh. 16 [doc. # 59-18]; Lumen's Second Quarter 2022 Earnings Presentation, dated August 3, 2022; M/Dismiss, Exh. 14 [doc. # 59-16]; Lumen's Third Quarter 2022 Earnings Presentation, dated November 2, 2022; M/Dismiss, Exh. 12 [doc. # 59-14]) (emphasis added). Plaintiffs were on notice not to place too much stock in Defendants' forward-looking statements. Moreover, Lumen's cautionary statements were sufficiently detailed as required to for Defendants' forward-looking statements to meet the PSLRA's safe harbor exception.

Accordingly, Plaintiffs have not alleged facts to plausibly support scienter, either individually or holistically.

G.    Defendants' Material Misrepresentations Are Partially Corrected on November 2, 2022

| ACAC ¶ | Alleged Misstatement/Omission | Speaker | Date |
|---|---|---|---|
| 158 | I'd like to talk more specifically about our digital transformation and the foundation we laid for our business going forward. ***Digital transformation is not a destination, but it's a journey.*** I'm very pleased with the significant strides we've made in driving simplicity and automation into our business. We are now easier to do business with, have | Storey | 11/2/22 |

| | | | |
|---|---|---|---|
| | greater efficiency and are evolving the way our customers interact with and experience our capabilities.<br><br>Our customer experience is better than ever and continues to improve as demonstrated by our very high NPS and customer e-scores for both Quantum Fiber and the upper end of our enterprise customer base. ***Although not yet where we want to be***, our results with our mid-market customers clearly show ***we're making progress*** there as well.<br><br>As I say to our team all the time, ***we have much more to do***, and I'm incredibly proud of their accomplishments so far. Top line growth is our principal focus, but ***we cannot overstate the importance of these transformation efforts in delivering the experience our customers want and driving the efficiencies we need to grow the profitability of our business***. | | |
| 159 | We have a powerful and robust fiber network complemented with an increasingly deep set of adjacent capabilities like orchestration, interacting with our customers' businesses via machine-to-machine applications rather than phone calls or e-mails. ***The market for these capabilities is still in the early stages of growth*** that I believe the ***foundation to Lumen to be a market leader has been laid and the opportunity for growth is significant***.<br><br>On the Mass Markets side, we have ramped our investment in the Quantum Fiber footprint and our all-digital service delivery platform. We've doubled the number of new enablements per quarter over last year. ***So let me be clear, we are not yet at the pace of build we expect or want. We will continue to ramp our enablements and overcome the supply chain, labor and inflationary constraints we've seen***. | Storey | 11/2/22 |
| 160 | "[W]e slowed some of our [digital] transformation efforts" while undertaking a series of divestiture transactions. | Stansbury | 11/2/22 |
| 161 | If you look at our fiber enablement, ***we're not doing it as fast as we want to do***. So let me lead with that. ***We're not doing it as fast as we want to be deploying new enablement. There are a lot of things that go into that supply chain constraints, labor shortages, inflationary pressures and those types of things.*** And we'll continue to work through those. ***So I'm not terribly worried about it, but we'll work through them***. | Storey | 11/2/22 |

Plaintiffs included these paragraphs in their section on Defendants' alleged material misrepresentations and omissions, but do not make any arguments regarding their falsity or misleading nature. Certainly, the statements themselves do not evidence any material

misrepresentations or omissions.  Like Plaintiffs, the Court includes the foregoing statements for

context.

> However, during the earnings call, Stansbury further explained that,
>
> [d]uring the quarter, total enablements were approximately 210,000, with approximately 195,000 of those enabled locations in our 16 routine states, bringing the total enabled locations in the retained states to 3 million as of September 30 with approximately 290,000 total locations enabled in the SellCo footprint.
>
> Enabling locations is hard work and the permitting process as well as third-party labor supply have been a significant headwind for us this year. While we are not satisfied with our enablement pacing year-to-date, it is important to note that we stood up a new factory internally as we pivoted from micro-targeting to a market-based approach. This includes an end-to-end process from planning to engineering, to construction and finally enablement. We have learned a lot through this process and those lessons will serve us well as we continue to work on Quantum built.
>
> During the quarter, we added 31,000 Quantum Fiber customers on a reported basis, an improvement from last quarter as we continue our pivot to a market-based approach and adjust our go-to-market strategy. This brings our total Quantum Fiber subscribers to 889,000, with 813,000 of the subscribers within the 16 retained states.

(Lumen's Third Quarter 2022 Earnings Call Transcript, dated November 2, 2022; M/Dismiss,

Exh. 11 [doc. # 59-13]).[40]

In addition, as they have done throughout the ACAC, Plaintiffs strategically dice and

splice excerpts from this same Fourth Quarter of 2022 earnings call as evidence of further

misrepresentations and omissions by Defendants, *see* discussion, *infra*,  notwithstanding the

above-quoted frank "corrections" and disclosures.

H.    <u>Defendants Continue to Make Material Misrepresentations and Omissions</u>

| ACAC ¶ | Alleged Misstatement/Omission | Speaker | Date |
|---|---|---|---|

---

[40] The Court may consider the document because it is referenced in the ACAC and, relied upon by Plaintiffs' to support their claims.  *See* ACAC, ¶¶ 158-161.

| 164 | "We have [sic] strong conviction with focusing on growing markets where we can create dense urban clusters, and supporting all of the communities within those clusters ***is the best approach to maximize our investments and significantly expand the reach of our Quantum Fiber offering.***" | Storey | 11/2/22[41] |
|---|---|---|---|
| 165 | I don't think this changes the goal. This is obviously a multiyear project, doing everything and, as Jeff mentioned earlier, ***to go as fast as we can.*** Obviously, there's some near-term headwinds. ***But at this point, I don't think that changes our goal in terms of where we want to go or what we think we can do. it's [sic] really about all hands on deck right now to see what we can do*** given permitting and labor issues to get as many enablements in the ground as we can, as fast as we can. | Stansbury | 11/2/22 |
| 166 | There was extensive conversation with the Board leading up to the close of that deal. Kate was involved in that before she joined, so that she knew what was coming and had input to that decision. ***And really, what it all boiled down to is we've got a commitment on Quantum Fiber, and that opportunity is real***. We've got an enterprise business that in large enterprise and public sector is performing well, but that also requires capital. And really, over the next 4 to 5 years, ***we're in investment mode while we position the company for long-term strength and returning capital to shareholders***. | Stansbury | 12/1/22 |
| 167 | If you think about the consumer business for a second, when you think about Quantum Fiber, the whole mindset about, hey, cannibalization is bad, is exactly why we have roughly 10% copper penetration in the markets where we are and ***why we're out doing Quantum today.*** That mindset cannot influence the way we think about the enterprise segment. | Stansbury | 12/1/22 |
| 168 | [Analyst]: So I definitely wanted to talk about Quantum Fiber, fiber to the home has been a big topic of discussion at this conference. So you've called out a variety of labor, supply chain, permitting challenges as part of your Quantum Fiber build. And I know aspirationally in the past, you've talked about wanting to get to a run rate of building out 1.5 million to 2 million locations on an annual basis, so maybe you could talk about the pathway or anything on the timing to get there? And whether you see some light at the end of the tunnel on working through some of these supply chain challenges?

[Stansbury]: Yes. So when I came in to Lumen, my biggest concern is that we – I didn't want us just to be focused on number of enablements and cost per enablement, right? We need to be focused on good enablements, right? Enablements | Stansbury | 12/1/22 |

---

[41] Plaintiffs return to Lumen's Third Quarter of 2022 Earnings Call to selectively excerpt statements out of context.

| | that allow us to generate solid penetration as we go forward. So there's no point in building fiber if a customer doesn't want that fiber, right*? And so we have gone through extensive work to make sure that those are the kinds of enablements we're building.  So that's a real thing.  I think there's been very good thinking that's been done on that*.<br><br>And then yes, that is -- you layer on top of that some of the issues we've had on the supply chain side, and that's where we are today.  So I'm not ready to give a time frame on when we get to necessarily those larger numbers*.  I do think that the scaling of the factory, if you will, is moving in the right direction, but it's not going to be quick.* It's -- when you look out in terms of engineering and permitting.  At any point in time when you're having that discussion, you're really talking about something that's going to take place in 9 months. And so I think we're doing the right things, but I think it's going to be a little while until we see that really start to ramp. | | |
|---|---|---|---|
| 169 | "I also would say that even with our focus on making sure we're building the right enablements, these are growing markets. And they're definitely –we're in Western markets, there's definitely a shift west. I think that will continue to create future opportunity that we can't really measure today. *But as building continues* and population shift, that's in our favor*."* | Stansbury | 12/1/22 |
| 170 | *So there's full transparency*. There's the external factors with tough labor markets and permitting, but there's also some internal stuff as well.  And when I came in, I wanted to make sure that the investments that we were making were in the right markets. We obviously, when we go into a market, we want to cover it well. But we want to make sure that long term, we're going to earn a return on that. *And so we hit pause to double down.*  I wanted to make sure there was financial rigor around that. And as a result, we did make some adjustments in terms of what to do and what not to do. And so that slowed us somewhat. *I would say the good news is, is I think it put us on a better path as we go forward.* The bad news is it slowed us down. | Stansbury | 12/6/22 |
| 171 | I would say that the planning – again, *we had a bit of a shift because I hit pause for a few months, but we now know exactly where we're going, what we're doing and how we're going to go about that*. So we'll give more color as we go forward. *But I think there's no more debate as to what are the right areas to focus on. It's now ongoing and executing*. | Stansbury | 12/6/22 |
| 172 | And so right now, the #1 focus is growth. Let's make sure we're investing in smart areas and doing the right thing, like *the hitting pause on Quantum to make sure that we were building the right markets*. But then from there, we go. So | Stansbury | 12/6/22 |

| | the real focus today is making sure that we understand where the gaps are, where we need to invest and then building that into our guidance for the next year. So that's what we're working on. | | |
|---|---|---|---|
| 173 | when specifically asked by Batya Levi, Executive Director and Research Analyst, at UBS Investment Bank, about "the cost to connect" and whether "$1,000" was "in the ballpark," Defendant Stansbury responded, "***That's in the ballpark. Yes***" before noting, "[a]nd again, there's this huge variation to that, we're depending on whether it's off of a pole or it's subterranean." | Stansbury | 12/6/22 |

Plaintiffs contend that the foregoing statements are false and misleading because they failed to disclose that (1) Lumen had ***stopped***—not paused—investment in fiber builds for the fourth quarter of 2022, ¶ 85; (2) Lumen's goals for the Quantum Fiber buildout were now 8-10 million homes and businesses, down from the over 12 million locations the market had previously expected, ¶ 85; and (3) the Company relied upon unrealistic cost estimates that were based on a "gold-rush mentality as it relates to fiber to the home," ¶¶ 87-88. (ACAC, ¶ 174).

The Court has addressed Plaintiffs' "gold-rush mentality" argument previously and need not do so again here. *See* discussion, *supra*. The Court also readily rejects Plaintiffs' attempt to draw a negative inference from Stansbury's use of the word "pause" instead of "stop" in the context of fourth quarter enablements. It is manifest that Stansbury did not intend any significant distinction between the words. In fact, even after Johnson referred to the fourth quarter reevaluation as a "stop" at the February 7, 2023 earnings call, Stansbury continued to refer to the stoppage as a "pause," not only during the February 7, 2023 earnings call, but yet again in March 2023. *See* discussion, *supra*. Moreover, enablements plainly were not halted throughout the fourth quarter because Lumen still managed to enable 97,000 homes during that period.

As for the decision to reduce the projected Quantum Fiber buildout from 12 million homes to 8-10 million homes, there are no facts to confirm that this decision had been made by early December 2022 when Stansbury spoke. At that time, he explained that they would provide

94

"more color" as they went forward and that they needed to focus on where to invest and then build that into their guidance for the next year.  (ACAC, ¶¶ 171-172).  Further, overall, not only were Stansbury's comments in early December 2022 negative, they did not include any specific numbers or disclosures.  Under these circumstances, the Court finds no material misrepresentation or omissions stemming from Defendants' statements set forth in ¶¶ 164-173. Accordingly, Plaintiffs also have not alleged facts to support scienter either individually or holistically.

I.  <u>Defendants' Material Misrepresentations and Omissions Are Partially Corrected on February 7, 2023</u>

| ACAC ¶ | Alleged Misstatement/Omission | Speaker | Date |
|---|---|---|---|
| 175 | *Second, let's talk about our Quantum pacing. As we've said previously, we hit the pause button during the fourth quarter. Now to be frank, it was more of a stop button than a pause button, which impacted our Quantum metrics for the quarter*. That said, the evaluation we undertook was absolutely critical to position Quantum for long-term success. By focusing on all metrics and not just the location enablement goal, we've established a higher IRR, more predictable long-term outcome for this exciting project.<br><br>A natural outcome of our assessment of Quantum is a more focused build target where we're able to achieve proper returns for shareholders. We believe the overall Quantum enablement opportunity is 8 million to 10 million locations. *The engine is revving back up, and we're aggressively working to ramp our build activities in 2023*.  And to that end, we made an important change during the fourth quarter to separate our operational activities like planning, engineering and all field operations between mass markets and business.<br><br>Maxine Moreau, our President of Mass Markets, now has top to bottom operational and P&L responsibilities. *This is a significant change internally that I expect will improve our Quantum deployment pacing, but it will take time to reach scale*. My expectation is that later this year, you'll see significant improvement in our execution on enablement. | Johnson | 2/7/23 |
| 176 | As Kate discussed, *we have made significant changes in how we are approaching the Quantum Fiber opportunity*. | Stansbury | 2/7/23 |

| | This was a thoughtful evaluation that will result in a significant improvement in long-term shareholder value. That said, *our location and subscriber results were impacted by the pause we had in place through our evaluation.  This change in strategy will continue to impact Quantum metrics until we get to scale with our new plan, which we expect to occur late this year.*  During the quarter, total enablements were approximately 97,000, bringing the total enabled locations to over 3.1 million as of December 31.  During the quarter, we added 19,000 Quantum Fiber customers, and this brings our Quantum Fiber subscribers to 832,000. | | |
|---|---|---|---|

Plaintiffs included these paragraphs in their section on Defendants' alleged material misrepresentations and omissions, but do not make any arguments regarding their falsity or misleading nature.  Certainly, the statements themselves do not evidence any material misrepresentations or omissions.  Like Plaintiffs, the Court includes the foregoing statements for context.

## X.      Additional Evidence of Scienter

Having determined that Plaintiffs do not allege facts to plausibly show that any Defendant made a statement that was misleading as to a material fact, the Court need not reach Plaintiffs' additional evidence of scienter.  However, having proceeded this far, the Court briefly will address these additional arguments.

### A.  Core Operations Theory

Plaintiffs contend that Quantum Fiber was so critical to Lumen's success during the Class Period that the mispresented and omitted information at issue would have been readily apparent to Lumen and the Individual Defendants.  The Fifth Circuit has recognized that, although an officer's position with a company does not suffice to infer scienter, "special circumstances," combined with the officer's position, may result in a strong inference of scienter.  *In re: Six Flags*, 58 F.4th at 219 (citing *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 958-959 (5th Cir. 2016)).  Pertinent factors that "might tip the

scales" include "(1) the company's size; (2) whether the transaction at issue was critical to the company's continued vitality; (3) whether the misrepresented information would have been readily apparent to the speaker; and (4) whether the defendant's statements were internally inconsistent with one another." *Id.* (citation and internal quotation marks omitted).

Applying the foregoing factors to the case at hand, the Court takes judicial notice that Lumen is a large company with at least 29,000 employees. *See* Pl. Opp. Brief, pg. 14 [doc. 70]. at 959. Furthermore, while Quantum Fiber within Lumen's Mass Markets segment represented a little more than three percent of Lumen's total revenue for the third quarter of 2022,[42] the ACAC is replete with statements by Defendants touting the significance of Quantum Fiber for Lumen's future performance. *See, e.g.*, ACAC, ¶¶ 179, *et seq*. Certainly, given Lumen's otherwise consistently disappointing earnings reports, Defendants naturally were interested in emphasizing any ray of light on the ever-darkening horizon. Stated differently, Quantum Fiber was an important aspect of Lumen's future growth prospects. *See In re: Six Flags*, 58 F.4th at 29. Nonetheless, in this case, the Court has not recognized any information that was misrepresented or omitted or any statements made by a Defendant that were internally inconsistent. Therefore, the Court finds that Plaintiffs' core operations theory does not provide support for a strong inference of scienter.

B. Storey and Dev Departures

Plaintiffs contend that the timing of the departures of Lumen's CEO and CFO within six months of one another and shortly after Defendants began disclosing supply chain and labor issues further supports a strong inference of scienter. (ACAC, ¶¶ 195, *et seq*.). However, the

---

[42] Lumen's Third Quarter 2022 Earnings Presentation, dated November 2, 2022; M/Dismiss, Exh. 12 [doc. # 59-14])

resignation of officials is, in and of itself, unavailing as proof of the commission of fraud when

no specific evidence indicates the resigning officials or their replacements knew of any material

misrepresentations or omissions or that such fraud was the reason for their resignations. *See In

re ArthroCare Corp. Sec. Litig.*, 726 F.Supp.2d 696, 725 (W.D. Tex. 2010) (citing *Southland

Securities Corp.*, 365 F.3d at 383). Here, Plaintiffs have not alleged requisite predicate facts to

infer scienter from the resignations of Storey and Dev. *See Southland Securities Corp.*, 365 F.3d

at 383 and discussion, *supra*.

C.  Certifications Pursuant to the Sarbanes-Oxley Act of 2002

Plaintiffs contend that scienter may be inferred from the fact that Defendants Storey,

Dev, and Stansbury certified pursuant to the Sarbanes-Oxley Act of 2002 that they were

"responsible for establishing and maintaining disclosure controls and procedures," which ensures

that material information relating to the registrant is made known to them. (ACAC, ¶ 198).

"Under the Sarbanes–Oxley Act, senior executives of public companies must certify the

accuracy of quarterly and annual financial reports." *In re: Shaw*, 537 F.3d at 544–45 (citing 15

U.S.C. § 7241(a)). However, "a Sarbanes–Oxley certification, standing alone, is not indicative

of scienter." *Id*. (citation omitted). Instead, there must be "facts establishing that the officer

who signed the certification had a reason to know, or should have suspected, due to the presence

of glaring accounting irregularities or other red flags, that the financial statements contained

material misstatements or omissions." *Id.* (citation and internal quotation marks omitted).

Plaintiffs have not made the requisite showing here.

D.  Motive

Plaintiffs do not address motive in the ACAC. However, they do discuss motive in their

response to the motion to dismiss. Motive is a critical, but non-essential component of a

successful claim for securities fraud. *Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*, 935 F.3d 424, 431 (5th Cir. 2019) ("Pier 1 Imports") (citation omitted). "A failure to show motive means that 'the strength of the circumstantial evidence of scienter must be correspondingly greater.'" *Id.* (citations omitted). "To demonstrate motive, plaintiffs must show concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Id.* (citations and internal quotation marks omitted).

Plaintiffs contend that Defendants were under immense pressure to deliver on their promised results for Quantum Fiber. However, a desire to protect one's job is not the type of motive that supports a strong inference of scienter. *Pier I Imports*, 935 F.3d at 431 (citations omitted). Furthermore, merely alleging facts that lead to a strained and tenuous inference of motive is insufficient to satisfy the pleading requirement.'" *In re: Shaw,* 537 F.3d at 543 (citation omitted). Accordingly, the Court rejects Plaintiffs' motive argument as creating an inference of scienter.

## XI.  Scheme Liability

Plaintiffs allege that Defendants engaged in a scheme to defraud investors by knowingly and recklessly omitting the true state of Lumen's Quantum Fiber rollout. (ACAC, ¶ 199).

Claims under Rule 10b-5(a) and (c) are referred to as "scheme liability" claims because they are based on deceptive *conduct*, while Rule 10b-5(b) claims are based on deceptive *statements* or *omissions. Sec. & Exch. Comm'n v. Verges,* Civ. Action No. 23-2146, 2024 WL 531260, at *4 (N.D. Tex. Feb. 9, 2024) (citations omitted). "Scheme liability requires proof of participation in an illegitimate, sham, or inherently deceptive transaction where the defendant's conduct or role has the purpose and effect of creating a false appearance." *Id.* (citations omitted). Thus, to plausibly plead scheme liability, Plaintiffs must allege sufficient facts for the

court to draw the reasonable inference that the defendant in question "(1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter." *Id*.

Here, however, Plaintiffs have not alleged facts to support any of the foregoing elements of their scheme liability claim. Instead, Plaintiffs essentially argue that their scheme liability allegations necessarily survives the motion to dismiss because Defendants did not address it in their opening brief. However, Defendants' motion seeks dismissal of Plaintiffs' entire complaint and they discussed scheme liability in their reply brief. Plaintiffs could have sought leave to file a sur-reply to address that argument, if they had possessed anything meaningful to add. They did not do so, however. Accordingly, the Court finds that Plaintiffs fail to allege facts to state a claim for relief for scheme liability.

## XII.    Controlling Party Liability

Section 20(a) of the Securities Exchange Act of 1934,[43] extends liability to any person who "controls" a person who is subject to primary liability under the respective statutory scheme. Under the act, "controlling person" liability requires, "(1) a primary violation by a controlled person; and (2) direct or indirect control of the primary violator by the defendant." *See Trendsetter Investors, LLC v. Hyperdynamics Corp.*, 2007 WL 172627, at *14-15  (S.D. Tex.

---

[43]  Section 20(a) states that

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t.

Jan. 18, 2007) (discussing liability under § 20(a)) (citation omitted).  Status or position alone does not automatically confer controlling person liability.  *Dennis v. General Imaging, Inc.*,  918 F.2d 496, 509 (5th Cir. 1990).  Rather, the controlling person must have at least exercised some influence over the direction of the firm.  *Id*.

However, "[c]ontrol person liability is secondary only and cannot exist in the absence of a primary violation."  *Southland Sec. Corp.*, 365 F.3d at 383 (citation omitted).  Because the ACAC fails to state a claim for primary liability under the 1934 Act, *see* discussion, *supra*, there can be no controlling party liability under § 20(a), and dismissal of the § 20(a) claim is required.  *In re:  Shaw*, 537 F.3d at 545.

## Conclusion

For years prior to the Class Period, Lumen's revenues were steadily declining.  (ACAC, ¶¶ 41-43).  Lumen knew that its revenues would continue to decline without major changes due to the fact that its business model was in jeopardy from the decreasing need for its many legacy services.  *Id*.  Accordingly, Lumen made the calculated effort to jump start its revenue prospects by emphasizing its new Quantum Fiber offering, a fully digital platform for delivering fiber-based products and services to residents and small businesses.  *Id*., ¶ 46.

During the Class Period, Lumen *increased* its number of fiber-enabled homes from approximately 1.1 million units to *over 3.1 million units*.  Nonetheless, because of supply chain, increased labor costs, and concerns about the penetration rate, Lumen ultimately did not enable as many homes at the pace Defendants had predicted or at the cost per enablement initially envisioned.  In addition, Lumen reduced the target of homes that it intended to enable.  Defendants explained that they prudently reduced the pace and number of enablements to ensure

that its penetration rates were high enough to justify the expense.  As at least one Defendant pointed out, enablements, without resulting subscriptions, is a waste of resources.  Furthermore, the money that otherwise would have been used to pay for enablements *remained available for Lumen's other strategic interests*, e.g., debt retirement.

Using other alleged issues with the Quantum Fiber roll-out identified by confidential witnesses in the marketing and customer experience departments, Plaintiffs have taken Defendants to task for conserving Lumen's capital and attempted to show that Defendants knew or were reckless in not knowing, in advance, that their projections would not come to pass. However, after discounting the extraneous, unsubstantiated, and/or immaterial statements from the confidential witnesses, the ACAC remains bereft of facts to plausibly show that Defendants made material misrepresentations or omissions, that they knew or were reckless in not knowing, were false *at the time they were made*.

The Court certainly sympathizes with Plaintiffs' losses associated with Lumen's stock. Stocks, however, are inherently risky instruments.  Therefore, so long as company executives are not playing dirty pool, losses come with the territory.  In this case, Plaintiffs' counsel made an exhaustive effort to try and salvage a playable hand from the limited cards they were dealt. Despite the slicing and splicing of statements and company goals, they failed to meet their pleading burden.  Ultimately, the Court is unable to plausibly infer any ill motive or intent stemming from subsequent revisions to Lumen's Quantum Fiber enablement guidance as a result of extraordinary supply chain issues and labor shortages that caused delays and increased costs. The same goes for Defendants' decision to reduce the pool of enablements in an effort to preserve the Company's capital and to ensure shareholder return.

In short, the undersigned finds that Plaintiffs do not state a plausible claim for relief against Defendants.  Furthermore, there is no reasonable expectation that discovery will reveal evidence to support the myriad missing elements of their claims.  *See Twombly*, 550 U.S. at 556.

For the reasons stated,

IT IS ORDERED that Defendants' motion for submission of affidavits [doc. # 54] and motion for additional equitable relief [doc. # 66] is DENIED and that the motion to take judicial notice [doc. # 61] is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER RECOMMENDED that Defendants' motion to dismiss for failure to state a claim upon which relief can be granted [doc. # 59] be GRANTED and that Plaintiffs' claims against all Defendants be DISMISSED WITH PREJUDICE, in their entirety.  FED. R. CIV. P. 12(b)(6).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL**

**FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 30th day of September, 2024.

_____

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE